Anna Sortun, OSB No. 045279
  Direct:  503.802.2107
  Email:  anna.sortun@tonkon.com
Steven M. Wilker, OSB No. 911882
  Direct:  503.802.2040
  Email:  steven.wilker@tonkon.com
Paul Balmer, OSB No. 203429
  Direct:  503.802.5745
  Email:  paul.balmer@tonkon.com
Gracey Nagle, OSB No. 215255
  Direct:  503.802.5753
  Email:  gracey.nagle@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779
    *Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| OREGON COUNCIL FOR THE HUMANITIES d/b/a OREGON HUMANITIES, a nonprofit corporation; FEDERATION OF STATE HUMANITIES COUNCILS, a nonprofit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DOGE SERVICE, a component of the Executive Office of the President; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; NATIONAL ENDOWMENT FOR THE HUMANITIES, an independent federal agency, and its advisory council NATIONAL COUNCIL ON THE HUMANITIES; MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities, <br><br> Defendants. | Civil No. 3:25-cv-829 <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**INTRODUCTION**

**"State and jurisdictional humanities councils are the public humanities in action."**

1.      Financial support from state and jurisdictional humanities councils reaches nearly every corner of every state and jurisdiction of the United States, enabling our Nation to preserve and honor the stories, cultures, ideas, practices, and experiences of all Americans. The National Endowment for the Humanities ("NEH") has funded our state and jurisdictional councils for the past half-century with broad, bipartisan support.

2.      The United States DOGE Service ("DOGE") brought the core work of those councils to a screeching halt in March and April 2025 when DOGE gutted the NEH and terminated almost all grants issued to the state and jurisdictional councils by the prior Administration with no reasoned analysis and with total disregard for the Congressionally mandated role of councils: to ensure that humanities programs reach every part of the United States.

3.      We ask the Court to stop this imminent threat to our Nation's historic and critical support of the humanities by restoring funding appropriated by Congress.  This lawsuit challenges the disruption and attempted destruction, spearheaded by DOGE, of the congressionally established federal-state partnership between the NEH and the fifty-six state and jurisdictional humanities councils created under federal statutes and funded by Congress.

***The Background***

4.      In 1965, Congress declared that "[t]he arts and the humanities belong to all the people of the United States" and accordingly established the NEH.  20 U.S.C. § 953(a); § 956.

5.      According to its mission statement, "[b]ecause democracy demands wisdom, the NEH serves and strengthens our republic by promoting excellence in the humanities and conveying the lessons of history to all Americans."[1]

---

[1] About the National Endowment for the Humanities, https://www.neh.gov/about (last visited May 14, 2025).

6.      Consistent with its mission, and with historically bipartisan support from Congress and administrations of both political parties, the NEH has funded humanities programs throughout the country since 1965.

7.      In 1972, Congress amended the NEH statutes to provide for the creation of a grants-in-aid programs in each of the states and territories of the United States. From 1972 forward, the NEH has funded state and jurisdictional humanities councils through congressional appropriations to the federal agency.

8.      The NEH statutes provide that states and jurisdictions of the United States shall receive NEH funding by establishing grant recipient organizations with board members appointed by an officer or agency of such state. *See* 20 U.S.C. § 956(2)(B).  Each of the states and territories whose humanities councils are involved in this litigation have formed Section 501(c)(3) nonprofit state humanities councils, most of which are members of Plaintiff Federation of State Humanities Councils ("Federation").

9.      For example, in 1971, Oregon created the Oregon Council for the Humanities, doing business as Oregon Humanities ("Oregon Humanities) as a Section 501(c)(3) to distribute NEH funds to public humanities projects in communities all over Oregon.  The Governor of Oregon appoints up to 25% of the members to Oregon Humanities' board of directors. As such, Oregon Humanities is funded by the NEH under 20 U.S.C. § 956(2)(B). Each of the other states and jurisdictions of the United States also has a 501(c)(3) humanities council and all but two humanities councils are members of the Federation.

***NEH Funding Preserves the History of our Cultures.***

10.      "[T]he humanities explore, interpret, and preserve the diversity of human cultures, ideas, practices and experiences, past and present. They are the languages, religions, laws,

philosophies, and customs that make us distinct. They are our history and our cultures, the ideas and movements that have shaped societies throughout time."[2]

11.    From Mississippi to South Dakota, Maine to California, the Northern Mariana Islands to Idaho, and places in between, NEH funding flows to state and jurisdictional humanities councils who in turn support a multitude of local grass roots public humanities programs throughout the Nation.  According to NEH, "[s]tate and jurisdictional humanities councils are the public humanities in action."[3]

12.    Indeed, here in Oregon, NEH funding helps fund humanities programming in every corner of the state—grants for rural libraries in communities such as Burns, Joseph, Blue River, Newport, and Forest Grove; funding for youth-led conversations about mental health in Medford; funding for storytelling projects led by Nez Perce Wallowa Homeland; the publication of a widely-distributed *Oregon Humanities* magazine featuring stories from all over the state; and so much more.

13.    NEH funding is critical to the survival of state and jurisdictional humanities councils.  By statute, NEH funds a large portion of the cost of activities that meet the NEH statutory criteria for each state and jurisdictional council. 20 U.S.C. § 956(f)(1).

14.    NEH manages its relationships with the Federation and the member state and jurisdictional humanities councils through its Office of Federal/State Partnership ("Fed/State"). Fed/State acts as the liaison between the NEH and the nonprofit network of state and jurisdictional humanities councils, including the Federation.

***NEH Funding to the States & Jurisdictions is Mandatory***

15.    NEH funding for state and jurisdictional councils is mandatory. *See, e.g.*, 20

---

[2] About the National Endowment for the Humanities, https://www.neh.gov/about (last visited May 14, 2025).

[3] Federal-State Partnership One Page Description, https://www.neh.gov/sites/default/files/inline-files/Federal-State%20Partnership_one-page%20description_2020.pdf (last visited May 14, 2025).

