Anna Sortun, OSB No. 045279
  Direct:  503.802.2107
  Email:  anna.sortun@tonkon.com
Steven M. Wilker, OSB No. 911882
  Direct:  503.802.2040
  Email:  steven.wilker@tonkon.com
Paul Balmer, OSB No. 203429
  Direct:  503.802.5745
  Email:  paul.balmer@tonkon.com
Gracey Nagle, OSB No. 215255
  Direct:  503.802.5753
  Email:  gracey.nagle@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779
  *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON COUNCIL FOR THE HUMANITIES d/b/a OREGON HUMANITIES, a nonprofit corporation; FEDERATION OF STATE HUMANITIES COUNCILS, a nonprofit corporation, | Civil No. 3:25-cv-00829-SI |
| Plaintiffs, | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DOGE SERVICE, a component of the Executive Office of the President; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; NATIONAL ENDOWMENT FOR THE HUMANITIES, an independent federal agency, and its advisory council NATIONAL COUNCIL ON THE HUMANITIES; MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities, | |
| Defendants. | |

## TABLE OF CONTENTS

LR 7.1 CERTIFICATION ...................................................................................................1

INTRODUCTION ..............................................................................................................1

FACTUAL AND STATUTORY BACKGROUND ............................................................2

    I.      NEH History and the Federal State Partnership ........................................2

    II.     NEH Structure and Funding of State and Jurisdictional Humanities
           Councils ....................................................................................................5

    III.    State and Jurisdictional Humanities Councils Rely Upon Mandatory NEH
           Support......................................................................................................7

    IV.    The Decision to Dismantle NEH and Disrupt the Federal State Partnership .........8

    V.      Termination of General Operating Support and Other NEH Grant Funding
           to State and Jurisdictional Humanities Councils ...................................9

    VI.    June "Recission" Notices.........................................................................10

    VII.   Federal Statutes and Regulations Provide a Process for Grant Termination
           and Alteration Including Notice, Hearing, and an Opportunity to Cure................11

    VIII.  The Federation and the Councils Are in Immediate Peril.......................12

LEGAL STANDARDS .....................................................................................................15

ARGUMENT .....................................................................................................................15

    I.      Plaintiffs are Likely to Succeed on the Merits......................................15

         a.     Defendants' Actions Violate the Separation of Powers...........................15

         b.     Defendants' Actions Violate the Impoundment Control Act ...................18

         c.     Defendants' Terminations and Recissions Violate the
             Administrative Procedures Act ................................................................20

             i.      The Grant Terminations and Partial Recissions Are Final Agency
                  Action ..................................................................................................20

             ii.     The Grant Terminations and Partial Recissions are Contrary to
                  Law ......................................................................................................22

             iii.    Defendants' Actions are Arbitrary and Capricious................................24

    II.     Defendants Cannot Avoid the Merits by Relying on Jurisdictional
           Arguments................................................................................................26

i

III.   Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief ....................28

IV.    The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor .........29

V.     The Court Should Enjoin the Actions Taken to Damage the Federal State
       Partnership ...........................................................................................................30

CONCLUSION.....................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. V. U.S. Dep't of State*,
  770 F. Supp. 3d 121 (D.D.C. 2025)................................................................25

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.)....................................16, 17, 18, 23

*Amerijet Int'l v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014)................................................................25

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................20

*Biden v. Texas*,
  597 U.S. 785 (2022)................................................................22

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)................................................................27

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)................................................................31

*Climate United Fund v. Citibank, N.A.*,
  No. 25-CV-698, 2025 WL 842360 (D.D.C. Mar. 18, 2025) ................................................................23

*Clinton v. City of New York*,
  524 U.S. 417 (1998)................................................................15

*Department of Education v. California*,
  145 S. Ct. 966 (2025)................................................................27

*Encino Motorcars v. Navarro*,
  579 U.S. 211 (2016)................................................................26

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)................................................................24

*FDA v. Wages & White Lion Invs., L.L.C.*,
  145 S.Ct. 898 (2025)................................................................24, 25, 26

*Fleck & Assocs., Inc. v. Phoenix*,
  471 F.3d 1100 (9th Cir. 2006) ................................................................27

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010)................................................................16

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ................................................................15

*Int'l Union, United Mine Workers of Am. V. U.S. Dep't of Lab.*,
    358 F.3d 40 (D.C. Cir. 2004) ...............................................................25

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ...............................................................15

*Maine Comm. Health Options v. United States*,
    590 U.S. 296 (2020) ..............................................................................27

*Michigan v. EPA*,
    576 U.S. 743 (2015) .........................................................................24, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................24

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022) ..............................................................................15

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ..................................................................20

*New York v. Trump*,
    133 F.4th at 68–69 .................................................................................20

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................29

*North Carolina v. Covington*,
    581 U.S. 486 (2017) ..............................................................................31

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) .................................................................................20

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ..................................................29, 30

*Purpose Built Fams. Found., Inc. v. United States*,
    634 F. Supp. 3d 1118 (S.D. Fla. 2022), *aff'd on other grounds*, 95 F. 4th 1346
    (11th Cir. 2024)......................................................................................20

*Randall v. United States*,
    95 F. 3d 339 (4th Cir. 1996) .................................................................27

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..............................................................................26

*Widakuswara v. Lake*,
— F.Supp. 3d —, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025)..................................17, 25, 30

*Winter v. Nat. Res. Defense Council, Inc.*,
555 U.S. 7 ...........................................................................................................................15, 28

**Statutes**

2 U.S.C. § 682(1) ...............................................................................................................18, 19

2 U.S.C. § 683 ............................................................................................................................18

2 U.S.C. § 683(b) ......................................................................................................................18

5 U.S.C. § 704 ...........................................................................................................................20

5 U.S.C. § 705 .......................................................................................................................2, 30

20 U.S.C. § 956 .........................................................................................................................15

20 U.S.C. § 956(c) ...............................................................................................................5, 6, 16

20 U.S.C. § 956(f) ...................................................................................................................2, 15

20 U.S.C. § 956(f)(2)(B) ...........................................................................................................3

20 U.S.C. § 956 (f)(3) ................................................................................................................6

20 U.S.C. § 956(f)(4) ..............................................................................................................6, 22

20 U.S.C. § 956(f)(4)(B)–(C) ..................................................................................................6, 23

20 U.S.C. § 956(f)(7) ...............................................................................................11, 15, 22, 23

20 U.S.C. § 960(a)(1)(B) ...........................................................................................................21

**Other Authorities**

2 C.F.R. § 200.340(a)(1) ...........................................................................................................11

2 C.F.R. § 200.340(a)(1), (2), (4)..............................................................................................22

2 C.F.R. § 200.342 ..............................................................................................................12, 22

2 CFR §200.340 ........................................................................................................................24

## LR 7.1 CERTIFICATION

Counsel for Plaintiffs conferred with counsel for Defendants at the United States Attorney's Office for the District of Oregon over the telephone concerning this Motion but were unable to resolve the issues raised herein.

## INTRODUCTION

In early April, Defendant DOGE tried to destroy the longstanding statutory partnership ("Federal State Partnership") between the National Endowment for Humanities ("NEH") and fifty-six state and jurisdictional humanities councils (the "Councils") by terminating all grants to the Councils while simultaneously dismantling the agency, including the very office designed to support the Federal State Partnership. These actions were unlawful and irreparably harmed the critical humanities infrastructure Congress intentionally formed more than sixty years ago when it created NEH and declared in the enabling legislation that, "the humanities belong to all the people of the United States." Among other things, Defendants choked off support for the Federal State Partnership and thereby interfered with and significantly harmed the delivery of humanities programming throughout the country.

Following the filing of Plaintiffs' Complaint in May 2025, NEH tried to mask its blatant violations of federal statutes by issuing partial "recission" notices to the Councils. But, as pleaded in the Amended Complaint filed June 11, 2025, these notices only served to confirm the agency's continuing violation of law. Indeed, NEH communicated that the partial recissions "still represent[ed] an incredible hardship" to the Federal State Partnership.

