Anna Sortun, OSB No. 045279
  Direct:  503.802.2107
  Email:  anna.sortun@tonkon.com
Steven M. Wilker, OSB No. 911882
  Direct:  503.802.2040
  Email:  steven.wilker@tonkon.com
Paul Balmer, OSB No. 203429
  Direct:  503.802.5745
  Email:  paul.balmer@tonkon.com
Gracey Nagle, OSB No. 215255
  Direct:  503.802.5753
  Email:  gracey.nagle@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779
     *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON COUNCIL FOR THE HUMANITIES d/b/a OREGON HUMANITIES, a nonprofit corporation; FEDERATION OF STATE HUMANITIES COUNCILS, a nonprofit corporation, | Civil No. 3:25-cv-00829-SI |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR 5 U.S.C. § 705 STAY AND PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DOGE SERVICE, a component of the Executive Office of the President; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; NATIONAL ENDOWMENT FOR THE HUMANITIES, an independent federal agency, and its advisory council NATIONAL COUNCIL ON THE HUMANITIES; MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

I.  Threshold Jurisdictional and Venue Arguments...................................2

    A.  The Federation has standing to pursue relief for its members. ..................2

    B.  *Trump v. CASA* has no impact on this Court's ability to fashion a
remedy or impose a stay under 5 U.S.C. § 705.............................................4

    C.  The Tucker Act does not bar Plaintiffs' claims and requested relief..........6

    D.  This Court is a proper venue....................................................................10

II.  Merits Arguments ................................................................................11

    A.  Separation of Powers ...............................................................................11

    B.  Impoundment Control Act ......................................................................14

    C.  Administrative Procedures Act ...............................................................15

        i.  Plaintiffs described discrete agency actions. ................................15

        ii.  The challenged acts are not committed to agency
discretion.........................................................................................16

        iii.  The NEH acted contrary to law. ....................................................17

        iv.  The actions of Defendants were beyond arbitrary and
capricious. .......................................................................................20

III.  Irreparable Harm ................................................................................22

IV.  Balance of Equities / Public Interest ...................................................23

V.  Plaintiffs seek a status quo injunction.................................................24

VI.  The Court should not require a bond. .................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ................................................................................11

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
   770 F. Supp. 3d 822 (D. Md. Mar. 2025) ...............................................................4

*Am. Council of Learned Societies, et al., Plaintiffs, v. Michael McDonald, et al.,*
   *Defendants; The Authors Guild, et al., Plaintiffs*, No. 25 ......................................4

*Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*,
   No. CV 25-1128 (BAH), 2025 WL 1795090 (D.D.C. June 30, 2025) ...................15

*American Council of Learned Soc. v. McDonald*,
   Case 1:25-cv-03657-CM (SDNY) .........................................................................16

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) ..................................................................................3

*Ass'n of Am. Universities v. Dep't of Energy*,
   No. 25-CV-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) ..................4

*Bennett v. Spear*,
   520 U.S. 154 (1997)...............................................................................................16

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)............................................................................................8, 9

*Cabrera v. Dep't of Labor*,
   No. 25-1909, 2025 WL 2092026 (D.D.C. July 25, 2025) .......................................5

*Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*,
   No. 25-cv-02847-AMO, 2025 WL 1168898 (N.D. Cal. Apr. 21, 2025), aff'd
   137 F.4th 932 (9th Cir. 2025) ................................................................................9

*Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau*,
   No. 4:25-CV-16-SDJ, 2025 WL 1920148 (E.D. Tex. July 11, 2025) .....................5

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019).................................................................................................6

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020).........................................................................................6, 9, 10

*Drs. for Am. v. Off. of Pers. Mgmt.*,
   No. CV 25-322 (JDB), 2025 WL 1836009 (D.D.C. July 3, 2025) ..........................5

*E. Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2020) .................................................................6

*Env'l Protection Info. Cnt'r v. Pac. Lumber Co.*,
    469 F. Supp. 2d 803 (N.D. Cal. 2007) ...................................................3

*Exxon Corp. v. F.T.C.*,
    588 F.2d 895 (3d Cir. 1978) ................................................................10

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .....................................................................22, 23

*FCC v. Prometheus Radio Proj.*,
    592 U.S. 414 (2021) ............................................................................22

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) .............................................................24

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ............................................................24

*Haitian Evangelical Clergy Ass'n v. Trump*,
    No. 25-CV-1464 (BMC), 2025 WL 1808743 (E.D.N.Y. July 1, 2025) ....................5

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ..............................................................................3

*Johnson v. Couturier*,
    572 F. 3d 1067 (9th Cir. 2009) ...........................................................24

*Las Americas Immigrant Advoc. Ctr. v. Biden*,
    571 F. Supp. 3d 1173 (D. Or. 2021) ...................................................10

*Las Americas Immigrant Advoc. Ctr. v. Trump*,
    475 F. Supp. 3d 1194 (D. Or. 2020) ...................................................10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................3

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
    No. CV DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025) .........9

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) .............................................................7

*Montana Wildlife Fed'n v. Haaland*,
    127 F.4th 1 (9th Cir. 2025) ..................................................................6

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................................22

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    767 F. Supp. 3d 243 (D. Md., 2025) .........................................................24

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget,*
    775 F. Supp. 3d 100 (D. D.C. 2025) ........................................................24

*New York v. Trump,*
    764 F. Supp. 3d 46 (D.R.I. 2025) ............................................................15

*Pacito v. Trump,*
    772 F. Supp. 3rd 1204, 1211 (W.D. Wa. 2025) ..................................1, 17

*Pacito v. Trump,*
    No. 2:25-cv-255-JNW, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ..............................8

*Railway Labor Executives' Ass'n v. ICC,*
    958 F.2d 252 (9th Cir. 1991) ..................................................................10

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem,*
    No. CV 25-306 (RDM), 2025 WL 1825431 (D.D.C. July 2, 2025) ..................................5

*Ryder v. Union Pac. R.R. Co.,*
    945 F.3d 194 (5th Cir. 2019) ..................................................................19

*S.F. A.I.D.S. Found. v. Trump,*
    No. 25-cv-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025) ..............................9, 25

*Sidney Coal Co. v. Soc. Sec. Admin.,*
    427 F.3d 336 (6th Cir. 2005) ..................................................................10

*Stafford v. Briggs,*
    444 U.S. 527 (1980) ...............................................................................10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) .................................................................................3

*Trump v. Boyle,*
    606 U.S. ___ (2025) .................................................................................9

*Trump v. CASA,*
    145 S. Ct. 2540 (2025) ...................................................................2, 4, 5, 6

*United Aeronautical Corp. v. U.S. Air Force,*
    80 F.4th 1017 (9th Cir. 2023) ...................................................................7