U.S.C. § 956(4).  Even NEH's website describes it as such: "**[b]y congressional mandate**, [NEH] provides general operating support awards to support public humanities programming in the 56 states and jurisdictions. Fed/State works with the designated humanities councils in each state and jurisdiction. The councils are Fed/State's sole awardees."[4]

16.    Fed/State provides such general operating support awards and other grant funding to the Federation's members "in order to bring humanities education, lifelong learning, and public humanities programming to communities across the country. Fed/State collaborates with [the Federation's members] to advance public understanding of the humanities, while enhancing public awareness of, access to, and support for the humanities on a local, grassroots level." [5]

17.    Each fiscal year, Congress appropriates funds for the NEH to carry out its statutory functions, including awarding grants. Appropriations to state and jurisdictional councils are delineated in each fiscal year appropriation bill.

18.    In Fiscal Year 2024, for example, Congress appropriated $207 million to NEH, of which $65 million was directed to the councils.[6]  The statutes provide formulas for allocating the Fed/State grant funding among the state and jurisdictional councils.  For one example, 44% "of [certain fiscal year appropriations] **shall be** allotted in equal amounts among the States and grant recipients which have plans approved by the Chairperson [of NEH]" and 22% "of [certain fiscal year appropriations] shall be allotted [in consistent with population to] the States and grant recipients which have plans approved by the Chairperson [of NEH]."  20 U.S.C. § 956(f)(4)(B)&(C).

---

[4] National Endowment for the Humanities: Office of Federal/State Partnership, https://www.neh.gov/divisions/fedstate (last visited May 14, 2025) (emphasis added).

[5] *Id.*

[6] National Endowment for the Humanities: FY 2024 Appropriations, https://www.neh.gov/sites/default/files/2024-08/FY%202024%20Appropriations%20Breakdown%20New%20Logo%20small.pdf (last visited May 14, 2025).

***NEH Funding is in Imminent Jeopardy.***

19.     The critical work of the NEH and its congressionally mandated financial support of state and jurisdictional humanities councils is now in jeopardy. Since the first week of April 2025, the current Administration and its United States DOGE Service have engaged in a concerted effort to disrupt and destroy the work of the NEH and the Fed/State Office. These efforts are unlawful, and Plaintiffs bring this lawsuit to seek relief for the immediate harms these efforts are causing to the Federation, its members, and those members' many grant recipients.

20.     Defendants' destructive efforts have taken the form of eliminating all but one staff person from the Fed/State office; across-the-board delays in the review and approval of otherwise approved grant reimbursements; delays and changes in pending grant applications; widespread terminations of already-issued grants without notice or appeal opportunities; and arbitrary and capricious changes to grant application processes and procedures.  Plaintiffs challenge all of these unconstitutional disruptions under the Administrative Procedures Act (APA).

21.     Defendants' actions also contravene the separation-of-powers constraints on the Executive Branch—and so also violate the Constitution. The Constitution grants Congress—not the President—the power to create and prescribe the duties of federal agencies, and Congress maintains the exclusive power of the purse in directing how federal funds must be spent.  The NEH may not refuse to spend funds that Congress has appropriated for state and jurisdictional humanities councils.

22.     The challenged delays and grant terminations have caused—and, if left unchecked, will continue to cause—direct, immediate, significant, and irreparable harm to the Federation and its members.

23.     The Federation and its members are collectively awaiting NEH's decisions on hundreds of thousands of dollars of requested humanities grants, including funds already appropriated by Congress.  And now, the NEH has ostensibly terminated general operating and support grants *already issued* to the Federation's members, clawing back millions of dollars (and

PAGE 6 – COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

counting) in already-awarded money. The result of these disruptions has been devastating to the Federation's members.

24.    State and jurisdictional humanities councils have terminated staff, cancelled planned events with community groups, ended support for libraries, schools, and families, terminated reading and writing programming, history programs, and more. Several state and jurisdictional humanities councils are at risk of closing permanently.

25.    The Federation itself will be damaged by loss of member dues and risks closing due to lack of funding.

26.    For all these reasons, Plaintiffs seek relief from this Court. The Court should order the NEH to: undertake the grant-application review process as the law requires; continue funding the Federation's members with the funds appropriated by Congress; apply the statutory criteria when making grant determinations; process advance and reimbursement applications for funding in normal course; and provide notice and an opportunity to cure and/or to challenge NEH decisions as required by law. The Court should set aside the NEH's unlawful termination of the Federation and its members' already-issued grants.

## JURISDICTION AND VENUE

27.    This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331; because Defendants are United States officials, 28 U.S.C. § 1356(a)(2); and because this case arises under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.

28.    This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

29.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendants are federal agencies and officers sued in their official capacity. Plaintiff Oregon Council of Humanities ("Oregon Humanities"), also a member of Plaintiff Federation of State Humanities Councils, is a resident of this judicial district.

**PARTIES**

30.    Plaintiff Oregon Humanities is a nonprofit corporation created in 1971 to distribute NEH funds to public humanities projects in communities all over Oregon.  The NEH is Oregon Humanities' largest funder and oldest partner.  Oregon Humanities is also a member of the Federation.

31.    Founded in 1977, Plaintiff Federation of State Humanities Councils is a nonprofit organization whose members include all but two of the 56 state and jurisdictional humanities councils.[7]  Through advocacy, events, partnerships, and shared resources, the Federation unites the work and voices of our Nation's humanities councils.  Its mission is to advocate for increased investment in and engagement with the national network of humanities councils and to support, connect, and amplify the work and voices of its members, demonstrating the councils' value for communities and their collective impact on civic health and cultural vibrancy.  Both the Federation and its members receive grant funding directly from the NEH.  As described in more detail below, the Federation and its members have been substantially injured by the recent actions of, or in the name of, NEH.

32.    Defendant United States DOGE Service ("DOGE") is a component of the Executive Office of the President established by Executive Order 14158 on January 20, 2025.

33.    Defendant Amy Gleason is the Acting Administrator of the United States DOGE Service and is the DOGE's highest ranking official. As such, she is responsible for activities of the organization. She is sued in her official capacity only.

34.    Defendant National Endowment for the Humanities is an agency of the United States government.  The National Council on the Humanities is an advisory council "established in the National Endowment for the Humanities" pursuant to 20 U.S.C. § 957.

---

[7] National Endowment for the Humanities: Directory of State Humanities Councils, https://www.neh.gov/sites/default/files/inline-files/Directory%20of%20State%20Humanities%20Councils%202021%20%283%29.pdf (last visited May 14, 2025).

35.     Defendant Michael McDonald is the Acting Chairman of the National Endowment for the Humanities.  Defendant McDonald is a member of the National Council on the Humanities.  He is sued in his official capacity only.