The grant terminations and partial recissions are unlawful many times over. Under the Constitution's separation of powers, the Executive may not refuse to spend funds appropriated by Congress. Defendants have done just that by rescinding approved grants stemming from $130 million in appropriated funds and flouting the direction of Congress to distribute a specified portion of the agency's most recent appropriation to the Councils in the Federal State Partnership. This is also a violation of the 1974 Impoundment Control Act, which was passed to assure that "the practice of reserving funds does not become a vehicle for furthering

PAGE 1 –   MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
           PRELIMINARY INJUNCTION

Administration policies and priorities at the expense of those decided by Congress." *See* S. Rep. No. 93-688 at 75 (1974). In the effort to dismantle the Federal State Partnership, Defendants also violated a host of statutory mandates, including the requirement that NEH apply a specific statutory formula to funds appropriated by Congress; the requirement that NEH provide notice and an opportunity to be heard before modifying approved grant funding; and the requirement of providing the Councils with a means for appeal.  Defendants have thereby violated the Administrative Procedures Act.

Given the clear lawlessness of Defendants' actions, the irreparable harm to the Plaintiffs, and the public interest in preserving humanities work across the Nation, Plaintiffs request a stay pursuant to 5 U.S.C. § 705 and a preliminary injunction to prevent further destruction of the Federal State Partnership and harm to the state and jurisdictional humanities councils and the public.

## FACTUAL AND STATUTORY BACKGROUND

### I.     NEH History and the Federal State Partnership

Congress created NEH nearly sixty years ago through the National Foundation on the Arts and Humanities Act of 1965.  Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).  In establishing NEH, Congress found that "[i]t is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations." *Id*. § 951(5). Congress declared that the Federal government has a key role in "help[ing] create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." *Id*. § 951(7).

To facilitate distribution of humanities support in every state and jurisdiction of the United States, Congress established the Councils. 20 U.S.C. § 956(f).  The Councils act as a crucial bridge between the federal government and widely dispersed local communities throughout the United States by acting as a conduit and steward of NEH funding.

PAGE 2 –   MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
          PRELIMINARY INJUNCTION

Specifically, the NEH statutes provide that the states and jurisdictions of the United States shall receive NEH funding by establishing grant recipient organizations with up to 25% of board members appointed by an officer or agency of such state. *See* 20 U.S.C. § 956(f)(2)(B).[1] Pursuant to this provision, each of the states and territories whose humanities Councils are involved in this litigation have formed Section 501(c)(3) nonprofit state humanities councils, which together constitute the membership of Plaintiff Federation of State Humanities Councils ("Federation").  Throughout this brief, we refer to the statutory relationship between the NEH and the state and jurisdictional humanities councils as the "Federal State Partnership."

For example, in 1971, Oregon created Oregon Humanities as a Section 501(c)(3) organization to distribute NEH funds to public humanities projects in communities all over Oregon. (Davis Decl.  ¶ 3.)  The Governor of Oregon appoints up to 25% of the members to Oregon Humanities' board of directors. *Id.* As such, Oregon Humanities is funded by the NEH under 20 U.S.C. § 956(f)(2)(B).  Each of the other states and jurisdictions of the United States also has a 501(c)(3) humanities council, and all but one council is a member of the Federation.

In Oregon, NEH dollars flowing through Oregon Humanities help fund humanities programming in every corner of the state—including grants for rural libraries in communities such as Burns, Joseph, Blue River, Newport, and Forest Grove; program funding for youth-led conversations about mental health in Medford and storytelling projects led by Nez Perce Wallowa Homeland; fellowships for emerging storytellers from Woodburn, Silverton, Seal Rock, Talent, and Cove; the publication of a widely-distributed *Oregon Humanities* magazine featuring stories from all over the state; the production of two audio programs, *The Detour* and *This Place*, that air on eight community radio stations and on podcast streaming platforms; community conversation programs held in libraries, cultural centers, and community colleges

---

[1] The statutes also provide that states may receive NEH funding through a state agency, *id.* § 956(f)(2)(A), but all the Councils were formed under section 956(f)(2)(B).

that generate healthy discourse, build trust and relationships across differences of background and belief, and encourage engaged and active civic participation. (Davis Decl. ¶ 9.)

This Congressionally-directed flow of federal NEH dollars is repeated throughout the states and jurisdictions of the United States.  NEH funds reach Councils in each state and jurisdiction, and those Councils deliver direct humanities programming and issue grants to local grassroots humanities projects in every county and locality in the country.  From Mississippi to South Dakota, Maine to California, the Northern Mariana Islands to Idaho, and places in between, NEH funding flows to the Councils who in turn support a multitude of community-based public humanities programs throughout the Nation. (*See, e.g.*, Asmo Decl; Best Decl.; Davis Decl.; Johnson Decl.; Lyon Decl.; Oey Decl; Perez-Verdia Decl.; Rockoff Decl.; Stein Decl.)  The local communities choose the humanities programming best suited for their area—by design, the content of humanities work funded by NEH is therefore not top-down but rather inherently local.

The several declarations supporting this Motion address only the tip of the iceberg in terms of impact of NEH funding in our country.  In Ohio, for example, Ohio Humanities Council is the only statewide grant maker in the state that exclusively funds the public humanities and has an open and public application process. (Asmo Decl. ¶ 4.)  Ohio, the seventh most populous state in the nation, is one of only 10 states where the state legislature does not support its state humanities council.  (*Id*. ¶ 5.)  This means that for many communities – especially underserved regions like Appalachia—NEH funding that flows through the council is one of the **only** guaranteed sources of funding to support the preservation and amplification of cultural assets and stories. (*Id*.)

In Alaska, home to members of 229 federally recognized tribes and speakers of 20 distinct Alaska Native languages, many of which are endangered, NEH funding supported language preservation efforts. (Perez-Verdia Decl. ¶ 8.)  The Eyak language, for example, lost its last fluent speaker in 2008.  Some remaining languages have fewer than 40 fluent speakers.

Efforts by Alaska Humanities Forum included youth-led language programs designed to ensure these languages—and the histories and cultures they carry—are not lost. (*Id*.)

While relative to the federal budget the dollars are miniscule, the impact of NEH funding flowing through the Councils to communities throughout the nation is enormous.

## II.    NEH Structure and Funding of State and Jurisdictional Humanities Councils

To effectuate Congress's directive that the NEH fund the Councils, the NEH had until recently maintained a robust organizational structure consisting of around 180 staff members and numerous program offices and divisions. (Sortun Decl. Ex. A "NEH Annual Report" at 6-8.) NEH maintained a program office to administer specific grant programs and related activities through the Federal State Partnership called the Office of Federal/State Partnership. This office performed work critical to meeting NEH's statutory mandates. *See* NEH Annual Report at 7-8. Until recently, the Office of Federal/State Partnership employed six people including a director, an assistant director, two senior program directors, and two program managers. (Mary Doe Decl. ¶ 7.) These staff members worked closely with the Councils by conducting site visits, coordinating grant applications, and generally supporting the longstanding partnership between the NEH and the states. *Id*.

Congress has consistently funded the NEH generally and the Federal State Partnership specifically through annual appropriations since its founding. In the 2024 Appropriations Act, Congress appropriated $207,000,000 to NEH, "of which $192,000,000 shall be available for support of activities in the humanities, pursuant to section [20 U.S.C. § 956(c)] of the Act and for administering the functions of the Act." Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024) (the "2024 Appropriations Act"). As such, $192,000,000 was designated for final awards to further the enumerated purposes under § 956(c), as well as administrative support. 2024 Appropriations Act at 281–82. Of that $192,000,000, $65,000,000 was designated for the Federal State Partnership. (Sortun Decl. Ex. F p. 8, Ex. E p. 4.) The President signed the appropriations bill.

On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all the funds appropriated to NEH in 2024, with the same breakdown in designated expenditures.