*United States v. Doe,*
    701 F.2d 819 (9th Cir. 1983) ..................................................................19

*United States v. Texas,*
    599 U.S. 670 (2023) .................................................................................6

*Walker v. Kennedy,*
    No. 20-CV-2834 (FB) (VMS), 2025 WL 1871070 (E.D.N.Y. July 8, 2025) ...........................5

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
    No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ...........................9

**Statutes**

5 U.S.C. § 701(a)(2) .................................................................................................................16

5 U.S.C. § 704 ..........................................................................................................................15

5 U.S.C. § 705 .......................................................................................................................4, 25

5 U.S.C. § 706 ............................................................................................................................8

20 U.S.C. 956(f)(4) ..................................................................................................................12

20 U.S.C. § 951(5) ...................................................................................................................20

20 U.S.C. § 956 ........................................................................................................................18

20 U.S.C. § 956(f) ...............................................................................................................17, 20

20 U.S.C § 956(f)(4) ............................................................................................................13, 15

20 U.S.C § 956(f)(6) .................................................................................................................14

20 U.S.C. § 956(f)(7) .............................................................................................................8, 18

20 U.S.C. § 960(a)(1)(B) ..........................................................................................................14

20 U.S.C. § 960(b)(1) ...............................................................................................................13

28 U.S.C. § 1391(e)(4) .............................................................................................................10

31 U.S.C. § 6303 .......................................................................................................................8

31 U.S.C. § 6304 .......................................................................................................................8

Impoundment Control Act, 2 U.S.C. § 660 *et seq.* ....................................................................14

Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024) ......................................................................12

**Other Authorities**

2 C.F.R. § 200.340 ...........................................................................................................17,18,19,21

2 C.F.R. § 200.342 ...............................................................................................................18, 19

**INTRODUCTION**

In April 2025, Defendants unlawfully terminated grants that provided Congressionally-mandated financial stability to the state and jurisdictional humanities councils (the "Councils"). The Councils were explicitly created by Congress to act as conduits to distribute federal humanities funding at the state and local level.  The Federal State Partnership is distinct from other federal granting relationships. Congress's intention in establishing the statutory architecture for the National Endowment for the Humanities ("NEH") was to provide stability to the Councils' operations.  Defendants' actions have significantly destabilized the system, are contrary to explicit Congressional direction, and thus must be vacated.

Defendants now admit the April grant terminations ran afoul of NEH statutes.  NEH Chairperson McDonald ("Chairperson") admits that "[r]escinding the [April] termination notices was necessary for NEH to ensure it complied with the congressional appropriation requirement that NEH fund its Federal/State Partnership Program."  McDonald Decl. [ECF No. 32] ¶ 16. Defendants' attempt to "cure" its illegal action through its selective issuance of June rescission notices is a separate, arbitrary and capricious action that did not resolve the legal problems Defendants created in April.

Defendants attempt to excuse their statutory violations by suggesting that NEH had the right to terminate the Councils' grants at any time if the Chairperson determines the grants "no longer effectuate[] the program goals or agency priorities," citing 2 C.F.R. § 200.340(a)(4).  This argument does not stand up to scrutiny.  "Administrative law rests on the foundational principle that agencies must act within the bounds of their statutory authority and provide reasoned explanations for their actions."  *Pacito v. Trump*, 772 F. Supp. 3rd 1204, 1211 (W.D. Wa. 2025). The Court should not give credence to Defendants' attempt to muddy the waters with post-hoc rationalizations for their statutory and Constitutional violations.

Defendants spend much of their Response questioning the Court's jurisdiction to consider Plaintiffs' claims and the Court's authority to fashion an appropriate remedy.  Defendants also argue that Defendants were not required to provide notice, an opportunity to be heard, or

appellate rights when DOGE and NEH mass-terminated grants to the Councils in April or when NEH subsequently purported to partially rescind a select number of the terminations.

The Court should ignore this misdirection and grant Plaintiffs' Motion for Stay and Preliminary Injunction.  First, this Court has jurisdiction over this dispute and the authority to fashion the injunctive relief requested by Plaintiffs.  The Tucker Act does not apply because Plaintiffs seek declaratory and injunctive relief finding that Defendants' actions are unconstitutional and violate of federal statutes and regulations.  This is not a case seeking damages for breach of contract.  Second, *Trump v. CASA* also does not apply and does not limit the relief Plaintiffs seek, because all parties seeking relief are properly before the Court.  Plaintiffs do not seek a universal injunction; they seek relief for the parties before the Court, which include the Federation's members.  And the Court may enter a prohibitory injunction returning the parties to the status quo ante litem under Ninth Circuit precedent.  Finally, Plaintiffs are likely to succeed on the merits of their claims.  Defendants' constitutional and statutory violations support the issuance of the requested injunctive relief.

## I.     Threshold Jurisdictional and Venue Arguments

Before turning to the merits of Plaintiffs' grounds for injunctive relief, we address the jurisdictional points brought forward by Defendants, as well as the suggestion that this Court may not be the proper venue.

### A.     The Federation has standing to pursue relief for its members.

The Federation seeks to redress statutory and constitutional harm to itself and to its members through the well-established concept of associational standing, which Defendants do not directly challenge. However, Defendants argue that Plaintiff Federation may not seek redress for harm to its members based upon the contractual theory of privity.  Response at 2, 40-48 [ECF No. 31] at 11, 50–51. Because the government challenges the Court's ability to provide injunctive relief to the Federation's members, which overlaps with standing principles, we address standing here.

As a threshold matter, to show standing, Plaintiffs must demonstrate (1) an "injury in fact;" (2) a "causal connection between the injury and the conduct complained of;" and (3) that it is likely that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted).

Courts have routinely held that membership organizations such as the Federation can establish standing based on their own injury or based on their members' injuries; the latter standing basis is known as representational or associational standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). An organization has associational standing to sue on behalf of its members where: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* at 181 (*quoting Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The Federation satisfies the three *Hunt* prongs required for associational standing. The Federation is a non-profit membership association that "advocates for increased investment in and engagement with the national network of humanities councils," (Stein Decl. ¶ 6), and counts among its members Oregon Humanities and 54 other Councils, which have standing in their own right to bring suit, as demonstrated in the Amended Complaint, the Declaration of Phoebe Stein, and the declarations of eight representative Councils accompanying the Motion. The Federation and its members are nonprofit organizations whose missions advance the public's understanding of language, literature, and the broader humanities. *See* Amended Compl. [ECF No. 6] ¶¶ 11-14, 35,123. Thus, the interests the Federation seeks to protect are germane to its purpose.