## FACTUAL AND LEGAL BACKGROUND

### "Democracy demands wisdom."

I.     **Congress Establishes NEH**

36.     Finding that "[t]he arts and the humanities belong to all people of the United States," 20 U.S.C. § 951(1), Congress created the NEH and its sister agency, the National Endowment for the Arts ("NEA"), in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA" or "the Act"). Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).

37.     In establishing the NEH, Congress found that "it is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations." *Id.* § 951(5). Congress believed that the federal government has a key role in "help[ing] create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." *Id.* § 951(7).

38.     Accordingly, Congress established the NEH to provide funding for organizations and individuals involved in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. § 956.

39.     Congress viewed this directive as a broad one, meant to fund a wide range of projects and not to promote a singular viewpoint, and to fund traditionally underrepresented recipients. *See* 20 U.S.C. § 956(c).

40.     To that end, in creating NEH, Congress included several provisions aimed at protecting the agency from political influence. For example, Congress has prohibited federal agencies and employees from "exercis[ing] any direction, supervision, or control over the policy determination, personnel, or curriculum" of any grantee organization.  20 U.S.C. § 953(c).

41.    This statutory framework demonstrates Congress's intent to insulate NEH from political control. As a Senate committee report explained: "It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. . . . [N]o undue preference should be given to any particular style or school of thought or expression." S. Rep. No. 80-300, at 3–4 (1965).

42.    With this broad purpose in mind, Congress provided that the Chairperson of the NEH may "enter into arrangements," including "contracts, grants, loans, and other forms of assistance," to further a limited set of purposes.  20 U.S.C. § 956(c).  These purposes include to:

- develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

- initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities;

- initiate and support training and workshops in the humanities by making arrangements with institutions or individuals;

- initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;

- foster international programs and exchanges;

- foster the interchange of information in the humanities;

- foster, with groups, education in, and public understanding and appreciation of the humanities;

- support the publication of scholarly works in the humanities;

- ensure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

- foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

*Id.*

43.     In addition, Congress provided for three additional types of grant programs including grants in aid programs in each state, at issue here.

44.     Through these programs, the NEH has played a significant role in both expanding access to the humanities and funding a wide range of research, training, and education.

45.     The NEH's chair, currently Defendant McDonald, is advised by the National Council on the Humanities, a board of twenty-six "distinguished private citizens appointed by the president and confirmed by the Senate"[8] (the "Council").  20 U.S.C. § 957.

46.     One of the statutory functions of the Council is to "review applications for financial support and make recommendations thereon to the Chairperson. The Chairperson shall not approve or disapprove any such application until the Chairperson has received the recommendation of the Council on such application, unless the Council fails to make a recommendation thereon within a reasonable time."  *Id.* at § 957 (f).

## II.     Plaintiffs' Typical Receipt of NEH Grants Funding

**"The humanities are the languages, religions, laws, philosophies, and customs that make us distinct. They are our history and our cultures, the ideas and movements that have shaped societies throughout time."**

47.     The Federation's members depend heavily on NEH funding to support their humanities programming. At any given time, individual state and jurisdictional humanities councils may depend on multiple NEH grants that support their operations and fund local and grassroots humanities organizations in the respective United States territory, such as libraries, teachers, and humanities-focused community groups.

---

[8] About the National Council on the Humanities, https://www.neh.gov/about/national-council-on-the-humanities (last visited May 14, 2025).

48.     State and jurisdictional councils apply to NEH for standard operating grants in response to a NEH Notice of Funding Opportunity ("NOFO").  The NOFO for each Fiscal Year Congressional appropriation outlines the steps that councils must take to request a standard operating grant.  Typically, the annual standard operating grant NOFO is posted in January or February each year.

49.     Once councils submit application materials to the NEH, they await award decisions, which are announced via a system called eGMS. eGMS Reach is the system for application review, award management, and official communications at NEH.  Award decisions, called Notice of Actions, set out the amount of funds awarded to the council for the operating grant.  The amount of money in the pool to make award decisions is entirely dependent upon Congressional appropriations.

50.     Standard operating grants for state and jurisdictional councils are generally for a three-year period with funds available for five years.  These grants provide stability to the Federation and its member councils, permitting the councils to pursue programs and activities in accordance with their respective annual plans.

51.     Councils receive the NEH standard operating grant funding in one of two ways. They may ask for funds in advance for a particular expense. The majority of funds, however, are reimbursements. Councils pay expenses directly, then seek reimbursement through eGMS under the relevant operating grant.  Until April 2, 2025, the NEH routinely and rapidly reimbursed councils for these expenses (generally within five to seven business days) as the outlay of money had already been approved by the NEH as mandated by Congress.

52.     To better illustrate the above system, consider Oregon Humanities. Oregon Humanities applied for and was approved for a standard operating grant that spans November 1, 2022, to October 31, 2027.  An NEH Notice of Action approved $2,580,205 in funding for this grant.  The grant constituted approximately 50% of Oregon Humanities' budget each year.  To date, NEH has awarded and reimbursed $2,029,271 in funds under this grant.  Oregon Humanities submitted an additional $292,000 in reimbursement requests for expenses through

March 31, 2025, which, as discussed in more detail below, have not been processed by NEH. An additional $258,934 is available under this grant during Fiscal Year 2025.

53.     In response to a NOFO, Oregon Humanities submitted an application for a new operating grant for November 1, 2025 to October 31, 2030. That grant application has not been processed by NEH.

54.     Each member of the Federation is in a similar position: all have standard operating grants that have been awarded but not fully paid. Many have unreimbursed expenses held up at NEH. Some have requested and not received advanced funds. All have received termination notices for existing grants. And NEH is not processing new operating grant applications in normal course.

55.     In addition to standard operating grants, councils may apply for and receive grant funding by applying for special initiative funding offered by NEH or for competitive grant opportunities. These funding opportunities are regularly posted on the NEH website and announced through eGMS.

56.     Special initiative grants are "non-competitive grants." In other words, unlike standard operating grants, councils may or may not apply for funding for particular projects announced by the NEH chair. If a special initiative grant is offered to the full range of councils, only councils interested in that funding opportunity will apply.