PAGE 5 –   MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
             PRELIMINARY INJUNCTION

Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing Resolution").  NEH thus received an additional $207,000,000, including an additional $192 million for grants and other assistance programs under § 956(c), with $65,000,000 earmarked for the Federal State Partnership.  (Sortun Decl. ¶ 8, Ex. E.)  The President signed the CR.

NEH has for decades funded the Councils.  NEH funding for the Councils is mandatory and has historically constituted the largest portion of the Congressional appropriations for the agency. *See, e.g.*, 20 U.S.C. § 956(f)(4); (Sortun Decl. ¶ 9, Exs. E & F.).  Even NEH's website describes it as such: "[b]y congressional mandate, [NEH] provides general operating support awards to support public humanities programming in the 56 states and jurisdictions. Fed/State works with the designated humanities councils in each state and jurisdiction.  The councils are Fed/State's sole awardees."[2]

To be eligible for receipt of NEH funds, each state or Council must first "submit an application for such assistance at such time as shall be specified by the Chairperson [of NEH]. Each such application shall be accompanied by a plan" that sets out certain requirements. 20 U.S.C. § 956 (f)(3).  All the Councils had 2025 plans approved by the NEH Chairperson as of the time of filing this litigation.  (Stein Decl. ¶ 4.)

The statutes provide a mandatory formula for allocating the funding specified for the Federal State Partnership among the Councils with approved plans once the money is appropriated by Congress.  For one example, 44% "of [certain fiscal year appropriations] **shall be** allotted in equal amounts among the States and grant recipients which have plans approved by the Chairperson [of NEH]" and 22% "of [certain fiscal year appropriations] shall be allotted [based upon population of] the States and grant recipients which have plans approved by the Chairperson [of NEH]."  20 U.S.C. § 956(f)(4)(B)–(C).

---

[2] National Endowment for the Humanities: Office of Federal/State Partnership, https://www.neh.gov/divisions/fedstate (last visited June 10, 2025) (emphasis added).

Councils are informed of their portion of the appropriated funds through a Notice of Action from NEH, described in more detail below.

### III.    State and Jurisdictional Humanities Councils Rely Upon Mandatory NEH Support

The Councils were established as state grant recipients to steward NEH funds intended for distribution throughout the country.  The infrastructure of the Federal State Partnership presupposes that the Councils depend heavily on NEH funding to deliver creative, intellectually stimulating, and emotionally vibrant humanities programming for all Americans. At any given time, Councils may have multiple open NEH grants that support their operations and fund humanities programming, including through grantmaking to local humanities organizations. (Stein Decl. ¶ 8–9.)

Councils apply to NEH for general operating support grants (often referred to as "GOS grants") in response to an NEH Notice of Funding Opportunity ("NOFO").  The NOFO for each Fiscal Year Congressional appropriation outlines the steps that Councils must take to request a general operating support grant. *Id.*

Once Councils submit application materials to the NEH, they await award decisions, which are announced via a system called eGMS. Award decisions, called Notices of Action, set out the amount of funds awarded to the Council for the general operating support grant.  The amount of money in the pool to make award decisions is governed by Congressional appropriations and determined by Congressional instruction.

Councils receive the NEH general operating support grant funding in one of two ways. They may ask for funds in advance for a particular expense.  The majority of funds, however, are reimbursements.  Councils pay expenses directly, then seek reimbursement through eGMS under the relevant operating grant.  Until April 2, 2025, the NEH routinely and rapidly reimbursed Councils for these expenses (generally within five to seven business days) as the outlay of money had already been approved by the NEH.

In addition to general operating support grants, Councils may apply for and receive grant funding by applying for special initiative funding offered by NEH. Special initiative grants are

"non-competitive grants" set aside specifically for the Councils. In other words, when the NEH Chairperson identifies an issue of importance for which the Councils are uniquely situated to assist NEH, the NEH Chairperson calls upon the Councils for their help. Two recent examples of Special Initiative grants are the Chair's Grants to respond to climate disasters hitting communities throughout the United States and the United We Stand effort to mitigate the devastation of hate-fueled violence impacting our Nation. Councils also may apply for (and do receive) grants through various NEH competitive grants open to the general public.

**IV.    The Decision to Dismantle NEH and Disrupt the Federal State Partnership**

On January 20, 2025, the President established DOGE as a new component of the Executive Office of the President. E.O. 14158 § 3(a) (Jan. 20, 2025). The Executive Order required agencies to work with a "DOGE Team Lead" who would "advise" the agency "on implementing the President's DOGE Agenda." *Id.* § 3(c). In a subsequent Executive Order, the President directed agencies to work with DOGE to "terminate or modify . . . contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." E.O. 14222 § 3(b) (Feb. 26, 2025).

In March 2025, shortly after the White House terminated NEH Chair Shelly Lowe, two operatives from DOGE arrived at NEH. (Jane Doe Decl. ¶ 8.[3]) DOGE met with senior NEH leadership to discuss DOGE's plans for NEH's future. (Jane Doe Decl. ¶ 12.) On April 1, 2025, Acting Chairman of the NEH, Defendant McDonald, told NEH staff that DOGE sought to "claw back" $175 million in grants. (*Id.*)

On April 9, NEH staff received a notice alerting them to an upcoming "multi-step approach to restructuring" that promised to include a Reduction in Force ("RIF"). (*Id.* ¶ 18 & Ex. BB.) The next day, 65-70% of NEH staff members received RIF notifications that they

---

[3] See also Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, N.Y. Times (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

would be terminated as of June 10, 2025. (*Id.* ¶ 19.) Every NEH staff person working in the Office of Federal/State Partnership was terminated by early June. (Stein Decl. ¶ 13; Mary Doe Decl. ¶ 7.)

**V.      Termination of General Operating Support and Other NEH Grant Funding to State and Jurisdictional Humanities Councils**

On April 2, following Defendant McDonald's statement that DOGE intended to "claw back" $175 million in grant funding, DOGE emailed nearly 1,500 grantees informing the grantees that their grants were being terminated. This included all the open general operating support grants, all the open special initiative grants, and the open Chair's grants, as well all open competitive grants of the Councils. (Stein Decl. ¶ 13;)

DOGE did not process the grant terminations through NEH's grants management system and the termination notification to grantees did not come from an NEH email address, but rather from Grant_Notifications@nehemail.onmicrosoft.com. (Jane Doe Decl. ¶ 14; Davis Decl. Ex. ¶ 11.) The emails attached a grant termination letter purportedly signed by Acting Director of NEH Michael McDonald. However, the termination letters were not hand-signed by McDonald or digitally signed with a verifiable digital signature. Instead, the signature was typed by someone as "/s/ Michael McDonald." *Id.*

The terminations were nearly identical, without any specific information about the grants or any information regarding how to appeal. (*See, e.g.*, Stein Decl. Ex. A; Davis Decl. Ex. A.) As justification, the termination notices claimed that Executive Order 14217 required that NEH eliminate non-statutorily-required activities and functions (*Id.*); however, Executive Order 14217 did not name NEH.

On April 30, the Councils and the Federation received an email from the NEH Office of Grant Management. (Davis Decl. ¶ 12, Ex. B.) The email stated that NEH terminated awards in 2025 and attached a document called "Guidance for Recipients of Terminated NEH Awards." The guidance provided a process for Councils to submit for "termination costs" associated with

terminated grants.  The guidance stated that "NEH is not offering a means of dispute resolution" or appeal for terminated grants. (*Id.*)

## VI.     June "Recission" Notices

The April 2 termination notices and April 30 guidance received by each Council threw the Councils into disarray.  The Federation heard immediately from its members multiple times a day regarding their damaged relationships with community partners, expenses incurred which NEH abruptly refused to reimburse, financial struggles, and fears about the future of humanities programming in their respective states. (Stein Decl. ¶ 14.)