As for *Hunt*'s third prong, whether the relief requested requires the participation of individual members, other courts have found that in claims for declaratory and injunctive relief, parties may generally satisfy the test by providing a sampling of evidence from association members, as we have here. *See, e.g., Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551-53 (5th Cir. 2010); *Env'l Protection Info. Cnt'r v. Pac. Lumber Co.*, 469

F. Supp. 2d 803, 817 (N.D. Cal. 2007). This is consistent with the holdings of other courts in recent weeks. *See, e.g., Am. Council of Learned Societies, et al., Plaintiffs, v. Michael McDonald, et al., Defendants; The Authors Guild, et al., Plaintiffs*, No. 25 CIV. 3657 (CM) (BCM), 2025 WL 2097738, (S.D.N.Y. July 25, 2025); *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 844 (D. Md. Mar. 2025) (holding that the associational plaintiff established associational standing by alleging in its complaint that three of its members received grants from the U.S. Department of Education, that were subsequently terminated, and termination of said grants impacted the organization's core missions); *Ass'n of Am. Universities v. Dep't of Energy*, No. 25-CV-10912-ADB, 2025 WL 1414135, at *8 (D. Mass. May 15, 2025) (similar holding).

Because the Federation satisfies the three prongs for associational standing, it can seek declaratory and injunctive relief from this Court on behalf of its members.

**B.      *Trump v. CASA* has no impact on this Court's ability to fashion a remedy or impose a stay under 5 U.S.C. § 705.**

Defendants rely on *Trump v. CASA* in support of their argument that the Court may not grant relief to the Federation's members. 606 U.S. __ (2025). However, that case explicitly left in place the Supreme Court's associational standing principles. *See id*. at __ n.2 ("[The administration] also challenges the District Courts' authority to grant relief to the organizations' members who are not identified in the complaints. . . . We do not address these arguments.") Because the Supreme Court expressly reserved this issue, lower courts do not have the ability to ignore pre-*CASA* precedent on this question.

In *CASA*, the Supreme Court stayed three so-called "universal injunctions" that district court judges had issued to enjoin the implementation and enforcement of President Trump's Executive Order No. 14160, which purports to identify circumstances in which a person born in the United States is not recognized as an American citizen. *Id*., at *4. The Court described these universal injunctions as "prohibit[ing] the enforcement of a law or policy against anyone," which it held exceeded the court's maximal authority to provide "complete relief to the *plaintiffs before*

PAGE 4 –     PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR 5 U.S.C. § 705 STAY
                    AND PRELIMINARY INJUNCTION

*the court*." Id., at ** 4, 11 (emphasis in original). The Court distinguished "universal injunctions" from "traditional injunctions." It clarified that "a traditional, parties-only injunction can apply beyond the jurisdiction of the issuing court." *Id*. at n.1 "The difference between a traditional injunction and a universal injunction is not so much where it applies, but whom it protects: A universal injunction prohibits the Government from enforcing the law against anyone, anywhere." *Id*.

In this case, Plaintiffs are seeking a "traditional injunction", not a "universal injunction." Plaintiffs seek limited relief for the plaintiffs before the Court, which include Oregon Humanities, the Federation, and the Federation's members, as described above and in the Motion. The relief sought is accordingly consistent with Supreme Court precedent.

Further, contrary to the Government's argument, *CASA* does not—expressly or impliedly—limit Plaintiffs' entitlement to full relief under the APA, including vacatur of unlawful agency action. As the government concedes, *CASA* explicitly did not reach the "distinct question" of whether the APA authorizes vacatur. *See* Response at 42 [ECF 31 at 51] (quoting *CASA*, 145 S. Ct. at 2554 n.10 ). Indeed, numerous courts to consider that very issue in the weeks following *CASA* have likewise understood *CASA* to have no bearing on vacatur. *See Cabrera v. Dep't of Labor*, No. 25-1909, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *51 (D.D.C. July 2, 2025); *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464 (BMC), 2025 WL 1808743, at *6 (E.D.N.Y. July 1, 2025); *Walker v. Kennedy*, No. 20-CV-2834 (FB) (VMS), 2025 WL 1871070, at *7 (E.D.N.Y. July 8, 2025) (*CASA* did not require the court to reconsider its decision to stay agency action); *Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322 (JDB), 2025 WL 1836009, at *22 n.17 (D.D.C. July 3, 2025); *Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau,* No. 4:25-CV-16-SDJ, 2025 WL 1920148, at *13 n.10 (E.D. Tex. July 11, 2025) ("The Court also made clear, however, that [*CASA*] did not address vacatur of federal agency action under the APA . . . Absent a change in controlling precedent, the Court adheres to the Fifth Circuit's existing guidance on this issue").

While Justice Gorsuch's concurrence in *United States v. Texas*, 599 U.S. 670 (2023)—which the Government cites nine times—questions the wisdom and propriety of vacatur, that concurrence is not law, and this Court cannot follow it in the face of binding Ninth Circuit precedent that squarely blesses vacatur. *See Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) ("[w]here a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA"); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020). The persuasive reach of Justice Gorsuch's Texas concurrence is likewise questioned by other members of the Court. Justice Alito noted in dissent in Texas that Justice Gorsuch's argument that "the APA's 'set aside' language may not permit vacatur . . . would be a sea change in administrative law as currently practiced in the lower courts." *Texas*, 599 U.S. at 721 (Alito, J., dissenting). More recently, Justice Kavanaugh's concurrence in *CASA* (which of course "necessarily did[] consider" the Court's ruling in *CASA*, *see* Response at 46 [ECF 31 at 55]) both highlighted the post-*CASA* availability of asking a court to "set aside" new agency action and also recited his concurrence in *Corner Post*. Further, Chief Justice Roberts has authored opinions that affirmed vacatur of agency decisions (*see Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020); *Dep't of Com. v. New York*, 588 U.S. 752 (2019)) and just weeks ago characterized the government's position against vacatur as "fairly radical and inconsistent" with APA precedents during the CASA oral argument. Transcript of Oral Argument at 35, *Trump v. CASA*, 145 S. Ct. 2540 (2025). There is no need (let alone legal support) to overread Justice Gorsuch's Texas concurrence to have any impact on the long history of vacatur under the APA, whether here or in another case.

Regardless, the equitable relief Plaintiffs seek is not broader than it needs to be to afford complete relief to the named plaintiffs.

### C.    The Tucker Act does not bar Plaintiffs' claims and requested relief.

Despite Defendants' arguments, this case belongs in federal district court. Defendants' Response is the latest in the government's largely unsuccessful attempts to assert that the Tucker Act deprives Article III Courts of jurisdiction to hear constitutional, *ultra vires*, and

PAGE 6 –    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR 5 U.S.C. § 705 STAY
           AND PRELIMINARY INJUNCTION

Administrative Procedure Act ("APA") claims challenging the termination of grants by mischaracterizing Plaintiffs' claims as contractual. But Plaintiffs do not allege breach of any contractual provision, nor do they seek contract (or any other) damages. Plaintiffs' claims do not rely upon the terms and conditions of any grant instrument, even if grants are properly considered contracts under the Tucker Act analysis. Instead, Plaintiffs seek declaratory and injunctive relief finding that Defendants' actions are unconstitutional and violative of federal statutes and regulations.