57.     For example, in 2025 Oregon Humanities applied for funding through a second round of NEH's United We Stand special initiative and was awarded $40,000 in grant funds. Those funds have already been expended by Oregon Humanities but not reimbursed by NEH.

III.    **Congressional Appropriations to NEH Amount to Hundreds of Millions of Dollars Each Fiscal Year, Most of Which is for Grantmaking**

"**The councils bring humanities education, lifelong learning, and public humanities programming to local communities throughout the country.**"

58.     Overall, from Fiscal Year 1966 to 2025, Congress generally increased NEH funding annually, which is consistent with NEH's stable, and generally increasing funding to

state and jurisdictional councils for nearly sixty years, under administrations of both political parties.[9]

59.    Congress's appropriations to NEH for Fiscal Year 2024 were no different. Consistent with past appropriations for NEH activities, in the Further Consolidated Appropriations Act of 2024 (2024 CAA), Congress appropriated $207 million to NEH, of which $192 million "shall be available for support of activities in the humanities, pursuant to section 7(c) [20 U.S.C. § 956(c)] of the Act and for administering the functions of the Act." $65 million of that $192 million was further specifically directed to the Federal/State Partnership.  This money was designated for grants, operations, loans, contracts, and other assistance to further the enumerated purposes set forth under 20 U.S.C. § 956(c). Pub. L. 118-42, 138 Stat. 25, 282 (Mar. 9, 2024) (the "2024 Act").

60.    Congress has not enacted a Consolidated Appropriations Act for Fiscal Year 2025, but on March 15, 2025, the President signed the Full-Year Continuing Appropriations and Extensions Act2025, commonly known as a "Continuing Resolution" or "CR" (2025 CR).  Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12.  Pursuant to the 2025 CR, Congress appropriated "[s]uch amounts as may be necessary . . . under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities . . . that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available" in the specific appropriations Acts. *Id.*., div A, § 1101(a), 139 Stat. at 11.  NEH thus received an additional $207 million that it must spend, including an additional $192 million that it must spend on grants and other assistance programs under 20 U.S.C. § 956(c), and $65 million of that $192 million was further specifically directed to the Federal/State Partnership.

_____

[9] National Endowment for the Humanities: NEH Appropriations: FY 1966–2024, https://www.neh.gov/sites/default/files/2024-08/NEH%20Appropriations%202024%20center.pdf (last accessed May 14, 2025).

61.     The 2025 CR extended congressional appropriations to the NEH through September 30, 2025.  State and jurisdictional councils should have received Notices of Action tied to existing operating grants following the 2025 CR.  For example, Oregon Humanities' funding should have increased by an additional $578,000 based upon this appropriation, bringing its total award for its operating grant to $3,140,000.  That Notice of Action was never provided.

62.     The Federation and its members have not received Notices of Action for the Congressionally mandated funds from the 2025 CR.

## IV.     Federal Statutes and Regulations Provide a Process for Grant Termination Including Notice and an Opportunity to Cure.

63.     Federal grants such as the standard operating grants to the Federation's members may be terminated per federal statutes and regulations if certain conditions occur.  *See* 20 U.S.C. § 956(f)(7); 2 C.F.R. § 200.240(a).  As a prerequisite to termination, however, the statutes require a finding by the NEH Chairperson "after reasonable notice and opportunity to be heard." 20 U.S.C. § 956(f)(7).  Such a prerequisite finding may be that a council (1) "is not complying substantially with the provisions" of the state council subsection of the statutes, (2) "is not complying substantially with terms and conditions of its State plan or grant recipient application approved under" the same section, or (3) "any funds granted to [a council] have been diverted from the purposes for which they are allotted."  *Id.*

64.     The regulations further provide that grants may be terminated by the respective federal agency if the recipient "fails to comply with the terms and conditions of the Federal award."  *Id.* at 1.  Alternately, a grant may be terminated by the agency with the consent of the recipient where the two parties agree upon termination conditions.  *Id.* at (2).  Finally, a grant may be terminated by the agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *Id.* at (4).

65.     If an agency terminates a grant prior to the end of the grant period "due to the recipient's material failure to comply with the terms and conditions," the agency is required to

follow a process including reporting the termination and other processes including providing the grant recipient with opportunities to challenge the decision and appeal rights. *See* 2 C.F.R. § 200.342.

66.     Significantly, the regulations require an opportunity for objections and appeal. ("The Federal agency must maintain written procedures for processing objections, hearings, and appeals. Upon initiating a remedy for noncompliance (for example . . . termination), the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action. The Federal agency or pass-through entity must comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved.") *Id.*

**V.     DOGE Sweeps into NEH and Mass Terminates Grants and Staff**

67.     The normal operations of NEH abruptly ended in March 2025.

68.     Before March, following President Trump's election as President, NEH received a series of instructions from the White House. According to accounts of former or current NEH employees, NEH staff were instructed to examine every open grant at NEH dating back to 2021 and determine whether each open grant ran afoul of any Executive Order (EO) issued by President Trump in his first days in office in 2025. NEH staff were instructed to develop an Excel spreadsheet listing every grant and determine the level of risk that such grant ran afoul of EOs and to rate the risk from "low" to "serious" (the "Spreadsheet"). NEH staff spent several workdays in February and early March combing through grants to determine whether they involved DEI work, for example, rating the risk, and working on completing the Spreadsheet.

69.     NEH staff received little if any guidance for how to make such an assessment of open grants or how to "rate" the risk that a standard operating grant (for example) implicated the President Trump EOs. NEH staff at Fed/State examined open grants to the state and jurisdictional humanities councils and generally rated such grants as "low" risk.

70.     On March 13, 2025, two days after President Trump signed the 2025 CR, NEH Chair Shelly Lowe was directed by the White House to resign from her position.

PAGE 16 –  COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

71.     According to accounts of former and current NEH staff, in March 2025, DOGE personnel met with NEH leadership to discuss DOGE's plans for NEH's future.

72.     DOGE has reportedly been deployed to multiple small agencies, in most cases to swiftly carry out mass terminations of staff, programs, and grants.

73.     On April 1, 2025, NEH staff members reportedly were informed that DOGE sought reductions in NEH staff by 70-80% and "what could amount to a cancellation of **all grants** made under the Biden administration that have not been fully paid out."[10]

74.     Upon information and belief, DOGE did not use the Spreadsheet to assess whether any grant constituted fraud, waste, or abuse, or implicated one of the EOs, but rather DOGE sought wholesale termination of any grant opened under the Biden Administration.