The Complaint in this litigation was filed May 15, 2025.  On June 2, NEH contacted the Councils via email. (Stein Decl. ¶ 18; Davis Decl. ¶ 13, Ex. C.)  The email, titled "FY25 GOS Awards: termination has been rescinded up to 20 percent" stated, "NEH has rescinded the termination of the fiscal year 2025 General Operating Support (GOS) grants.  For fiscal year 2025, the agency is funding the humanities Councils at 20 percent of its appropriation of program funds, which is the minimum that NEH is congressionally mandated to award to our state and jurisdictional humanities council partners. … I realize the reduction in funds from 40 percent to 20 percent still represents an incredible hardship." (Davis Decl. ¶ 13, Ex. C.) Following receipt of this email, the Councils began receiving letters from NEH concerning certain of their general operating support grants. (*See, e.g.,* Stein Decl. Ex. C.)

To reiterate the above process, at the time of the June 2 email from NEH, Councils had already received Notices of Action for two portions of FY25 General Operating Support Awards setting out approved funding under the 2024 Appropriations Act.  They had not yet (and still have not) received Notices of Action for the final amount of funding appropriated by Congress in the March 2025 Continuing Resolution. Moreover, the June communication was limited to Fiscal Year 2025 general operating support grants; it did not mention the other open council grants including the earlier year general operating support grants, open special initiative grants, open Chair's grants, or any open competitive grants of the Councils. Nor did the communication address funds appropriated in the Continuing Resolution but held back by NEH.

PAGE 10 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

**VII.    Federal Statutes and Regulations Provide a Process for Grant Termination and Alteration Including Notice, Hearing, and an Opportunity to Cure.**

Federal statutes provide that NEH grants to the Federation's members, including their grants for general operating support, may be terminated only if the Chairperson of the NEH finds that certain conditions occur.  *See* 20 U.S.C. § 956(f)(7).  As a prerequisite to termination, the statutes require a finding by the NEH Chairperson "after reasonable notice and opportunity for hearing." 20 U.S.C. § 956(f)(7).  Such a prerequisite finding may be that a Council (1) "is not complying substantially with the provisions" of the state council subsection of the statutes, (2) "is not complying substantially with terms and conditions of its State plan or grant recipient application approved under" the same subsection, or (3) "any funds granted to [a Council] have been diverted from the purposes for which they are allotted . . . ." *Id.*

If one of the above conditions occur, the statutes provide an opportunity to cure:  "[T]he Chairperson shall immediately notify the Secretary of the Treasury and the [Council] with respect to which such finding was made that no further grants will be made under this subsection to such [Council] until there is no longer a default or failure to comply or the diversion has been corrected, or, if the compliance or correction is impossible, until such [Council] repays or arranges the repayment of the Federal funds which have been improperly diverted or expended." *Id*.

Uniform Administrative Requirements in the federal regulations further provide that grants may be terminated by a federal agency if the recipient "fails to comply with the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(1).  Alternately, a grant may be terminated by the agency with the consent of the recipient where the two parties agree upon termination conditions.  *Id*. § 200.340(a)(2).  Finally, a grant may be terminated by the agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *Id*. § 200.340 (a)(4).

If an agency terminates a grant prior to the end of the grant period "due to the recipient's material failure to comply with the terms and conditions," the agency is required to follow a process including reporting the termination and other processes including providing the grant recipient with opportunities to challenge the decision and appeal rights. *See id.* § 200.340(c); § 200.341–342.

Significantly, the regulations require an opportunity for objections and appeal. *Id.* § 200.342 ("The Federal agency must maintain written procedures for processing objections, hearings, and appeals.  Upon initiating a remedy for noncompliance (for example . . . termination), the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action.  The Federal agency or pass-through entity must comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved.")

## VIII.   The Federation and the Councils Are in Immediate Peril

The above actions by Defendants have caused and are continuing to cause direct harm to the Federation and all its members including Oregon Humanities.  Plaintiffs have included a representative sampling of harms in declarations from the heads of the Councils of Alaska, Arkansas, Illinois, Mississippi, New Mexico, Ohio, Oregon, South Dakota, as well as the Federation itself.  Per the Executive Director of the Federation:

> It is hard to overstate how impacted all of our member organizations are, as well as our members' sub-grantees throughout the country. For example, I speak to humanities council leaders every day who have seen their robust staff, partnerships, grantees, and programs evaporate due to the elimination of both operating and program support. Even councils who have not laid off senior staff have lost those invaluable employees and their institutional knowledge and expertise because they could not guarantee future employment. I have seen the vibrant, effective coalition of humanities councils that I have devoted my 25-year career to shrink and falter. The true losers are the American people, who no longer have access to the resources that councils bring to every corner of the nation—for free.

(Stein Decl. ¶ 14.)  Councils have laid off staff, moved out of office space, damaged

relationships with community partners, incurred reputational harm, and generally have been

unable to fulfill their missions as a result of Defendants' actions.  It is less than clear that some of

the Councils will financially survive the coming months. (*See* Davis Decl. ¶ 15; Rockoff Decl.

¶ 11; Best Decl. ¶ 10.)  Representative harms are described in more detail in the supporting

declarations.  The table below demonstrates a small sampling of specific examples of Councils

forced to pause, suspend, or terminate programming and promised support:

| Council | Impacted Locality | Harm |
|---|---|---|
| Alaska Humanities Forum (Perez-Verdia Decl.) | Statewide | Cancelled *Kindling Conversations* program, which supported veterans across Alaska through facilitated dialogue and community-based resource kits. |
| Arkansas Humanities Council (Best Decl.) | Fayetteville (pop. 101,000), Dyess (pop. 322), Monticello (pop. 8,100), Arkansas | Cancelled contract in place with the Smithsonian Museum on Main Street program, to host the national traveling exhibition *Americans*. |
| Illinois Humanities Council (Lyon Decl.) | Rushville, Illinois, (pop. 2,903) | Cancelled all but one "Country and the City" programming, including an event in partnership with a cultural organization in Rushville. Rushville is in an agricultural area and its community members, many of whom are senior citizens, look forward to and eagerly plan around this kind of event. |
| Mississippi Humanities Council (Rockoff Decl.) | Rust College, Holly Springs, Mississippi (pop. 6,700) | Terminated a recently-awarded grant to Rust College, a HBCU with a 90% Pell-eligible student body, for an inaugural film festival exploring African American contributions to filmmaking. |
| New Mexico Humanities Council (Johnson Decl.) | Alamogordo (pop. 31, 300) and Gallup (pop. 22,000), New Mexico | Withdrew promised support to community organizations addressing cultural recovery needs in the wake of New Mexico's devastating 2022 wildfires. |

| Council | Impacted Locality | Harm |
|---|---|---|
| Ohio Humanities Council (Asmo Decl.) | Wood County (pop. 132,000), Akron (pop. 188,000), and Hopewell Township (pop. 3,000), Ohio | Rescinded promised support to (1) Wood County Museum honoring WWII veterans; (2) WOSU Public Media supporting a documentary film about the Hopewell Ceremonial Earthworks; (3) Temple Israel Akron to support a public exhibition about this history of Judaism in Ohio. |
| Oregon Council for the Humanities (Davis Decl.) | Otis (pop. 3,500), Corvallis (pop, 60,000), Cave Junction (pop. 2,000), Ashland (pop. 21,000), Enterprise (pop. 2,100), Oregon | Stopped all pending and upcoming grantmaking activities, including to small Oregon organizations that previously received funding such as Conexión Fénix in Otis, Corvallis Multicultural Library, KXCJ-LP in Cave Junction, Natives of One Wind Indigenous Alliance/Red Earth Descendants in Ashland, Vanport Mosaic in Portland, and Wallowa Land Trust in Enterprise. |
| South Dakota Humanities Council (Oey Decl.) | Lemmon (pop. 1,156), Winner (pop 2,900), and Sisseton (pop. 2,400), South Dakota | Suspended Speakers Bureau program, designed to bring educational and cultural opportunities to areas with limited access. |

The actions of the Defendants since April 2025 have severely undermined the ability of the Federation and its members to carry out their missions promoting the humanities at the local level across the nation. NEH's mixed messages, abrupt funding policy changes (with no advance notice or opportunity for Councils to be heard or appeal), and closure or near-closure of the Office of Federal/State Partnership have caused ongoing instability and uncertainty that jeopardize the functioning of these non-profit organizations who, by design, are local partners of NEH. By terminating funding for the Councils, the actions by NEH have, by extension, damaged the Councils' relationships with libraries, educators, historical societies, local museums, and stifled a myriad of humanities activities benefiting Americans in every state and jurisdiction. (Stein Decl. ¶ 20)

## LEGAL STANDARDS

A preliminary injunction is warranted when (1) a plaintiff is likely to succeed on the merits; (2) a plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Defense Council, Inc*., 555 U.S. 7, 20(2008).

"Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## ARGUMENT

I.    **Plaintiffs are Likely to Succeed on the Merits**

    a.    **Defendants' Actions Violate the Separation of Powers**

Unless enjoined, the hamstringing of the Office of Federal/State Partnership at NEH and related grant terminations and partial recissions will preclude NEH from disbursing its Congressionally appropriated funding to the Councils.  The deliberate decision to flout Congressional command and refuse to spend appropriated funds violates the constitutional separation of powers.

Like all administrative agencies, NEH is a "creature[] of statute." *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).  By statute, Congress established NEH, 20 U.S.C. § 956, defined its officers, *e.g.*, *id*. § 956(b), authorized programs for it to administer, *e.g.*, *id*. § 956(c)(1)–(10), (d), authorized the creation of state and jurisdictional humanities councils to receive NEH funds, *id*. § 956(f), defined mandated allocations of NEH funding to the councils, *id*., and implemented procedures the NEH must follow to alter approved grants, *id*. § 956(f)(7).

Because "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), the Administration could not abolish NEH directly. *Id*. at 464 ("'[R]epeal of statutes, no less than enactment, must conform with Art. I.'") (quoting *INS v. Chadha*, 462 U.S. 919, 954 (1983))

(Scalia, J., concurring in part). Nor can it lawfully do so indirectly by withholding the agency's funds, terminating its programs, and eliminating most of its personnel.

NEH's budget, no less than its formal existence, is subject to Congress's "plenary control." *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*., 561 U.S. 477, 500 (2010). Indeed, NEH may not "spend less than the full amount appropriated by Congress for a particular project or program." *See In re Aiken Cnty*., 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). "[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Id*. at 259. This foundational separation-of-powers principle is embodied in the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl.7.

Congressional appropriation laws specify the amount that NEH must spend. In the 2024 Appropriations Act, Congress appropriated to NEH $192,000,000 which "shall be available for support of activities in the humanities, pursuant to section [20 U.S.C. § 956(c) of the Act and for administering the functions of the Act." Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024) (the "2024 Appropriations Act"). Of that $192,000,000, $65,000,000 was designated for the Councils. (Sortun Decl. ¶ 8, Ex. E; ¶ 9, Ex. F.) The March 15, 2025 continuing resolution re-appropriated all of the funds appropriated to NEH in 2024, meaning an additional $65 million was earmarked for the Federal State Partnership. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025).

Defendants' decision to dismantle the Federal-State Partnership contravenes these appropriations laws and Congressional authority. For example, Defendants ordered the termination of General Operating Support and other grants that had been awarded as part of the $130 million Congress appropriated for the Federal State Partnership. The supporting Declarations indicate that each of the Councils were allocated appropriations by NEH, which were then clawed back, discontinued, or paused.

To use Oregon Humanities as an example, it applied for and was approved for a general operating support grant that spans November 1, 2022, to October 31, 2027. (Davis Decl. ¶ 6.)

An NEH Notice of Action approved $2,579,205 in funding for this grant.  To date, NEH has awarded and reimbursed $2,029,271 in funds under this grant.  An additional $258,934 should be available under this grant during Fiscal Year 2025.  In addition, Oregon Humanities' funding should have increased by an additional $578,000 based upon the Continued Resolution appropriation, bringing its total award for its operating grant to $3,140,000.  The CR Notice of Action was never provided. In response to a NOFO, Oregon Humanities submitted an application for a new general operating support grant for November 1, 2025 to October 31, 2030. That grant application has not been processed by NEH.  Oregon Humanities also applied for funding through a second round of NEH's United We Stand special initiative grant and were notified on January 22, 2025, that it was awarded $40,000 in grant funds.  Those funds have already been expended by Oregon Humanities, but not reimbursed by NEH.  (*Id*. at ¶ 7-8.)

In sum, Defendants have refused to disburse funds in the manner required by Congress, violating the separation of powers.  When this Administration has tried in recent months to dismantle other federal agencies by withholding appropriated funds, courts repeatedly and correctly enjoined such unconstitutional acts. *See, e.g., Widakuswara v. Lake*, — F.Supp. 3d —, 2025 WL 945869, at *7 (S.D.N.Y. Mar. 28, 2025) (granting TRO to prevent the termination of much of an agency and its grants, because the Administration "usurp[ed] Congress's power of the purse and its legislative supremacy" when it "with[eld] the funds statutorily appropriated to fully administer" the agency); *RFE/RL, Inc. v. Lake*, — F. Supp. 3d —, 2025 WL 1232863, at *8 (D.D.C. Apr. 29, 2025) ("When money has been appropriated by Congress, 'the Executive has no residual constitutional power to refuse to spend these appropriations.'") (quoting *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243–44 (D.D.C. 1973)); *Am. Library Ass'n v. Sonderling*, — F. Supp. 3d —, 2025 WL 1262054, at *2 (D.D.C. May 1, 2025) ("The wholesale termination of grants and services and the mass layoffs . . . contravenes Congress's appropriation of almost $300 million to [the Institute of Museum and Library Services].").

"This case has serious implications for our constitutional structure. *Aiken Cnty*., 725 F.3d at 266–67. "It is no overstatement to say that our constitutional system of separation of powers

would be significantly altered if [courts] were to allow executive . . . agencies to disregard federal law in the manner" done by Defendants here. *See id.* at 267.  This Court should similarly hold here that Defendants' dismantling of NEH likely violated the separation of powers.

### b.    Defendants' Actions Violate the Impoundment Control Act

Separation of powers principles have been codified in the Impoundment Control Act, which provides that all funds appropriated by Congress "shall be made available for obligation" unless Congress itself has rescinded the appropriation, 2 U.S.C. § 683(b), and that "[n]o officer or employee of the United States may defer any budget authority" except in exceedingly narrow circumstances, *id*. § 684(b)–(c).

Congress passed the ICA in response to President Nixon's refusal to spend funds on numerous statutory programs.  As then-Judge Kavanaugh explained, under the ICA, if the President has policy reasons for wanting to spend less than the full amount appropriated by Congress for a particular project or program, the President "must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *Aiken County*, 725 F.3d at 261 n.1; *see also* 2 U.S.C. § 683.

Similarly, under the ICA, the President may "defer" spending funds only in limited circumstances.  The ICA defines a "deferral" to include any "withholding or delaying the obligation or expenditure of" funds, and "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" funds. 2 U.S.C. § 682(1).  When the Executive Branch wishes to defer funds, it must send a message to Congress detailing the money to be deferred and the reasons for deferral.  There are only three permissible grounds for deferrals. *Id*. § 684(b).  "Policy reasons," including ensuring funds are spent in accord with the President's policy preferences, are not a proper basis for deferrals. *See* GAO, Office of Management and Budget—Withholding of Ukraine Security Assistance, B-331564, at 6 (Jan. 16, 2020). (Sortun Decl. Ex. G.)