Under Ninth Circuit law, as well as the persuasive authority of many other courts across the country, this Court should reject Defendant's theory and find that it has jurisdiction to hear Plaintiffs' claims. "[T]he mere fact that a court may . . . rule on a contract issue does not . . . automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have" pursuant to the Tucker Act. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The Tucker Act's jurisdictional hook applies only when a claim is "at its essence" a contract claim. *Id.* at 967. To determine the essence of an action, courts look at (1) the source of the rights on which the plaintiff bases its claims and (2) the type of relief sought. *See United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023). "If rights and remedies are *statutorily* or *constitutionally* based, then district courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphasis in original).

Contrary to Defendants' argument, Plaintiffs' claims in this case are not premised upon the individual terms of the Councils' grant agreements. *See* Response at 17 [ECF No. 31]. This Court need not even examine any of the grant terms nor interpret them to reach a ruling that the challenged grant terminations and partial recissions must be vacated.

Because the rights Plaintiffs base their claims upon are not contractual, the Court need not determine that the grants are not contracts.[1] The challenged agency actions are unlawful because they violate various federal statutes and the Constitution—classic examples of claims that belong in federal district court; the terminations flowed directly from those unlawful policies. *See* 5 U.S.C. § 706; *see also Bowen v. Massachusetts*, 487 U.S. 879, 908 (1988)("It would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions . . . in a specialized forum such as the Court of Claims."). For example, Plaintiffs base their claims upon the statutory termination provisions. The terminations run afoul of 20 U.S.C. § 956(f)(7), which provides that the Chairperson can terminate grants to Councils for cause only after providing notice and an opportunity to be heard. Congress intended that this process be specifically designated for the Councils, which is evident from the placement of the termination provision within the Federal State Partnership section of the NEH Statutes. Additionally, The Amended Complaint does not seek monetary damages, but rather is an action to stop NEH from violating the statutory architecture establishing state and jurisdictional Councils. That architecture was created by Congress and Plaintiffs submit that Defendants are violating statutory and constitutional rights, not contract rights.

The government relies on *Department of Education v. California*, a March 2025 emergency docket Supreme Court decision that granted a stay while opining that the district court "likely" lacked jurisdiction over an APA claim alone. 145 S. Ct. 966 (2025). As courts in other recent cases have explained, "[t]he Government overreads the three-page stay order."

---

[1] There is an argument that the grants are not "contracts" under the terms of the Tucker Act in the first place. The Act requires that the grants "give the contracting parties a substantive right to recover damages in the event of a breach," which Defendants do not show here. *Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 WL 893530, at *4 (W.D. Wash. Mar. 24, 2025). Contracts under the Tucker Act must also provide "a 'direct' and 'tangible' benefit on the United States." *Id.* at *4 (citation omitted). But as defined, grants merely "carry out a public purpose" (31 U.S.C. § 6304, emphasis added), whereas contracts permit the government to "acquire . . . property or services for the direct benefit or use of the United States Government" (31 U.S.C. § 6303 (emphasis added)).

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *14-15 (D.R.I. Apr. 15, 2025) (rejecting defendants' reliance on *California*). First, the Supreme Court did not address whether constitutional claims, like Plaintiffs', might be subject to the Tucker Act. *See generally California*, 145 S. Ct. 966. And even while granting the stay, the Court reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* at 968.

The Response also fails to address the numerous courts, including courts within the Ninth Circuit, that have found *California* inapplicable and non-precedential[2] when faced with the same argument and circumstances. *See, e.g., Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. CV DLB-25-1363, 2025 WL 1585051, at *23 (D. Md. June 5, 2025) ("[t]he grant terms are simply not relevant to this case at all," because the case "challenge[s] whether the agency action here was unlawful, irrespective of any breach."); *Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*, No. 25-cv-02847-AMO, 2025 WL 1168898, at *3 (N.D. Cal. Apr. 21, 2025), aff'd 137 F.4th 932, 939 (9th Cir. 2025) ("*Department of Education* has no application where, as here, the claims sound in statute, rather than contract"); *S.F. A.I.D.S. Found. v. Trump*, No. 25-cv-01824-JST, 2025 WL 1621636 at *11-12 (N.D. Cal. June 9, 2025) (granting TRO and retaining jurisdiction over Tucker Act argument where claims arose under the First and Fifth Amendments, the Spending Clause, and the Separation of Powers; "[t]hese are not breach of contract claims just because they 'requir[e] some reference to or incorporation of a contract.'" (citation omitted)).

---

[2] We acknowledge the Supreme Court recently stated that its interim orders "are not conclusive as to the merits [but] they inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. ___ (2025). Here, *California* is inapplicable to the facts of the case as Plaintiffs are seeking to enforce a mandatory statutory obligation to fund the Councils, not a contractual obligation.

This Court has jurisdiction to enter the orders sought here—providing declaratory relief under the APA independent of any contractual language—to "set[] aside an agency's action[s]" as arbitrary and capricious; the fact that the orders "may result in the disbursement of funds" does not divest the court of its jurisdiction. *California*, 145 S. Ct. at 968 (citing *Bowen*, 487 U.S. at 910).

This Court has the jurisdiction to hear Plaintiffs' claims because the claims are founded upon violations of constitutional and statutory rights, rather than breach of a contractual provision. Defendants' Tucker Act argument should be rejected.

**D.      This Court is a proper venue.**

Defendants' implication that venue in Oregon is inappropriate for Plaintiff Federation (or to seek relief for its members) is unsupported and contravenes the intent of the venue statute. 28 U.S.C. § 1391(e)(4) permits suit against a federal officer or agency in any judicial district where the plaintiff resides.

"Where there are multiple plaintiffs, only one plaintiff must be a resident of the district to satisfy the residency requirement of venue under § 1391(e)(1)(C). *See Railway Labor Executives' Ass'n v. ICC*, 958 F.2d 252, 256 (9th Cir. 1991); *Las Americas Immigrant Advoc. Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1202-03 (D. Or. 2020), on recon. sub nom. *Las Americas Immigrant Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173 (D. Or. 2021) (venue proper in District Oregon where only one of six nonprofit plaintiff organizations was based in Oregon).