75.     Acting Chair Michael McDonald "told senior staff that [DOGE] . . . 'wants to claw back $175 million' in grant money that has not yet been disbursed."[11]

76.     While at the NEH, DOGE was provided one or more lists of open NEH grants, and DOGE repeatedly asserted that cancelling at least $175 million in grant money was an imperative.  According to accounts of former or current NEH employees, very shortly after receiving the list of open NEH grants, on April 2, 2025, DOGE agents emailed nearly 1,500 grantees on the list informing the grantees that their grants were being terminated, including nearly all grants issued during the Biden Administration.

77.     DOGE attempted to send to every state and jurisdictional humanities council a grant termination notice for standard operating grants as well as special opportunity and competitive grants opened during the Biden Administration.  Most councils received the termination notices in the middle of the night.

---

[10] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, N.Y. Times (Apr. 1, 2025) https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

[11] Elizabeth Blair, *Cultural Groups Across U.S. Told That Federal Humanities Grants are Terminated*, NPR (Apr. 3, 2025), https://www.npr.org/2025/04/03/nx-s1-5350994/neh-grants-cut-humanities-doge-trump.

78.     DOGE did not process the grant terminations through NEH's eGMS system as required by internal agency policies.

79.     The emails received by NEH grantees did not come from an NEH server or email address, but from Grant_Notifications@nehemail.onmicrosoft.com, a non-governmental email account.

80.     The emails attached a grant termination letter purportedly signed by Acting Director of NEH Michael McDonald.  The termination letters were not hand-signed by McDonald or digitally signed with a verifiable digital signature.  Instead, the signature on the termination letters was simply typed by someone as "/s/ Michael McDonald."

81.     In a meeting with staff to answer questions about the terminations, McDonald appeared to acknowledge that he did not determine which grants to terminate, nor did he draft the termination letters.  First, he stated that he had explained NEH's traditional termination process but that "as they said in the notification letter. . . they would not be adhering to traditional notification processes" and "they did not feel those should be applied in this instance."  Further, in response to a question about the rationale for grant terminations, he replied that the "rationale was simply because that's the way DOGE had operated at other agencies and they applied the same methodology here."[12]  McDonald also said that any statement about the number of grants terminated would be "conjecture" on his part, even though he purportedly signed each termination.

82.     The termination letters to the Federation, its members, and Oregon Humanities sent on April 2 were nearly identical and lacked any individualized analysis or discussion of any terminated grant.

_____

[12] NEH SLT Meeting Recording April 3, 2025
https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5NThjBcVNYY0xJ/o/VEMwNDc3NTI1NjEz (last visited May 14, 2025).

The letters contained the following explanation for termination:

> This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant (Grant Application No. XXXX) effective April 2, 2025, in accordance with the termination clause in your Grant Agreement.
>
> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2CFR§200.340. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. See Commencing the Reduction of the Federal Bureaucracy, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 2, 2025.

83.    The termination letter to NEH grantees asserts that Executive Order 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions." But NEH is not one of the agencies named in the Executive Order for eliminating non-statutorily required activities and functions.

84.    The termination notices included no reference to any method for appeal or to seek reconsideration, even though NEH's General Terms and Conditions require that grantees have the right to appeal a termination.

85.    According to former or current NEH staff, instead of having the opportunity to weigh-in on termination decisions, relevant staff learned of the grant terminations at the same time that grant recipients received notifications.

86.    Indeed, according to former or current NEH staff, the terminations were not processed in NEH's eGMS system.

87.     All of the Federation and its members' open grants were terminated as part of the mass grant termination.

88.     NEH's grant terminations were and are unlawful.  NEH has failed to show—let alone provide—"good reasons for" any changes in agency policy supposedly justifying the terminations.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  And the shoddy and capricious justifications Defendants provided to justify the terminations ignore important and relevant considerations and run counter to the available evidence.  *See Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto, Ins., Co.*, 463 U.S. 29, 43 (1983).  For these and other reasons, the challenged terminations violate the APA, 5 U.S.C. § 706 (2).

89.     NEH failed entirely to provide notice and opportunity for hearing as required by the NEH statutes. NEH failed entirely to make a "finding" of noncompliance as required by the statutes prior to terminating grants.

90.     On April 3, 2025, 145 NEH staff members—making up 80% of the staff—were reportedly placed on administrative leave.  According to accounts of former or current NEH employees, this included every staff member in the Fed/State Office except for one.

91.     According to accounts of former or current NEH employees, as a result of the termination of staff and grants, the NEH has effectively eliminated or nearly eliminated entire divisions and programs, including the Fed/State Office.

92.     As a result of Defendants' actions, NEH is no longer able to effectuate its statutorily required duties.  It has terminated nearly all of its current grants and most of its future programs, despite having nearly $400 million in funding for programs over the last two years, including $192 million it received for grant programs in March 2025.

93.     NEH has terminated the staff necessary to undertake the review and processing of state and jurisdictional council grant applications. NEH has eliminated most of the staff required to oversee any grants it does award.

## VI.    Late April "Guidance" from NEH Doubles Down on APA and Constitutional Violations.

94.     On April 24, 2025, NEH issued a press release titled "An Update on Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders." The statement began, "[i]n recent weeks [NEH] has taken several internal operational steps to improve efficiency, eliminate offices that are not essential to fulfilling its statutory requirements, and to return to being a responsible steward of taxpayer funds."  In answer to the question, "Why is NEH cancelling awards," the agency stated, "[a]ll federal grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. This requires that NEH regularly evaluate its funding priorities within the policy framework established by Congress, the Administration, and the head of NEH. Awards and programming must align with these priorities."[13]

95.     It is false that the Fed/State Office was "not essential to fulfilling [NEH's] statutory requirements." As discussed above, the state and jurisdictional humanities councils are creatures of statute and are provided mandatory funding per the NEH statutes.

96.     The agency provided no explanation or information on how it determined that each and every approved standard operating grant, money for which was appropriated and mandated by Congress, was somehow inconsistent with the agency's mission or funding priorities. On information and belief, no such analysis took place prior to the blanket termination of NEH grants to state and jurisdictional humanities councils.  On information and belief, the only factor that went into determining whether a grant should be terminated was whether it was opened during the Biden Administration.