On June 16, 2025, the U.S. Government Accountability Office issued a relevant decision in the matter of the Institute of Museum and Library Services ("IMLS"), finding that the IMLS

PAGE 18 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
                       PRELIMINARY INJUNCTION

violated the ICA by withholding funds that cannot be withheld when it terminated grants as a result of President Trump's Executive Order 14238. GAO, IMLS—Applicability of the Impoundment Control Act to Reduction of Agency Functions, B-337375, at 2 (June 16, 2025) (Sortun Decl. Ex. B.)  GAO found that grants contemplated by the IMLS statute could not be withheld because the funds were "'allotted' to states by a specific 'formula.'" *Id*. at 11. Because the IMLS statutes contained (1) an allotment formula, (2) elements of notice ("IMLS 'shall' approve compliant state plans, which remain in place for five years thus giving states notice of future cutoffs"); and (3) a clear spending mandate (the statute directed the agency "shall award" grants in formula-specified amounts), the funds were "not eligible for deferral or rescission consistent with ICA procedures [and] may not be withheld from obligation and expenditure under the ICA." *See id*. at 12.

This case is markedly similar.  As with IMLS, the President did not send a message to Congress detailing the money to be deferred from NEH and the reasons for deferral.  Like IMLS, NEH drastically reduced its operations, *id.* at 5, terminated grants, *id.* at 9, and terminated staff, *id*. at 10. Like IMLS, NEH withheld grant funding "that cannot be withheld consistent with the ICA's fourth disclaimer prohibition for funds 'required' to be spent." *Id*. at 11.  The NEH statues contain an allotment formula, elements of notice, and a clear spending mandate.  The same conclusion GAO reached concerning IMLS funding should result.

The President has not followed the ICA's required procedure for proposing a rescission or deferral of NEH's appropriations.  Defendants' actions likely will result in a rescission of much of the nearly $130 million that Congress has appropriated to the Councils at NEH over the last two years.  At a minimum, Defendants' actions unquestionably are unlawful deferrals of the spending of these funds.  There can be no reasonable dispute that the mass firing of staff and interruption of the Federal State Partnership will "delay[] the obligation or expenditure of" appropriated funds.  *See* 2 U.S.C. § 682(1).  And Defendants have undertaken these actions for policy reasons, leaving no doubt that these deferrals violate the ICA.  *See* Withholding of Ukraine Security Assistance, (Sortun Decl. Ex. G at 6.)

c.    **Defendants' Terminations and Recissions Violate the Administrative Procedures Act**

    i.    **The Grant Terminations and Partial Recissions Are Final Agency Action**

The decisions to terminate NEH grants and the subsequent partial rescissions, and the measures taken to implement that decision, constitute "final agency action" reviewable under the Administrative Procedure Act (APA). 5 U.S.C. § 704.  An action is "final" if it (1) "'consummat[es]' [] the agency's decisionmaking process" and (2) determines "'rights or obligations'" or imposes "'legal consequences.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).  Here, Defendants consummated their decision-making by mass terminating grants in April, and then issuing partial rescissions of a select number of terminations in June, all without notice, opportunity for hearing, or appeal.  These decisions also carried legal consequences because they either terminated grants or significantly reduced their amounts by halving previous awards.  Accordingly, the decision to dismantle NEH is plainly final. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 67–68 (1st Cir. 2025) ("broad, categorical freezes on obligated funds" were "discrete final agency actions").

First, that the grants were terminated en masse, with identical language, leaves no doubt that the terminations were done pursuant to a final, categorical decision and thus consummated the decision-making. *See New York v. Trump*, 133 F.4th at 68–69 (concluding that "numerous notices and emails authored by Agency Defendants [ ] support[ed] the finding that their funding freezes were categorical in nature," and that the "pauses, freezes, and sudden terminations of obligated funds [ ] suggested that these actions were taken pursuant to such categorical decisions," distinguishing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)).

Second, Defendants made clear that the actions taken in furtherance of the decision to terminate were final and "not . . . merely tentative or interlocutory." *Bennett*, 520 U.S. at 178. Among other things, Defendants stated that there would be NO appeal opportunities for the Councils.  *See Purpose Built Fams. Found., Inc. v. United States*, 634 F. Supp. 3d 1118, 1124–25

(S.D. Fla. 2022) ("letter stat[ing] that the agency ha[d] decided to terminate . . . grants" was "final agency action" because it "ma[de] clear that legal consequences w[ould] follow from the letter" and "d[id] not state or even suggest that any further proceedings w[ould] take place prior to termination"), *aff'd on other grounds*, 95 F. 4th 1346 (11th Cir. 2024). When NEH circulated guidance for terminated grants to the Councils, it stated that "NEH is not offering a means of dispute resolution" or appeal for terminated grants." (Davis Decl. Ex. B.) Clearly, these decisions carried legal consequences.

The June partial rescissions do not change this conclusion. When NEH wrote to all Councils on June 2 it stated that some grant terminations had "been rescinded up to 20%." (Stein Dec. Ex. B.) The Councils then began receiving letters from NEH with confusing language that is at odds with Congressional appropriation language. For example, Wyoming Humanities Council received a letter that states that it could "continue approved activities under [its Fiscal Year 2025 GOS grant." (*Id*. Ex. C.) But the letter also stated that "[f]or fiscal year 2025, the agency is funding at a 20 percent allocation, which is the minimum that NEH is congressionally mandated to award to its state and jurisdictional humanities council partners," citing 20 U.S.C. § 960. These June communications did not reference previously awarded Notices of Action, provide for notice or an opportunity to be heard on grant terminations and modifications, or provide for an appeal right. In other words, the terminations of half of the grant funding remained final and not subject to appeal.[4]

---

[4] The 20% number in the June partial rescission notice is also contrary to Congress's instruction. In connection with the 2024 Appropriations Bill, Congress directed NEH to "continue to provide no less than 40% of its program funds to support the work of these councils and maintain the longstanding collaborative relationship between NEH and these councils." 118th Cong 1st Session House of Representatives Report 118-155. The Notices of Action delivered to the Councils stemming from this appropriation appear to have used the 40% number. The partial rescissions effectively halved awards to the Councils without reference to the required statutory formulas. Moreover, even if 20 U.S.C. § 960(a)(1)(B) provided NEH with discretion to cut Congressional appropriations in half, contrary to instruction from Congress, the statute plainly *does* not allow the claw back of appropriated funds after Council plans have been approved by

Defendants' decisions to terminate and rescind are thus final and subject to APA review. *See Biden v. Texas*, 597 U.S. 785, 807 (2022) ("attempt[] to terminate" programming constituted "final agency action").

### ii.    The Grant Terminations and Partial Recissions are Contrary to Law

In their rush to "claw back" $175 million in promised funding, Defendants failed to abide by numerous federal laws.  Specifically, in contravention of statute, Defendants (a) failed to follow the statutory process for grant terminations or modifications by, for example, failing to provide the Councils with notice and an opportunity to be heard, 20 U.S.C. § 956(f)(7); (b) cut funding required to be provided to the Councils on population and other formulaic bases, 20 U.S.C. § 956(f)(4); and (c) failed to provide appellate rights. *See also* 2 C.F.R. § 200.340(a)(1), (2), (4); 2 C.F.R. § 200.342.  Each violation is an independent basis for this Court to find there is a likelihood of success on the merits.