This rule is rooted in important policy goals: "Section 1391(e) aimed to make it more convenient for an aggrieved person to file suit against a federal entity. Thus, interpreting the phrase 'the plaintiff' to mean 'all plaintiffs' or 'each plaintiff' would substantially limit the statute's breadth and undermine congressional intent." *Sidney Coal Co. v. Soc. Sec. Admin*., 427 F.3d 336, 344 (6th Cir. 2005); *Stafford v. Briggs*, 444 U.S. 527, 541–42 (1980) (The purpose of Section 1391(e) is to "provide nationwide venue for the convenience of individual plaintiffs in actions . . . against the government"). *Exxon Corp. v. F.T.C*., 588 F.2d 895, 898–99 (3d Cir. 1978) ("requiring every plaintiff in an action against the federal government or an agent thereof

to independently meet section 1391(e)'s standards would result in an unnecessary multiplicity of litigation . . . There is no requirement that all plaintiffs reside in the forum district"). Therefore, because Plaintiff Oregon Humanities satisfied the residency requirement of § 1391(e)(1)(C), venue is also proper for Plaintiff Federation. Nothing in the venue statute limits the relief that can be afforded to Plaintiff Federation or its members.

## II.    Merits Arguments

Plaintiffs have met their burden to show they are likely to succeed on the merits of their claims, they are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in Plaintiffs' favor, and an injunction is in the public interest.  Below we respond to the arguments raised by Defendants that are not already thoroughly briefed in the Motion papers.

### A.    Separation of Powers

Defendants conceded Plaintiffs' separation of powers claim through NEH's June actions and the admissions in the Declaration of Director McDonald, who testifies that NEH had to partially rescind termination notices to certain councils "to ensure it complied with the congressional appropriation requirement that NEH fund its Federal/State Partnership Program at a minimum of 20% of its overall appropriation," citing 20 U.S.C. § 960(a)(1)(B). McDonald Decl. ¶ 16.

Defendants therefore agree that NEH's budget is subject to Congress's "plenary control" and that NEH "may not spend less than" at least *some amount* "appropriated by Congress." *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).  While the parties disagree as to the Congressional formula, both parties agree that some funding for the Councils is mandated by Congress. When DOGE and NEH interfered with this Congressional mandate by terminating *all* grants to the Councils in early April, they violated the law. Because Defendants are likely to engage in the same erroneous decision-making in the future, Plaintiffs seek a declaration from this Court that the decision to terminate those grants ran afoul of the statutory command and

injunctive relief to return the parties to the status quo ante before future erroneous decisions are made.

Defendant NEH's attempt to repair the significant and destabilizing error did not moot the separation of powers issue.  Councils, as a vehicle for the state-based distribution of federal funds to support the humanities, are written into the law, and Defendants lack the unfettered discretion they purport to wield, which threaten the Councils' existence.  As discussed in more detail below, obligated funds may not be rescinded under the NEH statutes without following the statutory provisions for terminating grants to the Councils. But more to the point for the separation of powers claim, Congress instructed that 40 percent of the appropriations for humanities programmatic funding (e.g., 40 percent of the $192,000,000 in the 2024 Appropriations Act for NEH) "shall be available for support of activities in the humanities", Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024). 20 U.S.C. 956(f)(4) includes the formulas that determine how that money must be allocated to and among the Councils for each fiscal year.

Congress mandated $65 million to the Councils in both the 2024 Appropriations Act and the 2025 Continuing Resolution (for a total of $130 million). Specifically, the 2024 Appropriations Act incorporates by reference the explanatory statement printed in the Senate section of the Congressional Record on or about March 5, 2024.  Pub. L. 118-42, 138 Stat. 25, at 2 (Mar. 9, 2024) (attached to the Declaration of Anna Sortun in Support of Reply ("Sortun Decl. in Support of Reply") as Ex. D.)  The Explanatory Statement in the Congressional Record indicates that "[a] detailed breakdown of the funding allocation [of $207 million] is include in the table at the end of this explanatory statement." Sortun Dec. in Support of Reply Ex. E.  And the table shows that the Federal State Partnership was allocated $65 million. *Id*.

Even if "grants are sourced to 'no year' appropriations" in most cases, as argued by Defendants, the NEH enabling statutes governing the agency's relationship with the Councils tie the mandated allocations of funds to particular fiscal year appropriations. The statutory formulas applicable to the Councils are specified by year, as noted in the highlighted sections of 956(f)(4), below:

(4) Of the sums available to carry out this subsection <mark>for any fiscal year</mark>, each State and each grant recipient which has a plan approved by the Chairperson shall be allotted at least $200,000. … In any case where the sums available to carry out this subsection for any fiscal year are in excess of the amount required to make the allotments under the first sentence of this paragraph--

…

(B) 44 per centum of the amount of such excess <mark>for such fiscal year shall be allotted</mark> in equal amounts among the States and grant recipients which have plans approved by the Chairperson; and

(C) 22 per centum of the amount of such excess <mark>for such fiscal year shall be allotted</mark> among the States and grant recipients which have plans approved by the Chairperson in amounts which bear the same ratio to such excess as the population of the State for which the plan is approved (or, in the case of a grant recipient other than a State, the population of the State in which such grant recipient is located) bears to the population of all the States.

(5)(A) The amount of each allotment to a State <mark>for any fiscal year</mark> under this subsection <mark>shall be available to each State or grant recipient, which has a plan or application approved by the Chairperson in effect on the first day of such fiscal year</mark>, to pay not more than 50 per centum of the total cost of any project or production described in paragraph (1).

The statute Defendants cite for the proposition that NEH is not required by Congress to spend all of the appropriated funds each year, 20 U.S.C. § 960(b)(1), refers to sums that remain "available for obligation and expenditure," not to funds that have already been obligated to the Councils per the above formulas. As noted elsewhere, NEH "obligates" funds to the Councils through the issuance of NOFOs.  Here, Congress appropriated funds to NEH through the 2024 Appropriations Act and the 2025 Continuing Resolution; NEH is statutorily obligated to use 40 percent (or based on Defendants' position *at least* 20 percent)[3] of the appropriated funds on the Councils; and the statutory formulas in § 956(f)(4) determine how those funds are to be allocated

---

[3] Defendants are required to spend 40 percent of the funds allocated to NEH for programmatic purposes on the Councils, based upon Congressional instruction.  Plaintiffs do not waive this argument by using Defendants' 20 percent position in this section to make the point that funding is mandatory.

among the Councils. NEH did the math before April and obligated the funds for the Councils, presumably according to the mandatory statutory formulas.[4]

Finally, Defendants' position that NEH by statute retains discretion not to "grant such amounts as allotted and to spend the amounts on other NEH program priorities" is wrong. Defendants cite 20 U.S.C § 956(f)(6) for this statement. That provision provides that "[a]ll amounts allotted or made available under paragraph (4) for a fiscal year which are not granted to any entity during such fiscal year shall be available to the National Endowment for the Humanities for the purpose of carrying out subsection (c)."