97.     On April 30, 2025, NEH grant recipients including the Federation, Oregon Humanities, and all of the Federation's members, received emails from the NEH Office of Grant

---

[13] An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders, https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation-trump-administration-executive (last accessed May 14, 2025).

Management.  The email stated that NEH terminated awards in 2025 and attached "Guidance for Recipients of Terminated NEH Awards."  The guidance provided a process for councils to submit for "termination costs" associated with terminated grants, defined as "those [costs] incurred as a direct result of termination and must be necessary and reasonable to ensure an orderly shut-down of award activities" as well as "closeout costs," administrative costs associated with the closeout of a terminated award.

98.    The April 30th guidance required Plaintiffs to submit complicated and atypical vouchers outside the typical NEH process.  It explicitly limited request for reimbursement of these costs to a single form.  ("NEH will not permit subsequent submissions").

99.    Notably, the guidance stated that all grant terminations were permanent and that there would be no appeal process for the agency action.  The "Appeals" section of the guidance states, in its entirety:

## 7. Appeals

NEH is not offering a means of dispute resolution.

## VII.    Plaintiffs are Injured by NEH's Decisions

100.    The Trump Administration's wholesale dismantling of NEH, elimination of the Fed/State Office, termination of nearly all previously approved standard operating grants, and cancellation of numerous programs moving forward has caused and continues to cause Plaintiffs serious, irreparable harm.

101.    Before the terminations, the Federation and its members had multiple active NEH awards.  The Federation and its members also planned to apply, and some did apply, for new standard operating grants or for competitive grants.  Many grant applications are "stuck" in process at NEH, which upon information and belief is no longer processing standard operating grants.

102.    For example, a $30,000 grant directly to the Federation to support capacity building for councils' data and evaluation needs, including support for an in-person consultation

with data and evaluation experts, was approved and then cancelled.  Prior to the DOGE interference, the Federation was invited to apply for a much larger $500,000 Cooperative Agreement grant with NEH's Office of Data & Evaluation for a three-year, multi-phased project to support the Federation's hiring of consultants to train councils in data gathering and evaluation methodology, as well as to support a new online platform to support councils.  The Cooperative Agreement and budget were drafted in conjunction with NEH staff before DOGE arrived at NEH.

103.     The Federation has also been damaged by councils' inability to pay Federation dues because of funding cuts.  Overall, the Federation has lost approximately 27% of its member-approved 2025 budget.

104.     The loss of grant opportunities has prevented the Federation and its members from accomplishing their missions.

105.     Each and every member of the Federation has been impacted by grant terminations, delays in grant processing, uncertainty regarding the process for challenging grant terminations and recovery of costs, and impacts to local grassroots humanities organizations. Relationships with community partners who rely upon state and jurisdictional council grant funding have been irrevocably damaged.  Several of the Federation's members are facing the risk of imminent shut down.

## CAUSES OF ACTION

### <u>Count 1</u>

**Administrative Procedures Act, 5 U.S.C. § 706(1): Unlawful Withholding and/or Unreasonable Delay of Agency Action**

106.     Plaintiffs reallege and incorporate by reference all the allegations contained in the preceding paragraphs.

107.     The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. §706(1).  Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that

it is required to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis omitted).

108.    By statute and regulation, "discrete agency action[s]" that NEH is required to take include: calculation and distribution of funds appropriated by Congress using the statutory formulas, review and approval of grant applications, and processing of reimbursement requests. The APA provides that, "within a reasonable time, each agency *shall* proceed to conclude a matter presented to it." 5 U.S.C. §555(b) (emphasis added).

109.    As discussed, Defendants have actually or constructively terminated and/or substantially delayed the above-described required activities of the NEH's grant review and approval processes—a significant and unprecedented departure from the NEH's published review process and the agency's past practice.

110.    As discussed, NEH statutes provide that for Congressionally appropriated funds for any fiscal year, "each State and each grant recipient which has a plan approved by the Chairperson **shall** be allotted at least $200,000. . . .  In any case where the sums available to carry out this subsection for any fiscal year are in excess of the amount required to make the allotments under the first sentence of this paragraph," certain additional amounts "**shall** be allotted" among the state and jurisdictional councils. 20 U.S.C. § 956(f)(4) (emphasis added).

111.    The NEH regulations further provide the NEH will process reimbursements to councils with previously approved grants and set forth a statutory process for any grant termination, which has not been followed.

112.    The above-described terminations and delays constitute unlawful withholding and/or unreasonable delay of agency action within the meaning of 5 U.S.C. §706(1) of the APA. *See, e.g., Rezaii v. Kennedy*, No. 1:24-cv-10838, 2025 WL 750215, at *5 (D. Mass. Feb. 24, 2025) (holding that a plaintiff had pleaded unreasonable delay where, among other things, the agency's delay in processing plaintiff's application was "at the outer edge of HHS's typical time for processing"); *Raouf v. U.S. Dep't of State*, 702 F. Supp. 3d 19, 33 (D. N.H. 2023) (finding

that a plaintiff had pleaded unreasonable delay where she alleged that the "delay [was] attributable to . . . an *ultra vires* internal policy for intentionally delaying issuance of visas").

113.    The above-described terminations and delays have caused, are causing, and imminently threaten to cause direct, concrete, and irreparable harm to Plaintiffs.  As discussed above, the harms from these cancellations and delays of grants have included layoffs, cancellation of programming, inability to meet financial obligations, and difficulty making rent payments.

114.    For the foregoing reasons, Plaintiffs are entitled to an order, and to a preliminary and permanent injunction, compelling Defendants to undertake the activities of NEH's Fed/State Office and any NEH Office required to act on Fed/State issues, including but not limited to the National Council on the Humanities, that Defendants have unlawfully withheld and/or unreasonably delayed.  Such activities include staffing the Fed/State Office; providing guidance to the state and jurisdictional humanities councils regarding grant applications and procedures; providing an appeal mechanism for grant terminations or rejections; applying the statutory formulas to determine distributions among the state and jurisdictional councils; and processing open and pending grants.