First, NEH statutes state that grants to the Federation's members, including their grants for general operating support, may be terminated only if the Chairperson of the NEH finds that certain conditions occur.  See 20 U.S.C. § 956(f)(7).  As a prerequisite to termination, the statutes require a finding by the NEH Chairperson "after reasonable notice and opportunity for hearing." 20 U.S.C. § 956(f)(7).  Such a prerequisite finding may be that a Council (1) "is not complying substantially with the provisions" of the state council subsection of the statutes, (2) "is not complying substantially with terms and conditions of its State plan or grant recipient application approved under" the same section, or (3) "any funds granted to [a Council] have been diverted from the purposes for which they are allotted . . . ." *Id.*

No such findings were made about any of the mass grant terminations that occurred on April 2.  Even if a finding had been made, the statutes also provide an opportunity to cure, which also did not occur:  "[T]he Chairperson shall immediately notify the Secretary of the Treasury

---

the Chairperson and NEH has issued Notices of Action, particularly without a lawful basis and without providing notice or opportunity to be heard.

and the [Council] with respect to which such finding was made that no further grants will be made under this subsection to such [Council] until there is no longer a default or failure to comply or the diversion has been corrected, or, if the compliance or correction is impossible, until such [Council] repays or arranges the repayment of the Federal funds which have been improperly diverted or expended." *Id.*

Second, Defendants violated federal laws regarding the specific allocation of NEH funds to the Federal State Partnership. As explained in Part I.a., supra, NEH may not "spend less than the full amount appropriated by Congress for a particular project or program." *Aiken Cnty.*, 725 F.3d at 261 n.1. By statute, the allocation formulas for NEH are mandatory once the Chairperson has approved a Council's plan: "44 per centum of the amount of such excess for such fiscal year shall be allotted in equal amounts among the States and grant recipients which have plans approved by the Chairperson" and 22% "of [certain fiscal year appropriations] shall be allotted [based upon population of] the States and grant recipients which have plans approved by the Chairperson [of NEH]." *See, e.g.*, 20 U.S.C. § 956(f)(4)(B)–(C).

Here, each of the Councils had 2025 plans approved by the Chairperson at the time of the April 2 terminations and the June partial recissions. Such cuts necessarily reduced certain states and jurisdictional Councils' formula funds well below the amount required to be allocated by statute. Defendants' cuts thus violate Congress's command to allocate specific amounts of formula funds to each Council.

Third, NEH failed to provide any mechanism for appeal. As stated above, NEH guidance on terminated grants stated no appeal mechanism would be provided. The June 2 partial rescission notices similarly did not provide an appeal right when NEH halved the Congressionally appropriated funds to the Councils.

Because the termination and rescission decisions violated these statutes, Plaintiffs are likely to succeed on their APA claim. *See Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, 2025 WL 842360, at *9 (D.D.C. Mar. 18, 2025) ("[A]gencies can decide to re-evaluate their programs, or they may decide to end agreements or federal awards. But those decisions must be

made lawfully and in accordance with established procedures and relevant rules and regulations . . . .").

### iii.      Defendants' Actions are Arbitrary and Capricious

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants' decision to terminate NEH is unlawful because Defendants failed to engage in "'reasoned decisionmaking'" as required by the APA. *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citing *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id*. (quotations omitted).

Defendants neither "articulate[d] a satisfactory explanation for [their] action[s]," *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983), nor did they "consider 'serious reliance interests'" that would be impacted by the agency's sudden and drastic termination of the Federal State Partnership, *see FDA v. Wages & White Lion Invs., L.L.C.*, 145 S.Ct. 898, 917 (2025) (quoting *Encino Motorcars v. Navarro,* 579 U.S. 211, 221–22 (2016)).

Defendants have offered only meaningless and boilerplate explanations as to why they terminated support of the Councils, halved promised support, and gutted the Office of Federal/State Partnership.  For example, the notices of terminations state only that the grants "no longer effectuate[] the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2 CFR §200.340. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda."  (Davis Decl. Ex. A.)

The only public explanation NEH has offered for the recent flurry of actions is a "Statement on NEH Priorities," which NEH posted on April 24, weeks after taking most of the relevant actions. (Sortun Decl. Ex. C.)  The "Statement" asserts that NEH is now focused only on

PAGE 24 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

"projects related to the nation's semiquincentennial and American exceptionalism," and that "NEH has recommitted itself to ensuring that its funding, as required by statute, contributes to public confidence in how it expends taxpayer funds." *Id.*[5]  Even if this was relevant, the explanation came after the actual decisions and therefore is a post-hoc rationalization that cannot be considered as part of the agency's decision.  Moreover, the Statement provides no explanation for the termination and partial rescissions.  NEH thus has not adequately explained its actions, and it certainly has not provided a "rational connection between the facts . . . and the choice made." *NRDC*, 658 F.3d at 215.  NEH's actions should be enjoined on this ground alone.  *See, e.g.*, *id.* at 217; *AIDS Vaccine Advoc. Coal. V. U.S. Dep't of State*, 770 F. Supp. 3d 121, 138 (D.D.C. 2025); *Widakuswara*, 2025 WL 945869, at *5.

These vague, "conclusory statements will not do" to explain the agency action.  *Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014); *see Int'l Union, United Mine Workers of Am. V. U.S. Dep't of Lab.*, 358 F.3d 40, 44 (D.C. Cir. 2004) ("[A] statement that there was a "change in agency priorities," without explanation, is not informative in the least[.]").

Nor did NEH provide any advance notice that it was executing a major change in policy.  As the Supreme Court reiterated recently, "[t]he change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities."  *Wages & White Lion Invs.,* 145 S. Ct. at 917.  Under that doctrine, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change," "display awareness that [they are] changing position," and "consider serious reliance interests."  *Id.* (quoting *Encino Motorcars*, 579 U.S. at 221–22).  Here,

---

[5] The same day, NEH announced a new grant program to fund statues for a "National Garden of American Heroes." The proposed program calls for NEH to issue grants to artists to "create life-size statues in marble, granite, bronze, copper, or brass depicting historical figures tied to the accomplishments of the United States." (Sortun Decl. Ex. D.) Unlike prior programs, the Notification of Funding Opportunity did not include limitations on using NEH funds for projects "outside of . . . the humanities," including the "creation…of art." *See* Press Release, *NEH Announces Grant Opportunity to Create Statues of Iconic Americans for the National Garden of American Heroes* (Apr. 24, 2025), https://perma.cc/BR7Y-U87N. This constitutes illegal reprogramming of congressional funds.

Defendants issued no public-facing statements and provided no advance notice that they were radically changing agency policy via drastically reduced support to the Councils.

Last, there is no indication that Defendants considered "serious reliance interests" on the part of Councils, the Federation, and the public, all of which have depended on steady NEH support for decades. *See Wages & White Lion Invs.*, 145 S. Ct. at 917 (quoting *Encino Motorcars*, 579 U.S. at 221–22). Plaintiffs and partner organizations have reliance interests in planning and budgeting programs based on Congressional appropriations and the agency's signed commitment to support programs for a specific award period under the rules in place at the time the award is made.

Defendants did not consider any of these reliance interests, much less weigh them against competing policy concerns (if any), or consider any alternatives (such as honoring existing program commitments and reserving any drastic policy changes for future programs). In sum, Defendants failed to engage in any "reasoned decisionmaking" whatsoever, *see Michigan*, 576 U.S. at 750, and the dismantling of NEH therefore is arbitrary and capricious. *See Encino Motorcars*, 579 U.S. at 222 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

## II.    Defendants Cannot Avoid the Merits by Relying on Jurisdictional Arguments

Defendants cannot escape a likely loss on the merits by relying on the same jurisdictional arguments they have raised elsewhere. First, Plaintiffs have standing to bring their claims. As detailed in Part II, Defendants' actions to destroy the Federal State Partnership are causing irreparable harm to Plaintiffs. Those harms are directly traceable to Defendants' unlawful conduct and will be redressed by the requested injunctive and declaratory relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (standing requires injury-in-fact, causation, and redressability).

Plaintiff Federation has both direct standing to sue and associational standing to pursue relief on behalf of its member organizations. The Federation has direct standing to sue because it suffered direct harm to its core activities as a result of Defendants. (Stein Decl. at ¶ 19.) It also

has associational standing because it can show that "(1) at least one of its members would have standing to sue in his own right; (2) the interests the suit seeks to vindicate are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006); *see also* Stein Decl.

Second, this Court—not the Court of Federal Claims under the Tucker Act—has jurisdiction over Plaintiffs' claims. As in *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988), none of the issues here involve the sorts of contractual obligations that are appropriately dealt with by the Court of Federal Claims. Rather, this case challenges Defendants' decision to terminate and partially rescind grants to Councils. The claims are founded in the Constitution and federal statutes and regulations governing NEH, and the relief sought is purely equitable—to vacate illegal agency actions and an injunction to return to the status quo.