The problem with Defendants' argument is that it entirely ignores the mandatory language in the statutes discussed above, directing NEH to fund the Councils. The upshot of Defendants' position is that NEH can ignore congressional direction, accumulate funds appropriated for Councils, and divert to other unspecified purposes those funds that have been expressly designated to support local humanities programs. When NEH and DOGE disregarded the mandatory Congressional direction in the appropriations bills and the statutes, they violated separation of powers.

### B.    Impoundment Control Act

Even though the Impoundment Control Act only explicitly provides for enforcement by the Comptroller General, that does not mean that relief is not available under the APA.  Nor has the Supreme Court ruled that only the Comptroller General has enforcement authority.  The APA allows the district courts to review agency action to determine if it is contrary to law.  Nothing in the APA or the Impoundment Control Act, 2 U.S.C. § 660 *et seq.*, prevents this Court from vacating agency action under the APA because it is unlawful under the Impoundment Control

---

[4] It bears noting that the NEH website has a reference page identifying relevant statutory provisions for the Councils, which makes no mention of 20 U.S.C. § 960(a)(1)(B)—the newly discovered basis for the NEH's 20 percent position. https://www.neh.gov/divisions/fedstate/resource/legislation-councils (last visited July 29, 2025).

Act.  *E.g., New York v. Trump*, 764 F. Supp. 3d 46, 51 (D.R.I. 2025); *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, No. CV 25-1128 (BAH), 2025 WL 1795090, at *22 (D.D.C. June 30, 2025).  For that reason, at the very least, the merits of that claim remain relevant for the present motion.

As stated in the Motion, this case resembles the Institute of Museum and Library Sciences Services case examined by the U.S. Government Accountability Office, in which the GAO found that grants contemplated by the IMLS statutes could not be withheld because the funds were "allotted" to states by a specific "formula." *See* Motion at 18-19.  Moreover, the statutes at issue, as with the IMLS statutes, include "a clear spending mandate" when it comes to the Councils.  That mandate is clear in the statutory formulas instructing that the Director "shall" make certain formulaic distributions to the Councils for each relevant fiscal year.  *See* 20 U.S.C § 956(f)(4).

### C.      Administrative Procedures Act

Defendants argue that Plaintiffs' APA claims fail because (a) this Court lacks subject matter jurisdiction, (b) APA review is unavailable, (c) Plaintiffs do not seek judicial review of a discrete agency action, (d) the challenged actions are committed to agency discretion by law, (e) Plaintiffs "contrary to law" claim is premised on notice and appeal provisions that are inapplicable, and (f) Plaintiffs "arbitrary and capricious" arguments are unpersuasive. Arguments (a) and (b) are addressed above in discussion of the Tucker Act.  The remaining arguments are addressed below.

### i.      Plaintiffs described discrete agency actions.

Defendants argue that Plaintiffs have failed to point to a discrete agency action because the Amended Complaint represents a "systematic" challenge and because the grant terminations were "superseded" by the NEH's partial rescissions in June 2025.  Response at 22-25.

The mass termination of Council grants and subsequent partial rescission of those terminations were discrete agency action under the APA. *See* 5 U.S.C. § 704.  The mass terminations and rescissions: (1) "mark[ed] the consummation of the agency's decisionmaking

PAGE 15 –   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR 5 U.S.C. § 705 STAY
                    AND PRELIMINARY INJUNCTION

process," and (2) are actions "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). In particular, the terminations and rescissions mark the summation of NEH's decisionmaking process with respect to terminated grants because they announce NEH's decision to immediately terminate or modify previously approved grants and do not allow for any appeal or reconsideration. Davis Dec. Exs. A & D; Am. Compl. ¶ 22, 30,76,77,95,110. The fact that these decisions had widespread effects does not disqualify them as programmatic challenges; indeed, it reinforces that they are final agency action.

The mass termination therefore constitutes an action by which "rights or obligations have been determined or from which legal consequences will flow" because it purports to eliminate all government obligations to pay out grant awards and all grantees' rights to receive their grant awards. *Bennett*, 520 U.S. at 178.  The subsequent rescission modifies grant awards after approval, also without any appeal or reconsideration rights, and effectively halves previously approved funding for the Councils.

The Southern District of New York, in another NEH litigation, recently agreed that the mass termination of non-Council NEH grantees constituted final agency action under the APA. *American Council of Learned Soc. v. McDonald*,  Case 1:25-cv-03657-CM (SDNY) July 25, 2025); Sortun Decl. in Support of Reply Ex. A).  Notably, the grantees in that case received identical termination letters as the Councils in this case. *See* Sortun Decl. in Support of Reply at Ex. B.

### ii.    The challenged acts are not committed to agency discretion.

Defendants also argue that the challenged actions are "committed to agency discretion" and therefore not subject to review pursuant to 5 U.S.C. § 701(a)(2).  Defendants claim that "the amount of appropriations to expend during a given period" and "whether to actually grant funds that were allotted under formulas to particular categories of grantees" are items left to the discretion of the agency. Response 26.

The Response "miscasts the narrow scope of the committed-to-agency-discretion-by-law exception." *See Pacito*, 772 F. Supp. 3d at 1217.  The exception applies only when "there is no law to apply"—that is, when the statutes at issue are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). Courts have consistently distinguished between an agency's discretion in how it implements statutory mandates (which may, in some instances, be unreviewable) and an agency's attempt to abandon those mandates entirely (which is always reviewable). *Id.*

Here, the NEH Is attempting to abandon entirely the statutory mandates in 20 U'S.C. § 956(f) (and others) that have been applied dating back decades until April 2025.  As discussed at length above, Defendants agree that funding the Councils is mandatory.  The statutory formulas tie mandatory distributions to the Councils (with approved plans) to fiscal year appropriations. NEH now agrees that "the amount" is mandate by statute.  Thus, "the amount of appropriations to expend during a given period" is *not* committed to agency discretion.

Further, Defendant's framing of the challenged act as "whether to actually grant funds that were allotted under formulas to particular categories of grantees," Response at 26, misses the critical point that the "category" of grantees at issue in this litigation are the Councils—again, creatures of statute.  NEH does not have a choice as to whether to grant funds to this specific category of grantee.

### iii.    The NEH acted contrary to law.

Plaintiffs' Motion asserted three bases for an APA claim that NEH acted contrary to law: (1) failure to follow the NEH statutes regarding grant terminations, (b) failure to follow the mandatory statutory formulas for grant allocation, and (c) failure to provide an appellate right.

Defendants first argue that NEH was not required by law to provide notice, an opportunity to be heard, and the right of appeal in connection with the grant terminations. Response at 28.  In support, Defendants claim that "NEH terminated grants pursuant to 2 C.F.R. 200.340(a)(4), which allows termination 'if an award no longer effectuates the program goals or

agency priorities.'"  Response at 28 [ECF No. 31 at 37].  Defendants further claim that reliance upon this regulation eliminates any hearing or appeal rights.