## Count 2

### Administrative Procedure Act, 5 U.S.C. § 706(2): Agency Action Contrary to Law (Grant Terminations)

115.    Plaintiffs reallege and incorporate by reference all the allegations contained in the preceding paragraphs.

116.    The APA authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2).

117.    As discussed, Defendants have invoked 2 CFR § 200.340 in canceling the grants. However, that regulation does not apply here and does not authorize the cancellation of the

grants because there has been no failure to comply with the terms and conditions of the awards or consent by the Federation's members.

118.    Defendant McDonald has not made findings required by the statutes to terminate grants, has not provided notice and an opportunity to be heard, and has not sought approval of the Council for grant terminations.

119.    The statutes and regulations that govern the administration of grants by the NEH set out specific conditions and procedures for terminating and suspending grants.  Defendants have not followed the procedures set out in those governing statutes and regulations and have frozen payment on grants in circumstances in which the statutes and regulations would not allow those grants to be terminated or suspended. By doing so, Defendants are acting contrary to law.

120.    DOGE, an agent of the Executive Branch, does not have authority to terminate mandatory funding from Congress.  Its actions are *ultra vires* and an unconstitutional violation of Separation of Powers and are unlawful for that reason, as well.

121.    In addition or in the alternative, on information and belief, Defendant Director McDonald has acted contrary to law by withholding purportedly necessary approvals to the NEH to release funding appropriated by Congress and by failing to convene the Council.

122.    Accordingly, Plaintiffs are entitled to an order and judgment, and a preliminary and permanent injunction, holding unlawful and setting aside Defendants' termination of the terminated grants and the staff directives to and within NEH underlying the terminations.

## Count 3

### Administrative Procedure Act, 5 U.S.C. §706(2): Agency Action Contrary to Statute (Dismantling of Fed/State; Internal NEH and Fed/State Functions)

123.    Plaintiffs reallege and incorporate by reference all the allegations contained in the preceding paragraphs.

124.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right," 5 U.S.C. § 706(2)(C), or "otherwise not in accordance with law," *id.* § 706(2)(A).

125.    In reviewing agency action, a court cannot accept "the agency's policy judgments . . . if they conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); see *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), aff'd, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress").

126.    Defendants have terminated certain of the terminated grants on the ground that they "no longer effectuate[] the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes" because, according to Defendants, the terminations are "necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of [the] grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible." *See* ¶ 81 above.

127.    The mass terminations defy statutory directives which require that NEH "shall" fund the state and jurisdictional humanities councils as set forth above.  The mass terminations also violate statutes and regulations pertaining to process for terminations and opportunity for appeal.

128.    Defendants' mass terminations are also contrary to law because they defy Congress's consistent appropriation of funding to NEH's state and jurisdictional affiliates to carry out their respective statutory purposes and public priorities.

129.    Defendants' actions are also contrary to law because they violate the Constitution's separation of powers between Congress under Article I and the President and Executive Branch under Article II.

130.    NEH is violating its statutory obligations by terminating thousands of grants, which will result in a substantial portion of Congress's appropriation going unspent.

131.    The terminations therefore are contrary to the statutes authorizing and appropriating funds for the NEH and its state and jurisdictional affiliates, and beyond Defendants' statutory authority, and must be set aside.

132.    Accordingly, Plaintiffs are entitled to an order and judgment, and a preliminary and permanent injunction, holding unlawful and setting aside Defendants' dismantling of the Fed/State Office, the termination of the terminated grants and the staff directives to and within the NEH underlying the terminations and ordering the funds allocated to Fed/State in the Fiscal Year 2024 Budget and 2025 CR to be allocated among the state and jurisdictional councils pursuant to the statutory formulas. Plaintiffs are further entitled to an order and judgment, and preliminary and permanent injunction, requiring the continued operation of the Fed/State Office and its grant review processes and procedures for allocation of all congressionally mandated funds to the state and jurisdictional humanities councils.

## Count 4

**Administrative Procedure Act, 5 U.S.C. §706(2): Arbitrary and Capricious Agency Action**

133.    Plaintiffs reallege and incorporate by reference all the allegations contained in the preceding paragraphs.

134.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706 (2)(A).

135.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  An agency action is also arbitrary and capricious if, when departing from a prior policy, an agency does not "display awareness that it is changing position" or does not "show that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515.

136.    As described above, Defendants have terminated the Plaintiffs' grants on the ground that they "no longer effectuates the agency's needs and priorities."  Defendants have communicated these termination decisions through boilerplate letters, using stock language for a large swath of varied grants.

137.    Defendants' decisions are arbitrary and capricious because their boilerplate letters do not acknowledge—let alone provide "good reasons for"—any official change in agency policy.  *Fox Television Stations*, 556 U.S. at 515.  Indeed, this boilerplate language obfuscates the obvious, actual reason for the terminations: implementation of the President's EOs and other policies.  While the White House and DOGE initially asked NEH to comb through its open grants to determine whether each grant ran afoul of the EOs, and to rate each grant's "risk level," DOGE ultimately mass terminated NEH grants without any such analysis (which would also have been arbitrary and capricious under the law) and instead determined that **any** grants opened under the Biden Administration were subject to termination.  Such a patently false explanation does not satisfy the requirement to provide a reasoned basis for agency decision making.

138.    Defendants' funding freeze decisions also fail to account for the substantial reliance interests in the ordinary disbursement of funds authorized by the NEH that the freeze radically disrupts.  "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account,'' and the failure to do so is arbitrary and capricious.  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

139.     Defendants' termination decisions are arbitrary and capricious for the additional reason that they have not engaged in reasoned consideration of any individual project before terminating a grant.

140.    Defendants' termination decisions are arbitrary and capricious for the additional reason that, in purporting to terminate the Plaintiffs' and Plaintiffs' members' grants, Defendants failed to consider several important aspects of the issues before them, including, at a minimum (1) Plaintiffs' reliance interests in the terminated projects; (2) whether those projects could be

adjusted, rather than terminated, to comply with Defendants' new "priorities" (assuming those new "priorities" were otherwise lawful); (3) whether Defendants could have adopted a measure other than across-the-board termination of entire categories of grants to effectuate their new "priorities" (assuming those new "priorities" were otherwise lawful); and (4) the harm that terminating the grants would inflict on U.S. citizens benefiting from the authorized grant activity.