Even though federal payments may be "engend[ered]" as a "by-product" of the "court's primary function of reviewing the [administration's] interpretation of federal law," that does not turn this Constitutional and APA case into a contractual suit for damages. *Id.* at 910; *see also id.* at 895 (distinguishing "money damages," i.e., compensatory relief as "a substitute for a suffered loss," from equitable relief that seeks "the very thing to which [plaintiff] was entitled"); *see also Maine Comm. Health Options v. United States*, 590 U.S. 296, 323–24 (2020) ("[W]hen the [APA] provides an avenue for relief," "[t]he Tucker Act yields."); *Randall v. United States*, 95 F. 3d 339, 347 (4th Cir. 1996) (injunctive relief was essence of complaint because "Plaintiff's claim for back pay would only arise if Plaintiff's request for retroactive promotion were granted").

For that reason, Defendants cannot rely on the Supreme Court's decision granting a stay in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025), because the Court there characterized the plaintiffs as seeking "orders 'to enforce a contractual obligation to pay money.'" *Id.* Indeed, the Court reiterated in that very case that district court jurisdiction "'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910).

### III.    Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief

Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief.  *Winter v. Natural Resources Def. Counc., Inc.*, 555 U.S. 7, 20, 120 S.Ct. 365 (2008).  Some of the Councils, for example Arkansas, Ohio, and Mississippi, have indicated their financial situation is entirely uncertain and they are operating on reserve funds.  *See, e.g,* Rockoff Decl. ¶¶ 2, 15.

The irreparable harm that will be caused to Plaintiffs in the absence of preliminary relief is about more than money, however.  The disruptions at NEH have put the delivery of humanities programming around the country at imminent risk—some of this harm has already occurred and is occurring daily, as outlined above and in the supporting declarations of Council Executive Directors.  Communities and organizations throughout the country rely upon the Councils for support—and now that support is evaporating.  Defendants' actions are damaging the reputations and stability of the Councils.  In the words of Rebecca Asmo, Executive Director for Ohio Humanities Council ("OHC"):

> The abrupt loss of NEH funding has forced OHC to break commitments to organizations it has long-standing relationships with, causing irreparable harm to their operations and to our reputation as a trustworthy partner. … [M]ost troubling is the impact these funding losses are having on communities across Ohio right now. OHC's grant contracts are designed to serve the public. Each of the projects described above are accessible to the public at low or no cost. On April 2, 2025, Ohioans were robbed of many opportunities to learn about our history, our culture and our shared human experience. Every day that goes by that this funding is not available; Ohioans lose opportunities to learn and connect.
>
> OHC has also suffered financial hardship as a result of NEH grant terminations. At the time of the grant termination, 90% of OHC's approximately $1.9M annual budget came from NEH funds. To sustain operations now and as long as this crisis persists, OHC will go from five full time staff to 3 full time staff beginning July 1, 2025. We have also elected not to fill a vacant full-time fundraising position. We are using non-federal cash reserves to operate during this time, something that will ultimately weaken our financial strength as a non-profit organization in the future.
>
> The termination of all of OHC's NEH funding has been a traumatic experience for the public humanities community in Ohio.

PAGE 28 – MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
          PRELIMINARY INJUNCTION

> It has harmed OHC's standing as a leader in Ohio's cultural sector and damaged the reputations, finances and operations of our grantees who work hard every day to serve and educate the public – especially those in small and marginalized communities. Winning back the trust of our community will be difficult, and I doubt the public humanities community will view OHC as a completely reliable partner again in the future.

(Asmo Decl. at 12-14.)  Ohio's experience is being played out in locations all over the country. Gabrielle Lyon, Executive Director of Illinois Humanities Council, summarizes the importance of the Councils' work as follows: "America was built on the idea that no matter who you are or where you come from, if you work hard, you can build a better life for yourself and your family. Illinois Humanities' part in all of this is helping build quality of life by ensuring the places people live support them to be creative, connected, and in community.  Every American should have access to arts, culture, and history—all the things that help people make a better life for themselves, their children, and their grandchildren." (Lyon Dec. ¶ 11.)  As these representative examples illustrate, the Federation, the Councils, and **all Americans** will suffer irreparable harm if preliminary relief is not granted.

## IV.    The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor

The final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, those factors overwhelmingly support maintaining the Federal State Partnership at NEH during the pendency of this case.

The public "undoubtedly has an interest in seeing its governmental institutions follow the law," *Roe*, 947 F.3d at 230–31, whereas Defendants suffer no harm from an injunction that merely ends unlawful action.  *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017).  Indeed, "'there is a substantial public interest in having governmental agencies abide by the federal laws' . . . 'that govern their existence and operations.'"  *Id.* (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  Moreover, the ongoing harm to Councils and the people that they serve outweighs any inconvenience to Defendants.

Plaintiffs are faced with the immediate and unanticipated termination of longstanding federal support in the middle of a fiscal year.  Each of the supporting executive director declarations describe the particular harms faced across the country—financial, reputational, community-based, local, and other impacts are continuing to play out each day NEH continues to violate the law.

By contrast, the only burden on Defendants is that they will be required to maintain NEH as the law requires, and support programs and grants that Congress has appropriated funds for and that the agency previously approved.  As in *HIAS, Inc. v. Trump*, Plaintiffs face "enormous burdens" due to Defendants' unlawful actions that will likely cause humanities programming to "clos[e] entirely in [their] jurisdictions," whereas Defendants only would be enjoined to preserve agency functions according to "well-established processes refined over several decades."  985 F.3d at 326.  Under these circumstances, "the public interest is served by maintaining the status quo during the pendency of this litigation."  *Id.; see also Doe v. Trump*, — F. Supp. 3d —, 2025 WL 485070, at *14 (D. Mass. Feb. 13, 2025) (equities favored injunction that "will do no more than maintain a status quo that has been in place for well over a century"), *aff'd sub nom., New Jersey v. Trump*, 131 F.4th 27, 2 (1st Cir. 2025).

## V.    The Court Should Enjoin the Actions Taken to Damage the Federal State Partnership

Based on the foregoing violations and harms, Plaintiffs respectfully request that the Court enter a entering a stay under section 705 of the Administrative Procedure Act (APA), 5 U.S.C. § 705, and a preliminary injunction against all Defendants:

1.    Enjoining, pending further order of the Court, Defendants, their agents, and anyone acting at Defendants' direction to restore the Federal State Partnership by returning NEH grants to state and jurisdictional humanities counsels to the status quo prior to the termination and rescission decisions.

2.      Requiring Defendants to file, within one week of entry of this order and every month thereafter until resolution of the merits, a Status Report documenting the actions that they have taken to comply with the Court's order.

This requested injunction is narrowly tailored to provide complete relief for the specific harms suffered by Plaintiffs. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunction "should be no more burdensome to the defendant than to provide complete relief to the plaintiffs before the court" (emphasis added)).  In crafting equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quotation omitted).  Based on these principles, Plaintiffs have limited the requested relief, wherever workable, to remedy their harm suffered.

## CONCLUSION

For the reasons set forth above, in the Amended Complaint, and in the supporting declarations filed herewith, Plaintiffs respectfully ask this Court to enjoin Defendants as requested in the Motion.

DATED:  June 25, 2025.

TONKON TORP LLP


By:    *s/ Anna Sortun*
    Anna Sortun, OSB No. 045279
     Direct:  503.802.2107
     Email:  anna.sortun@tonkon.com
    Steven M. Wilker, OSB No. 911882
     Direct:  503.802.2040
     Email:  steven.wilker@tonkon.com
    Paul Balmer, OSB No. 203429
     Direct:  503.802.5745
     Email:  paul.balmer@tonkon.com
    Gracey Nagle, OSB No. 215255
     Direct:  503.802.5753
     Email:  gracey.nagle@tonkon.com
    *Attorneys for Plaintiffs*

099997\33304\18485700v3