The guidance Defendants rely upon, propounded by the Office of Management and Budget, provides that:

> [a] Federal award may be terminated in part or its entirety as follows … (4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

*Id.* In other words, Defendants argue that funding the Councils is no longer an agency priority. To state what should be an obvious point, when Congress created NEH and the Federal State Partnership in 20 U.S.C. § 956, it determined by statute that the Councils *are an agency priority*. The Councils are arguably the largest priority of the statutory scheme, as they distribute federal funds to localities that otherwise would not see humanities programming—the entire point of the Councils' creation.  To suggest that NEH may terminate funding to the Councils under this general OMB guidance rather than through the Councils' specific statutory scheme borders on the absurd.

Nevertheless, Defendants apparently submit that this single OMB regulation supersedes the detailed NEH statutes and provides NEH with virtually unfettered authority to withhold from the Councils previously approved and Congressionally-mandated funding any time it wants, with no notice, and no opportunity for Councils to contest the decision. This cannot be the law. If, as the government suggests, an agency could terminate any award simply because it had changed its mind, that would render wholly superfluous the many other carefully crafted statutes and regulatory provisions that address agency termination authority at NEH.  *See*, *e.g.*, 20 U.S.C. § 956(f)(7); 2 C.F.R. § 340(a)(1)-(3); § 200.340(b); § 200.342 ("[t]he Federal awarding agency or passthrough entity must comply with any requirements for hearings, appeals or other administrative proceedings to which the non-Federal entity is entitled under any statute or regulation applicable to the action involved."). It is not sensible to interpret a single subclause of

a provision in OMB guidance to grant such sweeping authority. *See Ryder v. Union Pac. R.R.*
*Co.*, 945 F.3d 194, 203 (5th Cir. 2019) ("[W]e presume that [agencies], no less than Congress, do
not hide elephants in mouseholes.")

Even if it were the law (it is not), the government's argument fails because (1) the terms
and conditions it submits in support of its position include the right to an appeal,[5] and (2) the
terminations are not "authorized by law" because they are not found in the NEH statutes, which
supersede the OMB regulations, *see United States v. Doe*, 701 F.2d 819, 823 (9th Cir. 1983)
("Where an administrative regulation conflicts with a statute, the statute controls").

Contrary to Defendant's position, a Council whose funding is terminated is not supposed
to be without recourse. The terms and conditions and associated regulations give the Council the
right to appeal that termination. Specifically, the very NEH terms and conditions NEH now relies
upon directly provide for the right to an appeal. *See* McDonald Decl. at Ex. A p. 42. But,
following the mass termination of NEH grants to the Councils, the NEH instructed recipients of
grant termination notices that there was *no* appeal mechanism. Davis Decl. Ex. B, p.10.

Under the OMB guidance cited by Defendants, terminated awards are also subject to an
objections process, whereby the agency "must provide the recipient with an opportunity to object
and provide information challenging the action." 2 C.F.R. § 200.342. The agency is required to
"maintain written procedures for processing objections, hearings, and appeals." *Id*. This is true
for grant funding terminated under 2 C.F.R. § 200.340.

In short, the government's argument that it may terminate broad swaths of already-issued
grant funding under 2 CFR § 200.340(a)(4) is wrong. That regulation is superseded by statute;
moreover, § 200.340(a)(4) is limited:  it provides that the Federal agency or pass-through entity

---

[5] Plaintiffs cite to the terms and conditions to undermine the government's reliance on 2 CFR §
200.340(a)(4).  By citing the terms and conditions, Plaintiffs do not suggest that the remedies
sought by Plaintiffs are contractual or that the analysis of unlawfulness turns on the terms and
conditions.

may terminate an award on the ground that it no longer effectuates program goals or agency priorities "*to the extent authorized by law*." (emphasis added).  But nothing in the statutes authorizing NEH and appropriating funds to NEH indicate that Congress has delegated to OMB the power to make regulations applicable to NEH. NEH and DOGE may not legally stop funding the Councils; may not legally terminate Council grants without notice, an opportunity to be heard, and appellate rights; and may not legally fail to process Congressional appropriations through the formulas in 20 U.S.C. § 956(f).

### iv.    The actions of Defendants were beyond arbitrary and capricious.

Defendants' post hoc explanation that the terminations of the Councils' GOS and other grants were "individually considered" cannot be squared with the arbitrary and capricious rollout of NEH's mass grant terminations. As noted in the Amended Complaint and the Motion, NEH sent the exact same termination letter to all NEH grantees including the Councils. For example, one of Mississippi Humanities Council's sub-grantee received the very same letter as the Mississippi Council. Declaration of Stuart Rockoff in Support of Reply at Ex. A.  It is hard to believe, therefore, that Defendant McDonald "undertook individualized assessments and terminated grants including 79 general operating support (GOS) grants that NEH had awarded to [the Councils]" before sending the termination letters in April.  McDonald Decl. par. 8.

In another case involving NEH grantees, McDonald described an entirely different review of grants based upon the President's Executive Orders in which he said, "the policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) on 'environmental justice,' 'diversity, equity, and inclusion' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology'" only later shifting the focus, "in consultation with DOGE" where he "more broadly chose grants for termination that did not contribute to the public's confidence in how NEH expended its taxpayer funds as required by NEH's authorizing statute. See 20 U.S.C. § 951(5)." Sortun Decl. in Support of Reply Ex. C.  The boilerplate emails that Councils received leave open the question of what criteria, if any, Defendant applied.

PAGE 20 –   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR 5 U.S.C. § 705 STAY
            AND PRELIMINARY INJUNCTION

Moreover, the uniform termination letters were sent to all NEH grantees, whether a Council or not. NEH and DOGE did *not* cite the specific section of the CFRs Defendants now rely upon. Instead, the uniform notices stated that "Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination *due to several reasonable causes*, as outlined in 2 C.F.R. § 200.340." Davis Decl. Ex. A p. 2 (emphasis added). The agency did not cite section (a)(4) of the guidance in its notice.

The termination notices also stated that "NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions." The letter cited EO 14217, *Commencing the Reduction of the Federal Bureaucracy*. (*Id.*)

Recipients of the termination letter were thus left guessing as to which provision of 2 C.F.R. § 200.340 NEH believed applied and what other "several other reasonable causes" NEH identified as grounds for termination. Might one of the "other reasonable causes" be a "failure to comply" under 200.340(c) which gives rise to the right to objection, hearing, and appeal rights under 200.342? No answers were forthcoming from DOGE and NEH.