141.    Accordingly, Plaintiffs are entitled to an order and judgment, and a preliminary and permanent injunction, holding unlawful and setting aside Defendants' termination of the Plaintiffs' and Plaintiffs' members' grants and the staff directives to and within NEH underlying the terminations.  Plaintiffs are further entitled to an order and judgment that NEH's pronouncement that Fed/State was "not essential to fulfilling [NEH's] statutory requirements" was arbitrary and capricious and requiring the rehiring of staff to fulfill the critical work of Fed/State at NEH, including the grant application, processing, approval, and other work necessary within eGMS to fund the state and jurisdictional humanities councils as required by statute.

## **Count 5**

### **Separation of Powers**

142.    Plaintiffs reallege and incorporate by reference all the allegations contained in the preceding paragraphs.

143.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

144.    The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, §9, cl. 7 (Appropriations Clause); U.S. Const. art. I, §8, cl. 1 (Spending Clause).  "Among Congress's most important authorities is its control of the purse."  *Biden v. Nebraska*, 600 U.S. 477, 505 (2023).  "The Appropriations Clause is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government."  *U.S. Dep't of Navy v. Fed.*

*Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).  If not for the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation." *Id.* (internal citations omitted).

145.    Congress also possesses exclusive power to legislate.  Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."  U.S. Const. art. I, §1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.")

146.    The Constitution further provides that the executive must "take Care that the Laws be faithfully executed."  U.S. Const. Art. II, Sec. 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them." (brackets and quotation marks omitted)).

147.    The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.  *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"); *see also Util. Air. Reg. Grp.*, 573 U.S. at 327 (noting that the President "act[s] at time through agencies").

148.    Nor does any statute authorize the Executive's action here.  Congress consistently has appropriated funds to NEH to further its statutory purposes of advancing the humanities nation-wide and has not authorized the Executive to decline to spend vast swaths of funds. Further, Congress has provided for a procedure by which the Executive may propose to Congress to either rescind or cancel funds.  Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 682 *et seq*.  That statute likewise does not permit the Executive to take unilateral action, instead requiring the President must "propose[]" any rescission to Congress (which

Congress must then affirmatively approve) and may not defer funding for the policy reasons Defendants explicitly invoke here. 2 U.S.C. §§ 683, 684(a).

149.    Accordingly, consistent with these principles, the Executive's authority is at its "lowest ebb" because he is acting without constitutional authority and contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.  See *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring).

150.    Defendants' pattern and policy of systematic delays and terminations—as reflected in their treatment of the Plaintiffs' grants—therefore violates the separation-of-powers constraints described above.  Through these actions, Defendants have overridden the careful judgments of Congress by refusing to disburse duly appropriated funding.

151.    The delays and terminations are also contrary to the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.  *S. Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).  Here, the delays and terminations are not related to the federal interest in the humanities—to support and encourage promotion of scholarship in the humanities—and instead are related to policies and political factors.

152.    For the foregoing reasons, Plaintiffs are entitled to a preliminary and permanent injunction barring Defendants from maintaining their pattern and policy of systematic delays and terminations—as reflected in their treatment of the delayed grant applications, delayed reimbursements and approvals, and terminated grants.  For the same reasons, Plaintiffs are entitled, pursuant to 28 U.S.C. §2201, to a declaration that Defendants' pattern and policy of systematic delays and terminations—as reflected in their treatment of the delayed grant processing and terminated grants—violates the Constitution's guarantee of separation of powers.

/ / /

/ / /

/ / /

/ / /

## Count 6

**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions, Actions by DOGE without Legal Authority (Against Defendants DOGE and Gleason)**

153.    Plaintiffs reallege and incorporate by reference all the allegations contained in the preceding paragraphs.

154.    Federal agencies "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

155.    Congress did not create DOGE and has not vested DOGE with any powers. Rather, DOGE is an agency that was created by the President via Executive Order 145.

156.    DOGE has not been authorized by Congress to conduct business of another congressionally authorized agency such as the NEH.

157.    The actions set forth above, including the dismantling of Fed/State and the termination of all grants approved during the Biden Administration, were directly undertaken by, or specifically directed by DOGE.

158.    Because DOGE does not possess any congressionally conferred authority to terminate the NEH's grants and contracts, or to eliminate the Fed/State Office at NEH, DOGE and Gleason's actions are *ultra vires* and should be enjoined and declared unlawful.

## Count 7

### Attorney Fees

159.    Upon prevailing, Plaintiffs are entitled to recover attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    Declare unlawful and enter an order and an injunction compelling Defendants to undertake the activities of NEH that Defendants have unlawfully withheld and/or unreasonably delayed, 5 U.S.C. § 706(1);

PAGE 33 –   COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

B.      Declare as unlawful and enter an order setting aside Defendants' actions against the Fed/State Office and Plaintiffs as not in accordance with law, 5 U.S.C. § 706(2)(A), arbitrary and capricious, *id.*, contrary to the Constitution, *id.* § 706(2)(B), in excess of statutory authority, *id.* § 706(2)(C), and unlawful and *ultra vires*;

C.      Declare as unlawful and set aside as *ultra vires* Defendants' terminations of grants, including the grants to the Federation and its members, as well as the dismantling of the Fed/State Office at NEH;

D.      Enjoin Defendants from enforcing or giving effect to their decisions to eliminate the Fed/State Office at NEH, to shut down processing of grants to state and jurisdictional humanities councils, and to delay or refuse to spend the funds appropriated to NEH by Congress;

E.      Enjoin Defendants from enforcing and giving effect to the termination notices of the Federation's grants and its members' grants;

F.      Enjoin Defendants to obligate and spend the full amount of funds that Congress has appropriated to the Federal State partnership at NEH without intentional delay;

G.      Award Plaintiffs' reasonable costs and attorneys' fees; and

H.      Award such other relief as this Court may deem just and proper.

DATED:  May 15, 2025.

TONKON TORP LLP


By:  _s/ Anna Sortun_____
    Anna Sortun, OSB No. 045279
      Direct:  503.802.2107
      Email:  anna.sortun@tonkon.com
    Steven M. Wilker, OSB No. 911882
      Direct:  503.802.2040
      Email:  steven.wilker@tonkon.com
    Paul Balmer, OSB No. 203429
      Direct:  503.802.5745
      Email:  paul.balmer@tonkon.com
    Gracey Nagle, OSB No. 215255
      Direct:  503.802.5753
      Email:  gracey.nagle@tonkon.com
    *Attorneys for Plaintiffs*