In addition, the Councils were apparently told the incorrect justification for the termination by Defendant McDonald's citation to EO 14217, *Commencing the Reduction of the Federal Bureaucracy*. *See* McDonald Decl. n. 1. The chaotic and slipshod rollout of the mass termination letters evidences that Defendants acted in an arbitrary and capricious manner.

The June rollout of partial recission notices was no better. Apparently realizing its significant error in terminating all open grants to the Councils, NEH sent an email to the Councils and the Federation informing them that "NEH has rescinded the termination of the fiscal year 2025 General Operating Support (GOS) grants." Davis Decl. Ex. C. In this communication, NEH also stated it would be halving the previously authorized allocations to Councils by dropping the "minimum" allocations to 20 percent of the programmatic funding appropriated by Congress. *Id.* This email described the move as an "incredible hardship" to the

Councils – which heavily rely upon GOS grants for their stability. *Id*. Yet, like the terminations, the partial recission announcement did not provide any opportunity for a hearing or opportunity to appeal, even though the move left Councils significantly underfunded and confirmed the partial termination of previously approved grants. Following the email, some but not all Councils began to receive letters announcing the partial rescission. Aside from the fiscal year 2025 GOS grants, NEH made no adjustments to other grants to the Councils.

These facts add up to agency action that was neither reasonable nor reasonably explained. *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). There was no "satisfactory explanation" for NEH's and DOGE's actions including no "rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). When an agency enacts a decision that "rests upon factual findings that contradict those which underly its prior policy; or when its prior policy has engendered serious reliance interests," it must offer "a more detailed justification" than usual. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

There could be no greater reliance interest than the reliance of the Councils on the GOS grants from NEH, the backbone of Councils' ability to operate. An explanation that these grants fail to "effectuate[] the agency's needs and priorities" is false as well as arbitrary and capricious.

## III.    Irreparable Harm

Defendants argue that Plaintiffs have not shown that extreme or very serious damage will result if this Court denies the requested injunction. The declarations of the several state Council executive directors are replete with examples of imminent harm including potential forced layoffs, termination of funding to sub-grantees, cancellation of already-planned programming, cancellation of commitments to local communities leading to loss of community trust and engagement, and the essential inability to fulfill Council missions. The harm outlined in the declarations is well beyond matters that can be addressed by the Federal Court of Claims. What more could the Councils possibly do to show that harm is happening, and keeps happening each day that NEH is permitted to continue its unlawful withholding of mandated actions?

Defendants argue in this section that NEH "has discretion to choose when and how to support the humanities" and that NEH legislation "found that encouragement and support of national progress and scholarship in the humanities is 'primarily a matter for private and local initiative,'" citing 20 U.S.C. § 951(2). Defendants may want to pretend that Congress did not create the Councils and mandate their funding through statute and appropriations so that federal humanities dollars could spread across the nation, but that is not the case.  When NEH pulled the already-approved support to the Councils, it threw the Federal State Partnership into complete disarray and caused immediate harm, which continues to this day.

## IV.    Balance of Equities / Public Interest

As the Southern District of New York determined in another case relating to NEH grant terminations, "there is no public interest in the perpetuation of unlawful agency action."  *Am. Council of Learned Societies, et al*, 2025 WL 2097738  (S.D.N.Y. July 25, 2025) (citing *Planned Parenthood of N.Y. City, Inc. v. United States HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). "There is, on the other hand, substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

Defendants argue that the sought injunction "would disrupt NEH's efforts to implement the President's directives while complying with the agency's statutory obligations" and that, if forced to distribute funds to the Councils "such funds may not be retrievable afterwards." (Response at 38-39).

The Court should put the interest of continuation of humanities programming throughout the nation above the Defendants' interests.  Plaintiffs are asking to go back to the status quo prior to Defendants' unlawful actions in April 2025.  Considering the facts set forth in the declarations supporting the Motion and the narrow scope of proposed injunctive relief, the Court should find that the balance of equities and the public interest lean strongly in favor of Plaintiffs.

**V.    Plaintiffs seek a status quo injunction.**

Defendants argue that a higher standard ought to apply to Plaintiffs' request for injunctive relief based upon Defendants' position that Plaintiffs seek a mandatory injunction. Response at 7. However, Plaintiffs request the Court enter an injunction returning the parties to the status quo *ante litem*, which refers to "the last uncontested status which preceded the pending controversy." *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024). Contrary to Defendants' argument, barring Plaintiffs from the requested injunctive relief based upon a higher standard for mandatory injunctions would "lead to absurd results" where claimants could not bring claims for injunctive relief once infringing conduct had begun. *See GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1210 (9th Cir. 2000).

**VI.    The Court should not require a bond.**

Rule 65(c) provides that courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, "[d]espite the seemingly mandatory language, 'Rule 65(c) invests the district court with discretion as to the amount of security, if any'" and the court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant." *Johnson v. Couturier*, 572 F. 3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgenson v. Cassidy*, 320 F. 3d 906, 919 (9th Cir. 2003). Courts have emphasized that waiving bond is especially appropriate where plaintiffs are nonprofits seeking to enjoin unlawful government action with broad public impact. *E.g., Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md., 2025) (setting a nominal bond of zero dollars where plaintiffs, associations and nonprofits challenging executive orders, demonstrated likely success on the merits and irreparable harm); *Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 775 F. Supp. 3d 100 (D. D.C. 2025) (declining to require a bond where coalitions of nonprofits demonstrated likely success and significant public interest). As one court explained, "waiving bond is particularly appropriate where Plaintiffs are nonprofit organizations suing in

PAGE 24 –   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR 5 U.S.C. § 705 STAY
AND PRELIMINARY INJUNCTION

large part because they are suffering monetary harm from the unlawful operations of the

Challenged Orders that have withheld federal funding critical to their everyday operations." *San*

*Francisco A.I.D.S. Found. v. Trump*, No. 25-cv-01824-JST, 2025 WL 1621636 (N.D. Cal. 2025).

For the same reasons, the Court should not order Plaintiffs to post a bond in this case.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for 5 U.S.C. § 705

Stay and Preliminary Injunction.

DATED:  July 30, 2025.

TONKON TORP LLP


By:     *s/ Anna Sortun*
    Anna Sortun, OSB No. 045279
     Direct:  503.802.2107
     Email:  anna.sortun@tonkon.com
    Steven M. Wilker, OSB No. 911882
     Direct:  503.802.2040
     Email:  steven.wilker@tonkon.com
    Paul Balmer, OSB No. 203429
     Direct:  503.802.5745
     Email:  paul.balmer@tonkon.com
    Gracey Nagle, OSB No. 215255
     Direct:  503.802.5753
     Email:  gracey.nagle@tonkon.com
    *Attorneys for Plaintiffs*

099997\33304\18636357v4