# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON COUNCIL FOR THE HUMANITIES** doing business as **OREGON HUMANITIES;** and **FEDERATION OF STATE HUMANITIES COUNCILS**, | Case No. 3:25-cv-829-SI |
| | **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **UNITED STATES DOGE SERVICE**, a component of the Executive Office of the President**; AMY GLEASON**, in her official capacity as Acting Administrator of the United States DOGE Service**; NATIONAL ENDOWMENT FOR THE HUMANITIES; NATIONAL COUNCIL ON THE HUMANITIES;** and **MICHAEL MCDONALD**, in his official capacity as Acting Chairman of the National Endowment for the Humanities, | |
| Defendants. | |

Anna Sortun, Steven M. Wilker, Paul Balmer, and Gracey Nagle, TONKON TORP LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for Plaintiffs.

Scott E. Bradford, Interim United States Attorney; and Sean E. Martin, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Introduction ................................................................................................................ 4

Standards ..................................................................................................................... 6

   A.   Preliminary Injunction ...................................................................................... 6

   B.   Stay Under the APA ........................................................................................... 7

Background .................................................................................................................. 8

   A.   Statutory Framework ......................................................................................... 8

   B.   Factual Background ......................................................................................... 16

      1.   NEH, DOGE, and the Changes to NEH in Spring 2025 ............................ 16

      2.   Councils ..................................................................................................... 24

      3.   Federation ................................................................................................. 28

Discussion ................................................................................................................. 29

   A.   Likelihood of Success on the Merits ............................................................... 29

      1.   Separation of Powers ................................................................................ 29

      2.   Impoundment Control Act ......................................................................... 39

      3.   APA Claims ............................................................................................... 41

         a.   Jurisdiction ........................................................................................... 41

            i.   Tucker Act ...................................................................................... 42

            ii.   Preclusion by the ICA .................................................................. 48

            iii.   Final Agency Action .................................................................... 49

            iv.   Committed to Agency Discretion ................................................ 51

         b.   Contrary to Law .................................................................................... 52

            i.   Statutory Process for Grant Suspensions or Terminations ................... 52

            ii.   Statutory Formula for Funding ..................................................... 56

            iii.   Appeals Process ........................................................................... 57

            iv.   ICA ............................................................................................... 58

         c.   Arbitrary and Capricious ...................................................................... 61

   B.   Irreparable Harm .............................................................................................. 64

   C.   Balance of the Equities and Public Interest ..................................................... 67

   D.   Scope of Relief ................................................................................................. 68

      1.   Standing for Plaintiff Federation ............................................................. 69

    2.    Venue .................................................................................................................. 73

    3.    Stay Under § 705 of the APA ........................................................................... 74

    4.    Conclusion ........................................................................................................ 76

  E.    Administrative Stay and Bond ................................................................................. 76

    1.    Defendants' Request for an Administrative Stay .............................................. 76

    2.    Defendants' Request for a Bond ....................................................................... 78

Preliminary Injunction ............................................................................................................... 80

APA Stay ..................................................................................................................................... 80

Conclusion .................................................................................................................................. 81

## INTRODUCTION

> The humanities make people understand the world we live in, its history, languages, cultures, and places. Understanding others is of great importance in our world, in international relations, trade and tourism, but also at home, as we encounter persons who may have different experiences and convictions. Lack of cultural, historical, and linguistic competence and sensitivity may cost business. Not everyone needs to become a scholar in the humanities, but issues the humanities address are relevant everywhere, for us all, as citizens, as employees, and entrepreneurs, as humans.[1]

In 1968, when the National Endowment for the Humanities ("NEH") was in its infancy and a bill to continue its authorization and increase its funding was before Congress, U.S. Representative William D. Ford of Michigan spoke about the need for continued federal funding for the arts and humanities. He explained that

> the arts and the humanities are essential to our national interest. They are essential because they offer to our citizens the tools to explore ultimate directions and to define the goals to which public and private life should be directed. Indeed, the arts and the humanities are as essential to a nation as a conscience is to an individual. . . .
>
> The study of the arts and the humanities has relevance to our current domestic situation also. The members know well the issues arising from this situation: The meaning of "justice"; the relation between freedom and order; the concept of "community." The promise here is not that support of the arts and the humanities will bring a consensus on these difficult issues, but rather that study of these subjects will challenge us to remember these issues, and increase our capacity to discuss and even to differ on them reasonably rather than violently.
>
> My point is a simple one: The arts and the humanities are not frills, but are crucial to our Nation's survival and continued freedom.[2]

---

[1] Willem B. Drees, *What Are the Humanities For?* 121 (2021).

[2] 114 Cong. Rec. 4322 (Feb. 27, 1968).

Representative Ford's words still resonate today. Federal funding for the arts and humanities has enjoyed bipartisan support for decades, with Congress continuing to strengthen the statutes governing NEH and provide stable funding generation after generation. The 2024 and 2025 appropriations were no different, with Congress allocating $207 million each year to the humanities.

One of the "most direct and significant benefits" to Congress of the NEH structure is the "Federal/State Partnership," under which NEH provides grants to state and other jurisdictions in the United States, which then spend that money within their jurisdictions on local humanities projects.[3] In creating this structure, Congress specifically recognized the importance of "guaranteeing the stability and assurance of federal funding" while "in no way dictat[ing] what type of organization is to carry out the programs."[4] Congress, however, set out a list of priorities that NEH in its funding, and the Federal/State Partnership in its funding, must follow. These include "the research and teaching potential of the United States in the humanities"; programs "that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community"; "international programs and exchanges"; "scholarly works in the humanities"; programs that "would otherwise be unavailable due to geographic or economic reasons"; and in all selections giving "particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented."[5]

---

[3] H.R. Rep. No. 93-255, at 17 (June 5, 1973).

[4] 122 Cong. Rec. 11091 (Apr. 26, 1976).

[5] 20 U.S.C. § 956(c).

Shortly after President Trump took office for his second term in 2025, NEH reviewed all open NEH Federal/State Partnership grants for whether they might involve subjects such as "diversity, equity, inclusion, and accommodation," or "environmental justice." On April 2, 2025, NEH, in consultation with the newly formed Department of Government Efficiency ("DOGE"), but without providing any notice or opportunity to be heard, terminated the open grants in the Federal/State Partnership. DOGE also spearheaded the termination of more than 65 percent of NEH staff and a complete restructuring of the agency. After this lawsuit was filed, NEH partially rescinded the terminations of grants that were not in their final two-year "closeout" period. This sudden revocation of funding caused significant upheaval in all states and jurisdictions that have otherwise enjoyed the stable humanities funding created by Congress 50 years ago. From the largest cities to the most rural communities throughout our nation, humanities projects came to a screeching halt.

The two plaintiffs in this lawsuit are the Oregon Council for the Humanities, doing business as Oregon Humanities, and the Federation of State Humanities Councils. Plaintiffs allege that Defendants, as members of the Executive Branch, violated the U.S. Constitution and federal statutes in unilaterally refusing to spend congressionally appropriated funds as directed by statute. Plaintiffs have moved for a preliminary injunction and a stay under the Administrative Procedure Act ("APA") on their claims under the Separations of Powers doctrine, the Impoundment Control Act ("ICA"), and the APA. For the reasons explained below, the Court grants Plaintiffs' motion and enters a preliminary injunction and stay.

## STANDARDS

### A. Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "a preliminary injunction may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies*, 632 F.3d 1135). The Ninth Circuit also has a "'sliding scale' approach, in which 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1131).[6]

## B.  Stay Under the APA

"[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Immigr. Defs. Law Ctr. v. Noem*, --- F.4th ----, 2025 WL 2080742, at *15 (9th Cir. July 18, 2025) (first citing *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); and then citing *Cook County v. Wolf*, 962

---

[6] At oral argument, Plaintiffs withdrew their request for relief that could be construed as a mandatory injunction. Thus, the Court does not discuss the different standards between a mandatory and prohibitory injunction.

F.3d 208, 221 (7th Cir. 2020)). Such a stay serves to "postpone the effective date of an agency

action" or "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C.

§ 705.

## BACKGROUND

### A.  Statutory Framework

The National Foundation on the Arts and the Humanities Act of 1965[7] and its progeny

(the "Act") created the National Endowment for the Arts ("NEA") and NEH. In establishing

these two agencies, and in later amendments, Congress made specific findings emphasizing the

purpose of the Act, including, among other things, that:

> (1) The arts and the humanities belong to all the people of the
> United States.
>
> (2) The encouragement and support of national progress and
> scholarship in the humanities and the arts . . . are also appropriate
> matters of concern to the Federal Government.
>
> (3) An advanced civilization must not limit its efforts to science
> and technology alone, but must give full value and support to the
> other great branches of scholarly and cultural activity . . . .
>
> (4) Democracy demands wisdom and vision in its citizens. It must
> therefore foster and support a form of education, and access to the
> arts and the humanities . . . .
>
> (5) It is necessary and appropriate for the Federal Government to
> complement, assist, and add to programs for the advancement of
> the humanities and the arts by local, State, regional, and private
> agencies and their organizations. . . .
>
> (6) The arts and the humanities reflect the high place accorded by
> the American people to the nation's rich cultural heritage and to
> the fostering of mutual respect for the diverse beliefs and values of
> all persons and groups.
>
> (7) . . . [I]t is necessary and appropriate for the Federal
> Government to help create and sustain not only a climate

---

[7] Pub. L. No. 89-209, 79 Stat. 845 (1965) (codified at 20 U.S.C. §§ 951-60).

encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent.

(8) The world leadership which has come to the United States cannot rest solely upon superior power, wealth, and technology, but must be solidly founded upon worldwide respect and admiration for the Nation's high qualities as a leader in the realm of ideas and of the spirit.

(9) Americans should receive in school, background and preparation in the arts and humanities to enable them to recognize and appreciate the aesthetic dimensions of our lives, the diversity of excellence that comprises our cultural heritage, and artistic and scholarly expression.

(10) It is vital to a democracy to honor and preserve its multicultural artistic heritage as well as support new ideas, and therefore it is essential to provide financial assistance to its artists and the organizations that support their work.

(11) To fulfill its educational mission, achieve an orderly continuation of free society, and provide models of excellence to the American people, the Federal Government must transmit the achievement and values of civilization from the past via the present to the future, and make widely available the greatest achievements of art.

20 U.S.C. § 951.

Among other things, the Act created the position of Chairperson of NEH, who is appointed by the President and confirmed by the Senate. *Id.* § 956(b)(1). The Act also created a National Council on the Humanities ("National Council"). *Id.* § 956(c). The Chairperson, with the advice of the National Council, is authorized to make "contracts, grants, loans, and other forms of assistance" to:

(1) develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

(2) initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities . . . ;

    (3) initiate and support training and workshops in the humanities by making arrangements with institutions or individuals . . . ;

    (4) initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;

    (5) foster international programs and exchanges;

    (6) foster the interchange of information in the humanities;

    (7) foster, with groups, education in, and public understanding and appreciation of the humanities;

    (8) support the publication of scholarly works in the humanities;

    (9) insure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

    (10) foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

*Id.* Congress instructed that "the Chairperson shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.* Congress also required the Chairperson to "coordinate" new federal humanities programs, "insofar as practicable," with existing federal, state, and private programs and "with due regard to the contribution to the objectives" set forth in § 956(c). *Id.* § 956(d).

    To help realize its goal of increasing humanities access, education, and funding, the Act contains, in addition to the creation of the position of Chairperson and the National Council, a framework under which the states and other jurisdictions work in partnership with the federal agency to facilitate the distribution of federal funding (the "Federal/State Partnership").[8] 20

---

[8] Other "jurisdictions" include Washington, D.C., American Samoa, Puerto Rico, Northern Mariana Islands, Guam, and the U.S. Virgin Islands. *See, e.g.*, 20 U.S.C. § 952(g). For

U.S.C. § 956(f). Congress first directed that NEH must "carry out a program of grants-in-aid" and must do so "in such a manner as will furnish adequate programs in the humanities in each of the several States." *Id.* § 956(f)(1). The State partner could create an administrative agency. *See id.* § 956(f)(2)(A). Alternatively, the State could create a nonprofit humanities council ("Council"). *Id.* § 956(f)(2)(B). Under that scenario, no more than 25 percent of the board members of the Council could be appointed by an officer or agency of the State. *See id.* Fifty-six jurisdictional partners, including all States involved in this litigation, chose the latter option (*i.e.*, the Council option). Decl. of Phoebe Stein (ECF 20) ¶ 4. Further, all but one of these Councils are members of Plaintiff Federation of State Humanities Councils ("Federation"). [9] *Id.* No federal "department, agency, officer, or employee" is permitted to "exercise any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any school or other non-Federal agency, institution, organization, or association" in the administration of NEA or NEH programs or funding. 20 U.S.C. § 953(c).

To obtain federal funding, Councils submit to NEH applications, along with a plan. *Id.* § 956(f)(3). Congressionally appropriated funds to the Federal/State Partnership are allocated for each fiscal year as follows:

- First, a minimum of $200,000 to each approved plan—if there are not enough appropriated funds to pay $200,000 to each approved plan, then equal sums shall be allocated to each plan. *Id.* § 956(f)(4);

- Second, if there are excess funds after paying $200,000 to each approved plan, it is to be divided three ways:

simplicity, in this Opinion and Order the Court refers to "State" as an all-inclusive term encompassing both states and these other U.S. jurisdictions.

[9] Although Oregon's Council is the only state-specific Council named as a Plaintiff in this lawsuit, representatives from other state Councils have submitted declarations. *See* ECF 9, 10, 14, 15, 16, 17, 18. In this lawsuit, they are all represented by the Plaintiff Federation.

○ Thirty-four percent "of such excess for such fiscal year shall be available to the Chairperson for making grants . . . to States and regional groups and entities applying for such grants." *Id.* § 956(f)(4)(A);

○ Forty-four percent "of such excess for such fiscal year *shall* be allotted in equal amounts among the States and grant recipients which have plans approved by the Chairperson." *Id.* § 956(f)(4)(B) (emphasis added); and

○ Twenty-two percent of the "excess for such fiscal year *shall* be allotted among the States and grant recipients which have plans approved" based on population. *Id.* § 956(f)(4)(C) (emphasis added).

Congress added this allocation formula to the statutory framework in 1980. *See* Arts and Humanities Act of 1980, Pub. L. No. 96-496, § 104, 94 Stat. 2583, 2586 (codified at 20 U.S.C. § 956(f)(4)). Before that, Congress had authorized NEH to distribute appropriated funds 75 percent equally among States and 25 percent at the Chairperson's discretion. *See* 20 U.S.C. § 956(f) (1976). The formula added in 1980, giving the Chairperson discretion for 34 percent of the *excess* of appropriated federal-state funds, was a compromise between the dueling requests at the time—the administration's request of discretion for 50 percent of the *total* of Federal/State Partnership appropriated funds and the Councils' request of discretion for only 10 percent of the total funds. *See* 126 Cong. Rec. 29951 (Nov. 17, 1980). Congress at the time performed the arithmetic, calculating the excess above $200,000 for each State versus total appropriated amounts under various formulas and what would be left for discretionary authority. *Id.* The amendment deliberately "reduces the Chair[person]'s discretionary share but not as much as the state humanities councils would (17 percent rather than 10 percent of the total state funds)." *Id.* Thus, although the Chairperson had discretion for 34 percent of the *excess* funds, that equated to 17 percent of the *total* appropriated funds for the Federal/State Partnership.

The Federal/State Partnership legislation also includes a general provision allowing NEH to reallocate funds that are not awarded in a fiscal year: "All amounts allotted or made available under paragraph (4) for a fiscal year which are not granted to any entity during such fiscal year

shall be available to the National Endowment for the Humanities for the purpose of carrying out

subsection (c)." 20 U.S.C. § 956(f)(6).

This text is taken from current § 954(g)(5), which originally was § 954(h)(5) of NEA's

governing statute. When Congress amended this provision in the *NEA* governing statute to the

current text, which was later added to NEH's governing statute, Congress explained the

amendment as follows:

> It also amends section 5(h)(5) of the public law to permit the
> National Endowment for the Arts to use amounts remaining after
> grants are made to the States for general program purposes. Thus,
> any amounts allotted to the States which the States do not use may
> be used by the Endowment to support, for example, regional arts
> programs or other programs within the States. The amounts
> involved here are very small—$12,000 last fiscal year. Clearly, it
> is administratively not practical to divide such a small amount
> among all the States.

114 Cong. Rec. 4320 (Feb. 27, 1968); *see also* H.R. Rep. No. 93-529, at 9 (1973) (explaining the

provision as establishing that funds available to the States but "not used by the States" would

"revert" to the Chairperson for use under the general authorization).

Regarding congressional appropriations, the first iteration of the statute included specific

appropriation authorizations. The original version of the statute authorized appropriations to

support the general mission of NEA and NEH; appropriations in the amount of matching funds

for donations, up to a capped total; appropriations to support existing grants; and appropriations

to support administrative costs. *See* Pub. L. No. 89-209, § 11, 79 Stat. 845, 853-54 (1965)

(codified at 20 U.S.C. § 960). In 1973, Congress recognized the importance of the Federal/State

Partnership contained within the NEA statute. *See, e.g.*, H.R. Rep. No. 93-255, at 17 (1973)

("Indeed, one of the most direct and significant benefits arising from the establishment of the

National Endowment of the Arts is the State arts agency program."). Thus, Congress increased

the minimum NEA per-State grant in 1973 from $65,000 to $200,000, *id.*, and added "safeguard

language" to ensure that "no less than 20 percent shall be allotted to the States in equal amounts." *Id.*; *see also* National Foundation on the Arts and the Humanities Amendments of 1973, Pub. L. No. 93-133, § 2, 87 Stat. 461, 463, 465 (1973).

In 1976, Congress added the Federal/State Partnership provisions to the *NEH* statute. *See, e.g.*, 20 U.S.C. § 956(f) (1976). Before then, many States had "voluntary organizations" working in that capacity, and the 1976 amendment was intended to allow flexibility for those organizations to remain or for a more formal State agency to be created. *See* 122 Cong. Rec. 11091 (Apr. 26, 1976). The bill's sponsor explained that it "builds solidly on the achievements on existing State arts and humanities programs and adds new incentives for humanities programs by assuring them of yearly funding." *Id.* at 11092. He noted that the amendment had "impressive bipartisan support, having been reported out of the subcommittee with no dissenting votes and out of the Committee on Education and Labor by a vote of 29 to 0." *Id.* He emphasized that the "assurance of a minimum of Federal funds available to States" was added to "provide the State programs a greater degree of stability." *Id.* at 11091. The sponsor explained that the bill "would give the guaranteed 20 percent or $200,000 per State . . . to the humanities councils" to "guarantee[] the stability and assurance of Federal funds to carry out humanities programs in each State." *Id.*; *see also id.* at 11090 (explaining that the funding for the Federal/State Partnership would be "at least $200,000 for each State program, or 20 percent of all humanities endowment moneys"). The appropriations authorization provision thus was amended to add a minimum carve-out for NEH (the same as NEA) that not less than 20 percent of all sums appropriated shall be for the respective Federal/State Partnerships. *See* 20 U.S.C. § 960(a)(1)(B) (1976). Appropriations authorizations remained for other categories, such as administrative costs, existing grants, matching grants, and so forth.

Future amendments updated the dollar amounts specifically appropriated but did not materially change the concept of how the agencies overall or the Federal/State Partnerships specifically were funded. For example, the 1990 amendment to § 960, the current iteration of that provision, authorized the following appropriations for the *NEA* Federal/State Partnership: "For the purpose of carrying out section 954(c) of this title, there are authorized to be appropriated to the National Endowment for the Arts $125,800,000 for fiscal year 1991 and such sums as may be necessary for fiscal years 1992 and 1993" and required that "not less than 25 percent of the amount appropriated for the respective fiscal year" for 1991 and 1992 and "not less than 27.5 percent" for 1993 "shall be for carrying out section 954(g) of this title." 20 U.S.C. § 960(a)(1)(A)(i)-(ii). For the *NEH* Federal/State Partnership, the statute provides:

> For the purpose of carrying out section 956(c) of this title, there are authorized to be appropriated to the National Endowment for the Humanities $119,900,000 for fiscal year 1991 and such sums as may be necessary for fiscal years 1992 and 1993. Of the sums so appropriated for any fiscal year, not less than 20 per centum shall be for carrying out section 956(f) of this title.

*Id.* § 960(a)(1)(B). Each appropriations bill or continuing resolution since has allocated updated dollar amounts.

In the Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Congress appropriated $207,000,000 to NEH, "of which $192,000,000 shall be available for support of activities in the humanities, pursuant to [20 U.S.C. § 956(c)] and for administering the functions of the Act." Pub. L. No. 118-42, § 6, 138 Stat. 25, 281 (2024). Congress stated in the 2024 Appropriations Act that the joint explanatory statement, printed in the Senate report in the Congressional Record, "shall have the same effect with respect to the allocation of funds and implementation of divisions A through F of this Act as if it were a joint explanatory statement of a committee of conference." 138 Stat. 26.

PAGE 15 – OPINION AND ORDER

In the joint explanatory statement, at the start of the section governing NEH funding,

Congress stated:

> The joint explanatory statement accompanying this division is
> approved and indicates congressional intent. . . .
>
> Each department and agency funded in this Act is directed to
> follow the directions set forth in this Act and the accompanying
> statement and to not reallocate resources or reorganize activities
> except as provided herein or otherwise approved by the House and
> Senate Appropriations Committees through the reprogramming
> process as referenced in this Act. This joint explanatory statement
> addresses only those agencies and accounts for which there is a
> need for greater explanation than provided in the Act itself.
> Funding levels for appropriations by account, program, and
> activity, with comparisons to the fiscal year 2023 enacted level and
> the fiscal year 2024 budget request, can be found in the table at the
> end of this division.

170 Cong. Rec. S1675 (daily ed. Mar. 5, 2024). In the table attached to the joint explanatory

statement, Congress appropriated $65 million for the Federal/State Partnership for NEH (the

same as the 2023 funding level). *See id.* at S1859 (chart of appropriations for 2023 and 2024 for

NEH Federal/State Partnership).[10] The continuing resolution signed by President Trump on

March 15, 2025 ("2025 CR"), carried over the same funding levels for NEH as were found in

the 2024 Appropriations Act. *See, e.g.*, Pub. L. No. 119-4, §§ 1101(a)(7), (c), 139 Stat. 9, 11-12

(2025).

**B.  Factual Background**

**1.  NEH, DOGE, and the Changes to NEH in Spring 2025**

As noted, NEH is a federal agency, established under the Act. Before changes made in

April 2025, many NEH employees had significant specialized expertise, including master's

---

[10] This differs from the specific allocation to the NEA Federal/State Partnership, which
increased in 2024 to $65,180,000 from $64,980,000 in 2023. *See* 170 Cong. Rec. S1858.

degrees and Ph.D.s, to help with grantmaking reviews. Decl. of Jane Doe (ECF 12) ¶ 22. Also

before April 2025, NEH had engaged in a rigorous grant review process, as recently described by

U.S. District Judge Colleen McMahon in the Southern District of New York:

> Before April 2025, the NEH engaged in a rigorous process for
> selecting grantees among the many thousands of applicants it
> receives annually. Each year, the NEH recruits and organizes
> over 1,000 individual experts into more than 200 peer review
> panels to review each of the more than 5,500 grant applications the
> NEH receives annually.
>
> Peer review panels were organized and overseen by NEH program
> officers, who themselves were experts in the areas of scholarship
> for which they were asked to review grant applications. Program
> officers placed experts on review panels based on a variety of
> factors, including broad knowledge of the humanities and expertise
> in specific areas.
>
> After a grant application was submitted, a relevant program officer
> reviewed it and, based on academic discipline, institutional type,
> project area, or project type, assigned it to a specific peer-review
> panel for the relevant program. Each grant application thus
> received rigorous review by experts in the applicant's field.

*Am. Council of Learned Soc'ys v. McDonald*, 2025 WL 2097738, at *7 (S.D.N.Y. July 25, 2025)

(citations omitted).

NEH primarily funds Councils through general operating support grants. Councils submit

applications and plans, and NEH notifies the recipient of the grant award with a "Notice of

Action" through a computer system called "eGMS." Stein Decl. ¶ 9. Funds are then supplied in

one of two ways. *Id.* ¶ 10. Some expenses may be paid in advance. Most expenses, however, are

prepaid by Councils, which then ask NEH for reimbursement under the general operating support

grant. *Id.* Until changes that occurred in April 2025, NEH had rapidly processed and paid such

reimbursements because the outlay of money already had been allowed with the plan approval.

*See id.*

NEH also provides special initiative funding. *See id.* ¶ 11. This funding includes the Chair's Grants on special projects that NEH offers to one or more Councils or special projects that Councils request from NEH themselves, such as responding to climate disasters or hate-fueled violence. *See id.* Councils may or may not submit an application and plan in response to a special initiative project announced by the Chair.

On January 20, 2025, President Trump established DOGE as a component of the Executive Office of the President. Exec. Ord. No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). Each federal agency was required to work with at least four DOGE team members, who would "advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* On February 26, 2025, President Trump issued an Executive Order further implementing DOGE. Exec. Ord. No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). This Executive Order instructed agencies to consult with DOGE and "where appropriate and consistent with applicable law, terminate or modify" contracts and grants. *Id.* at 11095-96.

On January 21, 2025, President Trump issued an Executive Order rescinding previous Executive Orders issued during the past 50 years that encouraged or established policies or preferences for diversity, equity or inclusion; disability accommodation; environmental justice in minority and low-income populations; and equal employment opportunity. Exec. Ord. No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025). Shortly thereafter, NEH employees were instructed to examine every open grant since 2021, when President Biden took office, and determine whether the grant ran afoul of Executive Orders issued by President Trump. Decl. of Mary Doe (ECF 13) ¶ 3. NEH staff at the Office of Federal/State Partnership reviewed grants

and rated the risk from low to high in a spreadsheet, concluding that most grants were "low" risk. *Id.* ¶ 4.[11]

On February 11, 2025, President Trump issued an Executive Order to "commence[] a critical transformation of the Federal bureaucracy." Exec. Ord. No. 14210, 90 F.R. 9669 (Feb. 11, 2025). The President instructed the Director of the Office of Management and Budget ("OMB") to reduce the size of the federal workforce, including through "large-scale reductions in force" ("RIF"), which were required to be "consistent with applicable law." *Id.* at 9670. NEH first submitted a plan to reduce the number of its employees by 20-25 percent. Jane Doe Decl. ¶ 8. On March 28, 2025, DOGE met with agency directors and recommended a RIF of at least 70 percent of NEH staff. *Id.* ¶ 11. During the week of March 24, 2025, NEH senior leadership had

---

[11] Michael McDonald, Acting Director of NEH, submitted a declaration in this case. ECF 32. His declaration does not describe the process by which NEH employees reviewed grants for termination. Instead, he summarily states that beginning in "early April 2025," he engaged in an individualized review with DOGE and terminated grants pursuant to Executive Order No. 14222. *Id.* ¶ 8 & n.1. In a case before the Northern District of California, however, McDonald submitted a more detailed declaration, describing how NEH staff were tasked in the first week of the Trump administration with reviewing all open grants to see if they violated any of three Executive Orders issued by President Trump on January 20-21, 2025, and how beginning on February 7, 2025, staff created spreadsheets to mark projects funded during the Biden Administration. *See* ECF 35-3, Reply Decl. of Anna Sortun, Ex. C (Decl. of Michael McDonald filed in *Thakur v. Trump*, No. 25-cv-04737-RFL, ECF 48-3 (N.D. Cal. June 19, 2025)). McDonald's description from his declaration in *Thakur* comports with the description of Mary Doe in her declaration filed in this case. This process was also described in the spreadsheets for at least the federal programs produced in *American Council*. *See* 2025 WL 2097738, at *10-11 ("These spreadsheets confirm that agency officials flagged grants for termination based on their ostensible connection to the study of 'DEI,' 'gender ideology,' or 'environmental justice.'"). Ultimately, as explained in *American Council*, "nearly all" federal grants awarded under the Biden Administration were terminated. *Id.* at *11. The review process to see if grants violated President Trump's Executive Orders, however, began well before Executive Order No. 14222 was issued on February 26, 2025. And it strains credulity that a review of all open Federal/State Partnership grants could begin in "early April" and finish in time for mass termination letters to be drafted and sent on April 2nd. At this stage of the litigation, the Court does not find persuasive that the grant terminations in this case were done on an individualized basis, in early April, pursuant to Executive Order No. 14222.

also begun notifying NEH program directors about grants that were being terminated. *Id.* ¶ 10. Senior leadership stated that the goal was to "claw back" $170 million in grants. *Id.* ¶ 11.

Michael McDonald, Acting Director of NEH, in consultation with DOGE, ultimately decided to terminate Federal/State Partnership grants, including 79 general operating support grants. Decl. of Michael McDonald (ECF 32) ¶ 8. That appears to have been all of the open general operating support grants. *See* Mary Doe Decl. ¶ 6. NEH also terminated Chair's Grants, including to the Federation and its members. *See, e.g.*, McDonald Decl. ¶ 10; Decl. of Rebecca Asmo (ECF 9) ¶ 3; Decl. of Jama Best (ECF 10) ¶ 4. On April 2, 2025, outside the eGMS system, NEH began sending its grant termination notices. Jane Doe Decl. ¶ 13; *see also* Decl. of Adam Davis (ECF 11) ¶ 11, Ex. A. NEH staff who had reviewed whether the grants were at risk of violating an Executive Order were not involved in the final grant termination decisions and learned about them at the same time as the grant recipients. Mary Doe Decl. ¶ 5.

As an example, McDonald sent the email notice to Adam Davis, Executive Director of Oregon Humanities, stating: "We regret to inform you that your NEH grant has been terminated. Please see the attached grant termination notice." Davis Decl. ¶ 11, Ex. A. The attached termination letter stated:

> This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant (Grant Application No. SO28986523) effective April 2, 2025, in accordance with the termination clause in your Grant Agreement.
>
> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2 CFR § 200.340. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*,

> E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination of
> necessary to safeguard the interests of the federal government,
> including its fiscal priorities. The termination of your grant
> represents an urgent priority for the administration, and due to
> exceptional circumstances, adherence to the traditional notification
> process is not possible. Therefore, the NEH hereby terminates your
> grant in its entirety effective April 2, 2025.

*Id.*[12] The termination letter was followed with an email on April 30, 2025, from the NEH Office

of Grant Management. This email attached "Guidance for Recipients of Terminated NEH

Awards." *Id.* ¶ 12, Ex. B. It provided instructions on how to submit for reimbursement of

"allowable and allocable costs incurred prior to the termination notice," requiring that those costs

be "reasonable," and how to request "termination and closeout costs." *Id.* Ex. B at 3-7. NEH also

stated under the heading "Appeals" that it "is not offering a means of dispute resolution." *Id.*

at 10.

On April 3, 2025, Assistant Chair for Programs Adam Wolfson emailed division directors

in NEH, stating: "In the event you or your staff receive inquiries from grantees about the

termination of their awards, you should respond that the reasons for the termination are set out in

the communications that the grantees received and that you [meaning you or your staff] can

provide no additional information. Program staff should simply leave it at that." Jane Doe

Decl. ¶ 14 (brackets in original).

In the evening of April 3, 2025, NEH staff began receiving notices that they were placed

on administrative leave. An NEH staff member and officer of the American Federation of

Government Employees Local 3403 ("Union") estimates that 105 of the employees were placed

on leave and 72 were not. *Id.* ¶ 16. On April 9th, McDonald sent a memorandum to staff stating

---

[12] In his declaration filed in this case, McDonald stated that this notice mistakenly
referenced Executive Order No. 14217, when it should have referenced Executive Order
No. 14222. McDonald Decl. ¶ 8 n.1.

that NEH was "undertaking a multi-step approach to restructuring its internal organization." *Id.* ¶ 17, Ex. 2. On April 10th, the Union received a RIF notice that 116 positions, including 91 in the collective bargaining unit, were being eliminated, representing nearly 65 percent of staff. *Id.* ¶ 18, Ex. 3. The new structure of NEH collapses the original eight programs offices (Office of Challenge Programs, Office of Data and Evaluation, Office of Digital Humanities, Division of Education Programs, Office of Federal/State Partnership, Division of Preservation and Access, Division of Public Programs, and Division of Research Programs) into four—Office of Federal/State Partnership, Infrastructure, Lifelong Learning, and Research. *Id.* ¶ 20, Ex. 1 at 24. The director of the Federal/State Program office was terminated effective June 6, 2025, leaving the position vacant. Mary Doe Decl. ¶ 7.

The significant staff cuts have eliminated most of the highly specialized and knowledgeable staff at NEH, eroding the highly skilled workforce that enabled NEH to perform its statutory duties. Jane Doe Decl. ¶¶ 21-22. The cuts also have left only six employees in the Office of Grant Management and five employees in accounting, making it virtually impossible for NEH to perform its statutorily required role rigorously to review more than one hundred million dollars in federal grants and oversee tens of millions of dollars in Federal/State Partnership grants. *Id.*

On April 24, 2025, NEH issued a press release. McDonald Decl. ¶ 14, Ex. C. The release stated that NEH had taken steps to "eliminate offices that are not essential to fulfilling its statutory requirements," to "return to being a responsible steward of taxpayer funds," and to ensure that awards are "merit-based" and not based on "extreme ideologies based on race or gender." *Id.*, Ex. C at 1-2. The release also contained a statement of "priorities."

These priorities, however, do not include the priorities mandated by Congress, including initiating and supporting programs that "reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community" (§ 956(c)(4)); "foster international programs and exchanges" (§ 956(c)(5)); "insure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons" (§ 956(c)(9)); and in all programs "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented" (§ 956(c)). Instead, the changes made by NEH to comply with President Trump's Executive Orders relating to diversity, equity, inclusion, accommodation, and environmental justice directly contradict Congress's repeated and explicit instruction in the NEH statute expressly to consider such factors when evaluating grant awards. On May 8, 2025, NEH announced awards of $9.5 million in new grants. *Id.* ¶ 15, Ex. D. It is unclear which of those are direct federal grants and which, if any, are through the Federal/State Partnership.

On May 15, 2025, Plaintiffs filed this lawsuit. On June 2, 2025, NEH sent email notices regarding 55 of the 79 general operating support grants that were terminated in April, informing the States that the fiscal year 2025 general operating supporting grant terminations were rescinded up to 20 percent. *See, e.g.*, McDonald Decl. ¶¶ 16-17 (explaining that the rescission involved only 55 grants); Davis Decl. Ex. C (Oregon rescission letter); Stein Decl. Ex. C (Wyoming rescission letter). The email explained: "For fiscal year 2025, the agency is funding the humanities councils at 20 percent of its appropriation of program funds, which is the minimum that NEH is congressionally mandated to award to our state and jurisdictional humanities council partners [20 U.S. Code § 960 – Authorization of appropriations, 1 B]." Davis

Decl. Ex. C (brackets in original). The email notified recipients to watch for an official notification. The email also observed that "the reduction in funds from 40 percent to 20 percent still represents an incredible hardship." *Id.* NEH rescinded a portion of the termination for the 55 grants that were in an active period—the remaining 24 grants were in their "closeout" period and so they were left terminated and simply not "reinstate[d]." McDonald Decl. ¶ 17. That same day, NEH sent a second email notice. *See, e.g.*, Davis Decl. Ex. D. This email attached a notice rescinding the termination from April 2nd and reinstating funding at the 20 percent level that the agency believed was its only statutory obligation. *Id.*

On July 18, 2025, the National Council met and moved to approve Federal/State Partnership plans for general operating support grants for the 2026 fiscal year. *See* ECF 37-1. McDonald approved this motion on July 25th. *Id.* Funding is contingent on 2026 appropriations and NEH's interpretation of the Chairperson's "discretionary authority." *Id.* On August 1, 2025, NEH issued a press release announcing $34.79 million in humanities grant funding. *See* ECF 37-2. These appear all to be direct federal grants. None of this activity is relevant to the pending motion, which involves Federal/State Partnership grants for approved plans under 2024 and 2025 appropriations funding.

### 2. Councils

Plaintiff Oregon Humanities is the Oregon side of the Federal/State Partnership under the Act. Oregon Humanities distributes NEH funds in communities throughout Oregon. Davis Decl. ¶ 3. These funds support projects such as rural libraries in Burns, Forest Grove, Blue River, Newport, and Joseph; youth-led conversations about mental health in Medford; storytelling projects led by Nez Perce Wallowa Homeland; publication of *Oregon Humanities* magazine; production of audio programs *The Detour* and *This Place*, airing on local radio and podcast

platforms; community conversation programs held in libraries, community colleges, and cultural centers; and free humanities courses for adults living near the poverty line. *Id.* ¶ 9.

Oregon Humanities was approved for a general operating support grant, spanning November 1, 2022 through October 31, 2027. *Id.* ¶ 6. It also was approved on January 22, 2025, for a United We Stand special initiative grant of $40,000. It spent those awarded funds, but has not yet been reimbursed. *Id.* ¶ 8.

As noted, Davis received the April 2nd termination email from McDonald, the follow-up email on April 30th from the Office of Grant Management, and the June partial rescission emails restoring some level of partial funding. Davis states that this level of funding allows Oregon Humanities to operate through October 2025, after much disruption, but that its ability to continue operations after October is in doubt. *Id.* ¶ 15. Because of the turmoil caused by DOGE and NEH, Oregon Humanities has cancelled programs in rural communities throughout the state, canceled its own grants that it had planned to award throughout the state, cancelled a free summer course for youth, laid off three staff members, and lost one staff position to attrition. *Id.* ¶ 16. Oregon Humanities reduced its remaining staff by 50-80 percent and reduced benefits. *Id.* Oregon Humanities had budgeted to award $175,000 in grants in 2025, but stopped all grant-making activities after receiving NEH's termination notice. *Id.* ¶ 17. This includes Conexión Fénix in Otis, Corvallis Multicultural Library, KXCJ-LP in Cave Junction, Natives of One Wind Indigenous Alliance/Red Earth Descendants in Ashland, Vanport Mosaic in Portland, and Wallowa Land Trust in Enterprise. *Id.*

Other States' Councils received the same termination email on April 2, 2025. This includes Ohio Humanities Council ("OHC"),[13] Arkansas Humanities Council ("HAR"),[14] New Mexico Humanities Council ("NMHC"),[15] Illinois Humanities Council ("Illinois Humanities"),[16] South Dakota Humanities Council ("SDHC"),[17] Alaska Humanities Forum ("AKHF"),[18] and Mississippi Humanities Council ("MHC").[19] These Councils suffered harms similar to Oregon Humanities.

For example, OHC previously had their general operating grant approved plus a $40,000 United We Stand grant to combat antisemitism and a non-competitive $95,000 Chair's Grant for cultural recovery to combat misinformation about Springfield, Ohio. Asmo Decl. ¶ 3. The state legislature does not support OHC, even though millions of Ohioans live in communities that lack resources to support a vibrant cultural sector. *Id.* ¶ 5. Thus, reliable NEH funding is of particular importance. The majority of NEH funding to OHC supports grants to local cultural and history organizations directly serving the public. *Id.* ¶ 6. After the April 2nd termination, OHC paused its grant program indefinitely, including to organizations that have relied on funding from OHC for 50 years and organizations that were waiting for second payments on open grants. These organizations include, but are not limited to: four operating in Appalachia; Akron Children's

---

[13] *See* Decl. of Rebecca Asmo, ECF 9.

[14] *See* Decl. of Jama Best, ECF 10.

[15] *See* Decl. of Brandon Johnson, ECF 14.

[16] *See* Decl. of Gabrielle Lyon, ECF 15.

[17] *See* Decl. of Christina Oey, ECF 16.

[18] *See* Decl. of Kameron Perez-Verdia, ECF 17.

[19] *See* Decl. of Stuart Rockoff, ECF 18.

Hospital Palliative Care Department; an organization serving incarcerated women; an organization serving women who escaped human trafficking; the National Underground Railroad Freedom Center; the Wood County Museum exhibition about World War II veterans; a documentary film project about the Hopewell Ceremonial Earthworks, the only UNESCO World Heritage Site in Ohio; and a public exhibition about Judaism in Ohio at Temple Israel Akron. *Id.* ¶¶ 8-9. There were grant applications submitted and waiting to be approved and others that were in the middle of multi-year commitments. *Id.* ¶¶ 10-11. The cessation of OHC's commitments to its local partners caused irreparable damage to its relationships and its reputation, not to mention the harm to the public in losing access to the humanities, particularly at low or no cost. *Id.* ¶¶ 12, 14. Like Oregon Humanities, OHC also had to cut its staffing, and its future is uncertain. *Id.* ¶¶ 13-14.

All Councils that submitted declarations describe similar harms. Representative examples include that HAR had to cancel its Summer History Teacher Institute and its K-12 teacher workshops. Best Decl. ¶ 7. NMHC lost a special Chair's Grant designated to address cultural recovery needs after destructive wildfires, including centuries-old community-owned irrigation systems. Johnson Decl. ¶ 8. Illinois Humanities had to cancel all but one "Country and the City" programs, which particularly affects rural areas. Lyon Decl. ¶ 7(d). SDHC had to cancel South Dakota's planned participation the Smithsonian's national traveling exhibit *Americans*. Oey Decl. ¶ 8. AKHF faces significant losses to its language preservation program, which endeavors to preserve Alaska Native languages, many of which are endangered, and had to cancel its *Kindling Conversations* program, which supported veterans. Perez-Verdia Decl. ¶¶ 8-9. MHC faces termination of its newly launched project examining the legacy of Mississippi's first post-

reconstruction Republican governor, Kirk Fordice, who was governor of the state from 1992 to 2000. Rockoff Decl. ¶ 9.

### 3. Federation

Founded in 1977, the Federation is the national membership organization of the Councils. *See* Stein Decl. ¶ 4. As noted, 56 states and jurisdictions formed Councils and all but one are members of the Federation. *Id.* All Councils had 2025 statutory plans approved by the Chairperson of NEH. The Federation advocates for increased investment in and engagement with the national network of Councils. *Id.* ¶ 6. It fosters connections for Councils, provides resources, acts as a liaison with NEH, advocates to Congress, and amplifies the work and voices of members. *Id.* ¶¶ 5-6.

The Federation is a 501(c)(3) organization. *Id.* ¶ 7. It is governed by a volunteer board. *Id.* It is funded primarily through dues paid by Councils. *Id.* The Federation also receives grants directly from NEH to support its mission. It had received a $30,000 grant to support capacity building for Councils' data and evaluation needs. *Id.* ¶ 15. This grant was canceled by NEH. The Federation also lost out on a potential $500,000 grant opportunity for which it previously had been invited to apply. *Id.*

Before DOGE interfered with NEH, the Federation worked closely with NEH, serving as a liaison between the Councils and NEH. The Federation welcomed NEH to participate in the Federation's annual National Humanities Conference. *Id.* ¶ 12. The Federation consulted with NEH on matters of compliance and federal law and represented the Councils at public meetings of the National Council. *Id.* The Federation maintained regular communication with NEH, including the Chairperson's office, the Office of Federal/State Partnership, the Grants Management Office, and the Office of Communications. *Id.* This all changed in April 2025 when Defendants terminated nearly all the staff of NEH and nearly all NEH's open grants. *Id.* ¶ 13.

The Federation and its members suffered significant harm from the grant terminations and other chaos caused by Defendants. Federation members have consistently communicated to the Federation executive director regarding the members' damaged relationships throughout the country, and the tenuous position of the Councils, their staff, their partnerships, their projects, their grantees, their programs, and their institutional knowledge. *Id.* ¶ 14. The American people are daily losing free access to humanities programs. *Id.* The Federation is losing membership dues and faces closure. *Id.* ¶ 15. It already has lost 27 percent of its budget. *Id.*

## DISCUSSION

Plaintiffs raise several claims in their Amended Complaint on which they do not base their motion for interim equitable relief. Instead, the pending motion focuses only on Plaintiffs' claims that Defendants are violating the Separation of Powers doctrine, the APA, and the ICA.

## A.  Likelihood of Success on the Merits

### 1.  Separation of Powers

Plaintiffs bring a claim asserting that Defendants' conduct violates the Separation of Powers doctrine. Plaintiffs argue that they are likely to succeed on this claim because Defendants' conduct reflects a "deliberate decision to flout Congressional command and refuse to spend appropriated funds."

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause), U.S. Const. art. I, § 8, cl. 1 (Spending Clause)). Congress also has the power to legislate. U.S. Const. art. I, § 1; *see also id.* art. I, § 8, cl. 18 (Necessary and Proper Clause). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Instead, the President "shall take Care that the Laws be faithfully

executed." U.S. Const. art. II, § 3 (Take Care Clause). "The Separation of Powers was an integral part of the Founders' design." *City & Cnty. of S.F.*, 897 F.3d at 1232.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Courts generally look to the "tripartite" test stated in Justice Jackson's *Youngstown* concurrence when considering a Separation of Powers claim. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). This test provides that the President's authority is at its maximum when acting pursuant to an express or implied authorization of Congress. *Id.* The second level of power is a "zone of twilight" in the absence of either an express grant or denial of authority, where the President and Congress may have concurrent authority and "where congressional inertia, indifference or quiescence may invite the exercise of executive power." *Id.* (quotation marks omitted). "Finally, when the President takes measures incompatible with the expressed or implied will of Congress he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* (cleaned up). "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *City & Cnty. of S.F.*, 897 F.3d at 1233 (quoting *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring)).

"[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *Id.* at 1233-34 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). "Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *Id.* at 1232. As then-Circuit Judge Kavanaugh explained,

> a President sometimes has policy reasons . . . for wanting to spend
> less than the full amount appropriated by Congress for a particular

> project or program. But in those circumstances, even the President
> does not have unilateral authority to refuse to spend the funds.
> Instead, the President must propose the rescission of funds, and
> Congress then may decide whether to approve a rescission bill.

*In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Thus, "[a]bsent congressional

authorization, [an] Administration may not redistribute or withhold properly appropriated funds

in order to effectuate its own policy goals." *City & Cnty. of S.F.*, 897 F.3d at 1235. An Executive

Order that so requires "violates the constitutional principle of the Separation of Powers." *Id.*

When an agency receives an "allocation of funds from a lump-sum appropriation,"

however, that "is another administrative decision traditionally regarded as committed to agency

discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). As the Supreme Court explained,

> a fundamental principle of appropriations law is that where
> Congress merely appropriates lump-sum amounts without
> statutorily restricting what can be done with those funds, a clear
> inference arises that it does not intend to impose legally binding
> restrictions, and indicia in committee reports and other legislative
> history as to how the funds should or are expected to be spent do
> not establish any legal requirements on the agency.

*Id.* (quotation marks omitted). The Supreme Court clarified that "an agency is not free simply to

disregard statutory responsibilities" and must "allocate[] funds from a lump-sum appropriation to

meet permissible statutory objectives." *Id.* at 193. But otherwise "Congress may always

circumscribe agency discretion to allocate resources by putting restrictions in the operative

statutes (though not, as we have seen, just in the legislative history)." *Id.*; *see also Cmty. Legal*

*Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 940-41 (9th

Cir. 2025) (discussing *Lincoln* and explaining that when Congress creates a mandatory program

and directs certain activity, including through using the word "shall" in the statute, an agency

may not rely on lump-sum appropriations to disregard those statutory directives).

Whether Plaintiffs are likely to succeed on their Separation of Powers claim comes down to whether Congress circumscribed NEH's discretion to spend its lump-sum appropriation in a statute, either the NEH general governing statutes or the 2024 Appropriations Act (and its reaffirmance in the 2025 CR). Defendants admit that Congress has required that at least 20 percent of NEH's overall funding go to the Federal/State Partnership, but Defendants argue that with the June 2nd partial rescission of the April grant terminations, they are now complying with that statutory directive. They contend that NEH has no other statutory directive but essentially has unfettered discretion beyond that threshold funding requirement.

Plaintiffs focus much of their argument on the contention that Congress appropriated $65 million to the Federal/State Partnership in the 2024 Appropriations Act and also in the 2025 CR. That level of detailed appropriation, however, was in the table attached to the joint explanatory statement. Although the joint explanatory statement and its attached table together are an unambiguous statement of congressional intent and Congress specifically directed agencies to abide by the table's spending directives, they do not have the force of law. *See, e.g.*, *Laws.' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 30 (D.D.C. 2020), *aff'd*, 848 F. App'x 428 (D.C. Cir. 2021) (declining to consider an explanatory statement in an appropriations bill as binding, noting that "Congress does not vote on a joint explanatory statement, so it 'has no force of law' and functions as legislative history" (quoting *Goldring v. District of Columbia*, 416 F.3d 70, 75 & n.3 (D.C. Cir. 2005))); *Adams & Assocs., Inc. v. United States*, 120 Fed. Cl. 250, 253 (2015) (explaining that the joint explanatory statement attached to the appropriations bill is legislative history that does not have the force of law); *cf. Lincoln*, 508 U.S. at 192-93. Thus, although the joint explanatory statement may be persuasive evidence of legislative intent, it does not sustain a Separation of Powers claim.

When specific portions of an appropriations bill incorporate by reference the explanatory statement or an attached table, however, courts have found that binding. *See, e.g.*, *Widakuswara v. Lake* ("*Widakuswara I*"), --- F. Supp. 3d ----, 2025 WL 1166400, at *2 (D.D.C. Apr. 22, 2025) (relying on the relevant appropriation bill's specific incorporation that funds appropriated shall be allocated in accordance with the table attached to the explanatory statement); *Widakuswara v. Lake* ("*Widakuswara II*"), 2025 WL 1288817, at *11 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) (same, in the dissent adopted by an en banc decision), *stay vacated* 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (*"Widakuswara III"*). Although other sections of the 2024 Appropriations Act incorporate by reference the joint explanatory statement and its attached table, *see, e.g.*, 138 Stat. 27, 70, 126, the provision relating to NEH did not. That Congress knew how specifically to incorporate the 2024 Appropriations Act's joint explanatory statement and its table in specific funding provisions and did not do so with respect to NEH funding shows that the $65 million appropriation is not binding. *See Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018) ("When Congress includes particular language in one section of a statute but omits it in another, th[e] Court presumes that Congress intended a difference in meaning." (cleaned up)). Because Congress did not include the $65 million appropriation to the Federal/State Partnership in the 2024 Appropriations Act itself, Plaintiffs are not likely to succeed on their Separation of Powers argument that Defendants are failing to comply with this specific congressional spending directive.[20]

---

[20] Plaintiffs argue both that Congress directed $65 million and 40 percent of the $192 million be spent on the Federal/State Partnership. The $65 million stems from the final number in the joint explanatory statement to the 2024 Appropriations Act. The 40 percent figure comes from an early House Committee on Appropriations bill recommendation on NEH funding, in which the committee recommended funding NEH at $186,300,000, with 40 percent going to the Councils. *See* H.R. Rep. No. 118-155, at 100 (2023). Neither of those 2023 figures, however, are

Plaintiffs, however, also assert in their motion that Defendants violated the Separation of Powers doctrine by refusing to spend appropriated funds. Also, in arguing in support of their APA claims that Defendants' conduct was contrary to the governing statutes, Plaintiffs contend that Defendants violated the Separation of Powers doctrine by, among other things, failing to comply with the formula stated in 20 U.S.C. § 956(f)(4).

Defendants respond that NEH has broad discretion because its fiscal year appropriations remain available until obligated or expended and thus are not required to be spent in any given fiscal year. Defendants also assert that NEH does not have to spend funds under the carefully crafted formula in 20 U.S.C. § 956(f)(4) because of the general residual clause in § 956(f)(6). Defendants' argument, however, reads too much discretion into § 956(f)(6) and disregards the statutory framework of the NEH governing statutes as a whole.

In construing a statute, a court "must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015) (quotation marks omitted); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, 167-69 (2012) (hereinafter "*Scalia & Garner*") (discussing the "Whole-Text Canon"). "Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (quotation marks omitted). "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be

_____

in the final 2024 Appropriations Act. Notably, the 40 percent figure also is referenced in NEH's partial rescission notice.

superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *see also Scalia & Garner*, at 174-79 (discussing the "Surplusage Canon"). A court may look to legislative intent by examining legislative history when a statute is ambiguous. *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)); *see also Haro v. City of Los Angeles*, 745 F.3d 1249, 1257 (9th Cir. 2014).

Defendants' interpretation of 20 U.S.C. § 956(f)(6) is contrary to the plain text of the statute read as a whole. The text of § 956(f)(4) provides a specific formula for allocating monies appropriated to the Federal/State Partnership to *approved plans*. Those are programs and projects already approved by NEH. Additionally, § 956(f)(5) states: "The amount of each allotment to a State for any fiscal year under this subsection *shall* be available to each State or grant recipient, which *has a plan or application approved* by the Chairperson in effect on the first day of such fiscal year . . . ." (emphases added). A general residual clause allowing funds "which are not granted to any entity" to revert to the Chairperson does not negate the express statutory text requiring the Chairperson to distribute the funds to approved plans under an express formula and to make the funds available to States with approved plans on the first day of the fiscal year. Defendants' interpretation of § 956(f)(6) also would render § 956(f)(4) superfluous. If § 956(f)(6) allows NEH to forgo the formula required in § 956(f)(4), § 956(f)(4) would then serve no purpose.

In addition, Defendants' interpretation violates "the 'well established canon of statutory interpretation . . . that the specific governs the general,' which applies especially where, as here, 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *United States v. Brumbaugh*, 139 F.4th 1077, 1085 (9th Cir. 2025)

(quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012))

(alteration in *Brumbaugh*); *see also Scalia & Garner*, at 183-88 (discussing the

"General/Specific Canon"). Congress deliberately solved the issue of how to divide appropriated

funds by carefully considering at the time competing requests from the States and the

administration. The general residual clause ensuring that monies appropriated to humanities but

not awarded and used would still be available for humanities projects does not override that

specific solution.

Further, viewing the statute as a whole, Congress placed importance on the Federal/State

Partnership, States obtaining approval for plans, and States being able to rely on stable funding

for approved plans. Congress began by requiring that NEH provide grants to States and that the

program "furnish *adequate* programs in the humanities in each of the several States." 20 U.S.C.

§ 956(f)(1) (emphasis added); *see also Scalia & Garner*, at 208 (noting that a law's "evident

purpose" helps define scope of a catchall provision). Congress even required that new *federal*

programs must, to the extent practicable, coordinate with existing *State* programs. *Id.* § 956(d).

Congress expressly ensured that no federal "department, agency, officer, or employee" could

"exercise any direction, supervision, or control" over State or private applicants or recipients of

funding. *Id.* § 953(c).

Congress also specifically provided for notice and an opportunity to be heard for grant

recipients before grant funding could be suspended or recaptured, and then limited such conduct

to only enumerated reasons. *Id.* § 956(f)(7). As noted, Congress provided extra protection for

States whose plans were approved by the first day of the fiscal year, ensuring that their funding

"shall" be available. *Id.* § 956(f)(5). Defendants' reading of § 956(f)(6) as providing virtually

unfettered discretion ignores the context of the statute as a whole, which repeatedly limits the discretion of the Chairperson with respect to the Federal/State Partnership.

The Chairperson also is not given much discretion in funding the Federal/State Partnership, with only a small amount of discretionary funding (34 percent of any excess in appropriations) allotted to the Chairperson. This framework, however, is not only to allow for discretionary funding, but more importantly, to allow for *regional* funding. When the text granting the Chairperson discretion on the 25 percent of the full Federal/State Partnership appropriations first was added to the NEA provision in 1973, the emphasis was on allowing for funding to regional groups to allow for projects that crossed state lines, particularly for "sparsely populated states." *See, e.g.*, H.R. Rep. No. 93-255, at 3, 16 (1973). NEH funding provisions were modeled after the NEA funding provisions when the Federal/State Partnership provisions were added in 1976. Although this allocation is within the Chairperson's discretion, it still must be awarded to States or regions and cannot be used for federal grants.

Even if the statutory text could be considered ambiguous, the legislative intent, through the legislative history, is clear that the discretion of the Chairperson is not unfettered. To the contrary, Congress specifically intended to cabin the Chairperson's discretion with respect to funding the Federal/State Partnership so that the State humanities programs would have guaranteed funding. Indeed, as described above, when the formula of 20 U.S.C. § 956(f)(4) was added in 1980, the discretionary authority of the Chairperson was *reduced*.

Thus, the only reasonable interpretation of § 956(f)(6) is that Congress did not want any money going to waste, and included the residual clause to capture any funds in a fiscal year not used by the States. That also is how Congress described this same text in the context of the NEA statutes. *See* 114 Cong. Rec. 4320 (Feb. 27, 1968); H.R. Rep. No. 93-529, at 9 (1973). Congress

explained that this clause was intended to catch the "very small" amount of funds allotted to states that they did not use. 114 Cong. Rec. at 4320. Defendants offer an unreasonable interpretation of this clause when they say that it may nullify the formula set forth in § 956(f)(4) or allow NEH not to spend funds otherwise expressly required by § 956(f), including the directive in § 956(f)(1) to provide *adequate* State humanities programs or the directive in § 956(f)(5) to make the funds available for plans approved as of the first day of the fiscal year. It also does not nullify other statutory obligations, including how NEH may terminate a grant.

This same statutory construction applies to § 960(b)(1) and the 2024 Appropriations Act's allowance that appropriated funds remain available until spent. *See* § 960(b)(1) (stating that funds appropriated "for any fiscal year shall remain available for obligation and expenditure until expended"); 138 Stat. 25, 281 (stating that funds will "remain available until expended"). The appropriations bills essentially amend the dollar amounts appropriated in § 960(a)(1)(B). These provisions must be evaluated in the context of the statute as a whole. The text states that the funds are available until obligated or expended. When a Council's plans are approved, however, the funds are obligated to that Council. *See, e.g.*, § 956(f)(5). The statute sets forth in § 956(f)(7) how NEH can suspend or recapture grants it has committed to a Council.

Defendants' interpretation of the clause that funds need not be spent in a given year, along with their interpretation of § 956(f)(6), also would have the absurd result that NEH could refuse to fund any State programs in a given year, invoke the residual clause under § 956(f)(6), and then revert all appropriated funds to federal programs. That would violate specific congressional directives to spend appropriated funds on the Federal/State Partnership. Congress simply was providing an additional benefit to the Federal/State Partnership by allowing funds to

carry over if not spent, not allowing the administration to use that provision, in conjunction with a nonsensical interpretation of § 956(f), to avoid following its statutory directives.

As the Supreme Court explained in *Lincoln*, even when there is a lump-sum appropriation, the agency must abide by its other statutory objectives and responsibilities. *See Lincoln*, 508 U.S. at 193; *see also Cmty. Legal Servs.*, 137 F.4th at 940. NEH states that it is following the directive of presidential Executive Orders in terminating the grants. "Simply put, 'the President does not have unilateral authority to refuse to spend the funds.'" *City & Cnty. of S.F.*, 897 F.3d at 1232 (quoting *Aiken County*, 725 F.3d at 261 n.1). NEH's contention that it does not have to follow Congress's directive making funds available to States with approved funds and allocating funds according to the formula established by Congress is a violation of the Separation of Powers doctrine. The Executive Branch is not at liberty to rewrite a statute or unilaterally refuse to spend appropriated funds as directed. *See United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) ("The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" (quoting *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990)).

### 2. Impoundment Control Act

Plaintiffs argue that Defendants violated the ICA, 2 U.S.C. § 681 *et seq.*, by failing to follow its required procedure for proposing a rescission or deferral of NEH's appropriations. Defendants respond, and Plaintiffs concede in their reply, that the ICA forecloses a private right of action challenging executive impoundment decisions. The ICA states in relevant part:

> If, under this chapter, budget authority is required to be made
> available for obligation and such budget authority is not made
> available for obligation, the Comptroller General is hereby

> *expressly* empowered, through attorneys of his own selection, to
> bring a civil action in the United States District Court for the
> District of Columbia to require such budget authority to be made
> available for obligation, and such court is hereby expressly
> empowered to enter in such civil action, against any department,
> agency, officer, or employee of the United States, any decree,
> judgment, or order which may be necessary or appropriate to make
> such budget authority available for obligation.

2 U.S.C. § 687 (emphasis added).

As the parties acknowledge, courts that have confronted the question of enforcement agree that the ICA provides that *only* the Comptroller General may bring suit directly to enforce the ICA. *See Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977) ("[T]he Court concludes, based on its examination of both the language and history of the statute, that Congress did not intend the [ICA] to create a claim upon which relief can be granted to individuals . . . . Instead, Congress expressly provided that such suits could be brought by the Comptroller General, and even he could bring such enforcement suits only after receiving the tacit approval of Congress in each particular case."); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 828-30 (D.D.C. 1981) (reviewing the legislative history of the ICA to conclude that the plaintiffs had a "scant likelihood" of demonstrating an express or implied private right of action to enforce the ICA).[21] Thus, the Court holds that Plaintiffs are not likely to succeed on the merits of their claim brought directly under the ICA.[22]

---

[21] The Court is aware of one case that evaluated the merits of an ICA challenge brought by a private party. *See W. Cent. Mo. Rural Dev. Corp. v. Donovan*, 659 F.2d 199 (D.C. Cir. 1981). But there, the D.C. Circuit did not address standing and instead conducted a brief analysis to conclude that the President's conduct did not violate the ICA. *See id.* at 202-03. Because Plaintiffs do not rely on this case or suggest that the Court should depart from the generally consistent conclusion that the ICA does not authorize a private right of action, the Court does not discuss this case further.

[22] The Court notes that in addition to a claim under the ICA, Plaintiffs also allege a general ultra vires action against DOGE, in which they assert that DOGE acted without

Plaintiffs also argue that nothing in the APA or the ICA prevents the Court from finding that a government entity violated the APA by not complying with the ICA. Defendants dispute whether the Court has jurisdiction under the APA to review this claim and argue that Plaintiffs are unlikely to succeed on the merits. The Court addresses these arguments next in its analysis of Plaintiff's claims under the APA.

### 3. APA Claims

Plaintiffs assert APA claims against all Defendants, alleging agency action contrary to law and arbitrary and capricious agency action. As an initial matter, DOGE is likely not an "agency" subject to the APA. Executive Order 14158, which created DOGE, expressly exempts "the Executive Office of the President or any components thereof" from the meaning of "agency" as defined in 5 U.S.C. § 551. *See New Mexico v. Musk*, --- F. Supp. 3d ----, 2025 WL 1502747, at *17 (D.D.C. May 27, 2025). Thus, Plaintiffs' APA claims are likely not properly asserted against DOGE and Gleason, and the Court considers these claims against only NEH, McDonald, and the National Council (hereinafter, the "NEH Defendants").

#### a. Jurisdiction

Defendants argue that the Court lacks jurisdiction over Plaintiffs' APA claims because: (1) the Tucker Act gives the Court of Federal Claims exclusive jurisdiction over this type of action; (2) the ICA precludes review of Plaintiffs' ICA-based APA claim; (3) Plaintiffs do not challenge a final agency action; and (4) the challenged actions are committed by law to agency discretion.[23] The Court addresses each argument in turn.

---

congressional authority. *See* ECF 6 ¶¶ 166-71. Because Plaintiffs do not move for preliminary equitable relief based on this claim, the Court does not discuss it further.

[23] Defendants also argue that the Court lacks subject-matter jurisdiction over Plaintiffs' claims regarding the "firing of staff" at NEH and the "elimination or near elimination of entire

### i. Tucker Act

The Tucker Act gives the Court of Federal Claims exclusive jurisdiction over claims for damages based on contracts with the United States where the amount in controversy exceeds $10,000. *See* 28 U.S.C. § 1491(a)(1) (granting jurisdiction to Court of Federal Claims); 28 U.S.C. § 1346(a) (granting district courts concurrent jurisdiction with the Court of Federal Claims when the amount in controversy does not exceed $10,000). The Tucker Act, however, "does not permit the Court of Federal Claims to grant equitable or declaratory relief." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (cleaned up); *see also Richardson v. Morris*, 409 U.S. 464, 465 (1973) (explaining that "the Court of Claims has no power to grant equitable relief"). "Due to this limited remedial authority, a contract-based action falls within the scope of the Tucker Act only if the plaintiff seeks *money damages* for the breach of a government contract." *United Aeronautical Corp.*, 80 F.4th at 1026 (emphasis in original). Indeed, the "Tucker Act yields . . . when the Administrative Procedure Act . . . provides an avenue for relief." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 323-24 (2020).

The Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp.*, 80 F.4th at 1026 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). To determine whether an action is a disguised breach of contract claim, the Ninth Circuit uses a two-part test derived from the D.C. Circuit's decision in *Megapulse*. This test looks to: "(1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate)." *Id.* (quotation marks omitted). Accordingly, "[i]f rights and remedies are

---

divisions" at NEH. Plaintiffs, however, do not challenge employee terminations or agency organization decisions in their motion.

*statutorily* or *constitutionally* based, then district courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does," even if the plaintiff formally seeks injunctive relief. *Cmty. Legal Servs.*, 137 F.4th at 938 (quoting *United Aeronautical Corp.*, 80 F.4th at 1026) (emphases in *United Aeronautical Corp.*). "The Tucker Act does not bar an APA action if the plaintiff's rights and remedies, as alleged, are noncontractual—even if it is inevitable that the government will raise a contract provision as a defense." *United Aeronautical Corp.*, 80 F.4th at 1026. In terms of the relief sought, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).

Defendants argue that Plaintiffs' suit is in essence a claim seeking money damages for breach of a government contract. Defendants rely heavily on the recent Supreme Court order granting an application for an emergency stay in *Department of Education v. California* ("*California*"), in which the Supreme Court stated that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" based on the Tucker Act. 604 U.S. ----, 145 S. Ct. 966, 968 (2025) (per curiam). The emergency order does not provide the reasoning behind this conclusion. The Supreme Court recently explained that "[a]lthough [its] interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in *like cases*." *Trump v. Boyle*, 606 U.S. ----, 2025 WL 2056889 (July 23, 2025) (emphasis added).

Without further guidance as to the reasoning in *California*, the Court does not find that the claims in this case are sufficiently like those in *California* for its guidance to be informative. In *California*, eight states sued the Department of Education ("DOE") and its officials, alleging that DOE violated the APA by arbitrarily terminating grants awarded to high-need educational

agencies and schools for the purpose of training teachers. Importantly, the plaintiffs in *California* requested injunctive relief restoring grant funding, and "the terms and conditions of each individual grant award [we]re at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). In contrast, Plaintiffs here seek a narrow injunction that would simply enjoin the grant terminations and prevent unspent funds from being spent elsewhere, not require any payments. Further, Plaintiffs' claims are not premised on the specific terms of any Councils' grant agreements, and the Court need not consider the grant terms to decide Plaintiffs' APA claims.

Defendants also argue that the grant agreements at issue are essentially contracts with the federal government and that Plaintiffs seek "specific performance of the government's funding of the grants—a contract remedy." ECF 31 at 27 (citing *Widakuswara II*, 2025 WL 1288817, at *4).[24] Defendants contend that the grant terminations at issue here are like those in *California* and cases involving similar statutes in which the courts have concluded that the claims were essentially breach of contract claims. *See, e.g.*, *Harris County v. Kennedy*, --- F. Supp. 3d ----, 2025 WL 1707665 (D.D.C. June 17, 2025); *Vera Inst. of Just. v. U.S. Dep't of Just.*, 2025 WL 1865160 (D.D.C. July 7, 2025); *Sols. in Hometown Connections v. Noem*, 2025 WL 1103253 (D. Md. Apr. 14, 2025). These courts acknowledged, however, that the "Supreme Court's sparse reasoning in [*California*] has sown confusion" and that judges have not "been uniform in their application" of *California*. *Vera Inst. of Just.*, 2025 WL 1865160, at *9

---

[24] Defendants repeatedly cite the two-judge majority opinion of this D.C. Circuit panel decision, which granted an emergency stay and held that the Tucker Act likely barred district court jurisdiction. This panel decision, however, was reconsidered en banc and the panel's stay was vacated, with the reasoning on the Tucker Act argument being "substantially for the reasons explained by Judge Pillard" in her dissent in the panel decision. *Widakuswara III*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025).

(collecting cases); *see also Harris County*, 2025 WL 1707665, at *13-14 (noting that the

"Supreme Court's brief foray into the jurisdictional issue left many questions unanswered," and

that "[p]erhaps because of these unanswered questions, different judges have applied

[*California*] in different ways" and collecting cases).

Indeed, many courts have declined to apply *California* to challenges to grant terminations

and have found that the Tucker Act did not bar jurisdiction.[25] The Court finds particularly

persuasive the D.C. Circuit's en banc decision in *Widakuswara III*, substantially adopting Judge

Pillard's dissent in *Widakuswara II*, the earlier panel decision. In her dissent, Judge Pillard

discussed *California* and distinguished between "entities created by statute and designated by

Congress to receive specified sums" (for which the Tucker Act would not bar jurisdiction) and

parties whose "only claim was to sums awarded to them in previously awarded discretionary

grants" (for which the Tucker Act would bar jurisdiction). *Widakuswara II*, 2025 WL 1288817,

at *13 (Pillard, J., dissenting). "If a plaintiff's claim depends on interpretations of statutes and

regulations rather than the terms of an agreement negotiated by the parties, the claim is not in

essence contractual." *Id.* at *12 (Pillard, J., dissenting). The statutes at issue in *Widakuswara*—

which the D.C. Circuit considered to be in the former category—established broadcasting

networks and "required allocation of funds to those specific, named entities" to perform specific

functions. *Id.* at *11 (Pillard, J., dissenting) (citing 22 U.S.C. § 6208(a)-(b)). Those statutes are

---

[25] *See, e.g.*, *Widakuswara III*, 2025 WL 1521355, at *1 (statute governing grant disbursement to broadcast network); *Thakur v. Trump*, --- F. Supp. 3d. ----, 2025 WL 1734471, at *18-19 (N.D. Cal. June 23, 2025) (NEH governing statute); *Green & Healthy Home Initiatives, Inc. v. Env't Prot. Agency*, --- F. Supp. 3d ----, 2025 WL 1697463, at *12-14 (D. Md. June 17, 2025) (same); *S. Educ. Found. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2025 WL 1453047, at *6-11 (D.D.C. May 21, 2025) (statute that authorized the Department of Education to award grants but did not mandate the award of such grants); *Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971, at *10-14 (D. Md. July 7, 2025) (AmeriCorps grants under similar statute to the Act).

similar to the Act and other statutes that courts have found do not deprive the district courts of jurisdiction under the Tucker Act.[26]

Turning to the *Megapulse* test, Plaintiffs do not rely on the terms of any agreements between them and the Government to support their claims but instead allege violations of the U.S. Constitution (Separation of Powers, the Appropriations Clause, the Spending Clause, and the Take Care Clause) and statutes (the Act, APA, and ICA). *See Thakur v. Trump*, --- F. Supp. 3d ----, 2025 WL 1734471, at *19 (N.D. Cal. June 23, 2025) ("Plaintiffs' claim that the terminations [were] carried out in an arbitrary and capricious manner does not rest on a contention that Defendants breached the terms of any contracts."); *S.F. Unified Sch. Dist. v. AmeriCorps*, --- F. Supp. 3d ----, 2025 WL 1180729, at *7-9 (N.D. Cal. Apr. 23, 2025) (explaining that the plaintiffs challenged the lawfulness of conditions placed on grants based on statutory and constitutional rights, not based on the terms of the original grants). Indeed, even "the purported authority Defendants cited in their notices terminating the grants was a federal regulation: 2 C.F.R. § 200.340(a)(4) . . . . Contractual terms particular to each individual grant are not necessary to sustain Plaintiff[s'] claims or Defendants' apparent defenses." *Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971, at *11 (D. Md. July 7, 2025); *see also Maryland v. Corp. for Nat'l & Cmty. Serv.*, --- F. Supp. 3d ----, 2025 WL 1585051, at *23 (D. Md. June 5, 2025) (explaining that "[t]he grant terms are simply not relevant to this case at all,"

---

[26] *See supra* note 25. Judge Pillard also analogized the case before her to *Department of State v. AIDS Vaccine Advocacy Coalition*, 604 U.S. ----, 145 S. Ct. 753 (2025), in which the Supreme Court declined to stay injunctive relief based on the Tucker Act. 2025 WL 1288817, at *14. In *AIDS Vaccine Advocacy Coalition*, as here, the plaintiffs' "claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes." *Id.* Here, the Act directs appropriate funds to be used for specified purposes, and Plaintiffs allege that Defendants' policy directives were unlawful under the Act.

in part because the defendant's purported authority for terminating the grants was 2 C.F.R.

§ 200.340(a)(4)). As in *Widakuswara*, Plaintiffs' "claim of entitlement rests on [Defendants']

alleged contravention of applicable statutory and constitutional constraints—not the terms of any

particular contract. . . . The Congressional basis of their entitlement precedes the individual

grants that deliver their allocations." *Widakuswara II*, 2025 WL 1288817, at *12 (Pillard, J.,

dissenting).

Further, Plaintiffs seek injunctive and declaratory relief. *See* ECF 6 (Am. Compl.) at 40.

This "prospective equitable declaratory and injunctive relief against allegedly unlawful conduct

[is] outside the jurisdiction of the Court of Claims and properly within the jurisdiction of the

district court." *S.F. Unified Sch. Dist.*, 2025 WL 1180729, at *7; *see also Martin Luther King, Jr.*

*County v. Turner*, --- F. Supp. 3d ----, 2025 WL 1582368, at *10 (W.D. Wash. June 3, 2025)

("Plaintiffs seek injunctive and declaratory relief only, they do not seek money damages based

on a breach of contract claim. . . . This, alone, is sufficient to render the Tucker Act

inapplicable."). In addition, the Court of Federal Claims cannot provide this form of equitable

relief. "The result requested by [Defendants] would mean that no court has jurisdiction to hear

plaintiffs' claims. Not only is this result contrary to common sense, but it also conflicts with the

'strong presumption favoring judicial review of administrative action' that is embodied in the

APA." *See Cmty. Legal Servs.*, 137 F.4th at 939 (quoting *Mach Mining, LLC v. EEOC*, 575

U.S. 480, 486 (2015)).

Plaintiffs bring a "suit seeking to enforce the statutory mandate itself, which happens to

be one for the payment of money." *Bowen*, 487 U.S. at 901. Even in *California*, the Supreme

Court reaffirmed the holding in *Bowen* that "a district court's jurisdiction 'is not barred by the

possibility' that an order setting aside an agency's action may result in the disbursement of

funds." *California*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910). Thus, the Tucker Act does not preclude the Court's jurisdiction to hear Plaintiffs' APA claims.

### ii.  Preclusion by the ICA

One of Plaintiffs' arguments under the APA is that Defendants' conduct was contrary to the ICA, rendering that conduct contrary to law under the APA. Defendants argue that the Court cannot review this assertion under the APA because the ICA provides for exclusive enforcement by the Comptroller General. Defendants cite *General Land Office v. Biden* in support of this argument. 722 F. Supp. 3d 710 (S.D. Tex. 2024). In *General Land Office*, the Southern District of Texas concluded that because "the ICA provides that the Comptroller General may bring suit for alleged ICA violations and meticulously outlines the mechanism for doing so . . . . APA review for ICA violations is improper." *Id.* at 734 (citation omitted). That court held that the plaintiffs' ICA-based APA claim was, therefore, "precluded from judicial review." *Id.* at 734-35.

As discussed, the ICA does not provide a private right of action. Yet, that does not mean that the ICA also precludes Plaintiffs' APA claims based on the argument that the actions of the NEH Defendants are contrary to law. There is a meaningful distinction between direct challenges under the ICA and an APA challenge asserting that an agency action is contrary to law because it violates the ICA. In the absence of binding precedent to the contrary, the Court finds more persuasive the reasoning in other district courts that "[m]erely because Congress expressly provided a role and process for the Comptroller General to address perceived violations of [the ICA] on behalf of Congress does not operate more broadly . . . to foreclose private parties from seeking review of agency action for violating the same statute under the APA." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 2025 WL 1795090, at *22 (D.D.C. June 30, 2025); *see also id.* ("[T]he mere fact that the Impoundment Control Act affirmatively empowers the Comptroller General to sue is not sufficient to overcome the 'strong presumption' in favor of review under

the APA."); *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 148 n.17

(D.D.C. 2025) (stating that the defendants' argument that a violation of ICA cannot be a basis for

finding action contrary to law under APA because the ICA allows for enforcement by the

Comptroller General "lacks merit"); *New York v. Trump*, 769 F. Supp. 3d 119, 138 n.13

(D.R.I. 2025) ("Defendants assert that because the ICA does not provide for a private right of

action, the statute is 'generally not enforceable through an APA suit.' The Court declines to

adopt such a narrow view of what it may consider when determining whether an agency has

acted 'not in accordance with law' under the APA. In the Court's view, 'not in accordance with

law,' refers to '*any* law.'" (emphasis in original) (citation omitted)). Thus, Plaintiffs' APA claim

challenging the NEH Defendants' actions as contrary to the ICA is not precluded.

### iii. Final Agency Action

For an agency action to be reviewable under the APA, it must be "final." 5 U.S.C. § 704.

An agency action is final when the challenged action (1) "marks the consummation of the

agency's decisionmaking process," and (2) is an action "by which rights or obligations have been

determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154,

177-78 (1997) (cleaned up). The NEH termination letters that Plaintiffs received on April 2,

2025, stated that their federal grants were terminated, effective that same day. Further, the

guidance for terminated grants that NEH circulated in April 2025 stated that there was no means

of dispute resolution, meaning that the terminations were final and not appealable. At the time

when Plaintiffs filed this suit, "[a]s a direct consequence of the termination letters, [Plaintiffs]

immediately stopped receiving grant funding." *Thakur*, 2025 WL 1734471, at *16. Thus, at that

time, the April grant termination letters were final agency actions. *See id.*; *S. Educ. Found. v.*

*U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2025 WL 1453047, at *15 (D.D.C. May 21, 2025)

(holding that letter stating that grant terminated immediately was final agency action); *Am.*

*Council*, 2025 WL 2097738, at *13-14 (finding that mass termination of NEH grants to non-Council grantees—by means of identical letters as here—constituted final agency action).

On June 2, 2025, NEH emailed Plaintiffs, purporting partially to rescind the April 2nd grant terminations and restore funding up to 20 percent. Those notices stated that funding was still reduced from 40 percent to 20 percent and acknowledged the "incredible hardship." Defendants argue that these June emails "largely rescinded" the earlier grant terminations, and thus the April grant terminations no longer represent the consummation of the agency's decision-making process and are no longer final agency action for purposes of an APA challenge.

Under the voluntary cessation doctrine, NEH's voluntary change in conduct after Plaintiffs filed this lawsuit does not moot Plaintiffs' claims. *See West Virginia*, 597 U.S. at 720. Further, even if the rescission or revocation of a final agency decision undid its finality, of which the Court is skeptical, the new funding decision by the NEH Defendants still has significantly reduced Plaintiffs' grant funding[27] and contains the same alleged deficiencies as the original decision. This reduction marks the consummation of NEH's decision-making process and has legal consequences for Plaintiffs. Thus, Plaintiffs challenge a final agency action.

Defendants also argue that Plaintiffs make a "programmatic challenge" to the dismantling of NEH and do not challenge the final action of grant terminations. In their motion, however, Plaintiffs do not challenge the "dismantling" of NEH, although that information is provided as background, for context, and to clarify who was involved in the grant termination decisions. Plaintiffs have moved for an injunction solely relating to the grant terminations. Plaintiffs

---

[27] Whether NEH considered funding for the Federal/State Partnership originally at 40 percent of $192 million ($76.8 million) or the $65 million from the table attached to the joint explanatory statement of the 2024 Appropriations Act, the reduction to 20 percent of $192 million ($38.4 million) is a significant reduction.

challenge the "discrete and clear" conduct of NEH's cuts to grant awards, effectively shutting down the Councils. As Judge Pillard explained in her dissent that was later adopted by the en banc majority: "The fact that the government elected to take many unlawful agency actions . . . does not exempt their violations from judicial scrutiny." *Widakuswara II*, 2025 WL 1288817, at *9 (Pillard, J., dissenting). "[T]he very volume of lawbreaking and the scope of operational functioning laid waste does not add up to courts losing the power to determine the lawfulness of agency action." *Id.*

### iv.  Committed to Agency Discretion

Under § 701(a)(2) of the APA, administrative action that is "committed to agency discretion by law" is exempt from judicial review. The Supreme Court has read the "committed to agency discretion" exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotation marks omitted). Thus, this exception applies only when discretion is so unlimited that "there is truly no law to apply." *Cmty. Legal Servs.*, 137 F.4th at 942 (quotation marks omitted).

Defendants argue that the Act is one of these rare statutes. Defendants cite that the Act authorizes the Chairperson to "enter into arrangements, including contracts, grants, loans, and other forms of assistance" to achieve enumerated objectives, but does not require NEH to fund specific grants. *See* 20 U.S.C. §§ 956(c), 956(f)(6), 960(b)(1). As discussed above, however, the Act provides a sufficient mandate to NEH to fund the Federal/State Partnership, including providing a statutory formula for approved plans and requiring that funds shall be available to all approved plans as of the first of the fiscal year. Thus, the NEH Defendants' grant termination decisions are reviewable. Similarly, 2 C.F.R. § 200.340 "does not reflect standardless discretion," but instead "permits an agency to terminate a grant in certain circumstances."

*Thakur*, 2025 WL 1734471, at *17. Thus, the NEH Defendants' decisions are not committed to agency discretion.

### b.  Contrary to Law

Courts must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) & (C). Plaintiffs argue in their motion that they are likely to succeed on their claim that Defendants acted contrary to law in four ways: (1) by failing to follow the statutory process for grant terminations or modifications, *see* 20 U.S.C. § 956(f)(7); (2) by cutting funding that was required to be provided to the Councils under 20 U.S.C. § 956(f)(4); (3) by failing to provide appellate rights, *see* 2 C.F.R. § 200.342; and (4) by violating the ICA. The Court addresses each in turn.

### i.  Statutory Process for Grant Suspensions or Terminations

Plaintiffs argue that under the Act, grants may not be suspended until the Chairperson has made a finding "after reasonable notice and opportunity for hearing," and that the Chairperson made no such finding, much less with notice, opportunity for hearing, or opportunity to cure. *See* 20 U.S.C. § 956(f)(7). Defendants do not dispute that they have not followed this procedure. Instead, Defendants respond that this provision applies only in the narrow circumstances described in § 956(f)(7). This provision states:

> Whenever the Chairperson, after reasonable notice and opportunity
> for hearing, finds that--
>
> > (A) a group or grant recipient is not complying
> > substantially with the provisions of this subsection;
> >
> > (B) a State agency or grant recipient is not complying
> > substantially with terms and conditions of its State plan or
> > grant recipient application approved under this subsection;
> > or

> > (C) any funds granted to any group or State agency or grant
> > recipient under this subsection have been diverted from the
> > purposes for which they are allotted or paid,
>
> > the Chairperson shall immediately notify the Secretary of the
> > Treasury and the group, State agency, or grant recipient with
> > respect to which such finding was made that no *further grants* will
> > be made under this subsection to such group, State agency, or grant
> > recipient until there is no longer a default or failure to comply or
> > the diversion has been corrected, or, if the compliance or
> > correction is impossible, until such group, State agency, or grant
> > recipient repays or arranges the repayment of the Federal funds
> > which have been improperly diverted or expended.

20 U.S.C. § 956(f)(7) (emphasis added). This subsection is ambiguous; specifically, it is unclear

whether the phrase "further grants" refers to future plan approvals, funding of existing open

grants, or both.

The Court first looks to the Act as a whole. Importantly, the text of § 956(f)(7),

applicable to NEH, comes from § 954(h) of the NEA provision. Subsection 954(h) applies to *all*

grants under the NEA statutes, including direct federal grants, while § 956(f)(7) applies only to

grants under the Federal/State Partnership. For direct grants, it is logical to refer to "further

grants" because the direct recipient applies for a discrete grant for each project. The

Federal/State Partnership, however, primarily involves a general operating support grant, from

which the State repeatedly draws funds throughout the fiscal year. The State does not receive its

standard operating grant as a lump-sum payment, but submits reimbursements requests to NEH.

Under this system, it would not make sense for NEH to continue reimbursing a State that is not

complying with its obligations. The term "grant" is used broadly throughout § 956. Funds are

described as "granted" in § 956(f)(7)(C). Looking at the statute as a whole, "further grants" more

reasonably refers to both future grants and funds that have not yet been paid to the State on an

open grant, even though the "grant" already has been approved.

The Court next looks to the legislative history for clarification. When Congress amended the Act in 1976 to add what is now § 956(f)(7), it provided no reason for the amendment. Subsection 956(f)(7), however, took its text from a clause in the statute establishing NEA. *See* 20 U.S.C. § 954(h). In introducing an earlier version of what is now § 954(h) in 1963, Congress explained that the "subsection provides for *suspension* or *recapture* of grants." S. Rep. No. 88-780, at 29 (1963) (emphases added). When enacting the law in 1965, the congressional reports stated that what is now subsection (h) "sets forth the circumstances under which grants to a group or to a State agency may be *terminated*, providing there has been reasonable notice and opportunity for a hearing." *See* S. Rep. No. 89-300, at 22 (1965) (emphasis added); H.R. Rep. No. 89-618, at 9 (1965) (same). These explanations show that the purpose of § 956(f)(7) is to provide a mechanism to terminate or suspend grants when a grant recipient is not in compliance with the Act, and to prevent that grant recipient from receiving any further funds (and potentially to have to repay funds), until the recipient has cured the noncompliance.

Finally, the Supreme Court "has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of the statute." *Dubin v. United States*, 599 U.S. 110, 120-21 (2023) (quotation marks omitted); *see also Scalia & Garner*, at 221-24 (discussing the "Title-and-Headings Canon"). The heading of § 956(f) is: "Grants-in-aid programs; designation of State administrative agency; matching funds; applications and plans; allotments; cost limitations; grants to regional groups; non-Federal funding; definitions; *suspensions of grants*; single entity limitation." (emphasis added). Similarly, the heading of § 954(h) is: "Suspension of grants for defaults, noncompliance with provisions and plans, and diversion of funds; repayment of funds." These headings support that § 956(f) does not only prevent the payment of any possible future grants, but also governs the

suspension of currently awarded (open) grants that have not been fully paid. The Court thus concludes that § 956(f)(7) applies when NEH rescinds funding allotted to the Federal/State Partnership.

Under this reading of § 956(f)(7), Defendants' argument that a grant can be suspended for other reasons ignores the principle of statutory construction that reflects the "ancient maxim" of *expressio unius est exclusio alterius*: the express mention of one thing excludes all others. *See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("[W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies."); *see also NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (explaining that this canon means "expressing one item of an associated group or series excludes another left unmentioned" (cleaned up)); *Scalia & Garner*, at 107-10 (discussing the "Negative-Implication Canon"). This canon applies only "when circumstances support[] a sensible inference that the term left out must have been meant to be excluded." *SW Gen., Inc.*, 580 U.S. at 302 (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002)). In this case, the Act contains one provision, § 956(f)(7), that provides a mechanism for terminating and suspending grants. This provision sets forth three circumstances under which the Chairperson can stop providing funding to a grant recipient and does not include any language to suggest that other circumstances may also trigger the termination of funding.[28]

It is undisputed that the NEH Defendants did not terminate Plaintiffs' grants for a reason listed in § 956(f)(7). Instead, the April termination letters referenced 2 C.F.R. § 200.340(a)(4) in

---

[28] Defendants also argue that under the terms of the grant agreements with the Councils, NEH is authorized to suspend or terminate grants based on changed agency priorities. *See* ECF 32-1 at 41 ("NEH may suspend or terminate awards in whole or in part if: . . . an award no longer effectuates the agency's needs and priorities . . . ."). This contractual term, however, does not supersede the statutory requirements set forth by Congress in § 956(f)(7).

stating that the grant being terminated "no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement." ECF 11-1 at 2. This regulation is in the OMB Guidance for Federal Financial Assistance, in a subsection titled "Remedies for Noncompliance." The NEH governing statute, however, already establishes the remedies for noncompliance in § 956(f)(7), and it is a sensible inference that all other remedies for noncompliance were meant to be excluded.

Additionally, the NEH governing statutes specifically establish the Federal/State Partnership as a priority and require its stable funding to furnish "adequate" programs and other statutory requirements. The vague and general statement in the OMB regulation does not override these statutory requirements. Further, the OMB regulation only allows agencies to terminate grant agreements "to the extent authorized by law." *See* 2 C.F.R. § 200.340(a)(4). Thus, "this regulation cannot authorize actions that contravene statutory requirements, nor does it relieve [the NEH Defendants] of [their] duty to follow the law." *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, --- F. Supp. 3d ----, 2025 WL 1822487, at *20 (D. Mass. July 2, 2025) (quotation marks omitted). Accordingly, the NEH Defendants' purported grant terminations under § 200.340(a)(4) are only valid to the extent that statutes authorize the terminations. As discussed, the Act does not authorize termination of grants without a finding that the grant recipient is not complying substantially with the requirements of the statute or the grant agreement or has diverted funds from the purposes for which they are allotted. Thus, Plaintiffs are likely to succeed on the merits of their claim that the NEH Defendants acted contrary to law in terminating Plaintiffs' grants without such a finding.

### ii.  Statutory Formula for Funding

Plaintiffs next argue that Congress established a framework for how NEH must operate the Federal/State Partnership in 20 U.S.C. § 956, and Defendants are failing to comply with that

statutory directive. Specifically, Plaintiffs argue that the statute provides a formula for how NEH funds must be allotted to approved plans. *Id.* § 956(f)(4). This formula requires 44 percent to be distributed equally among all approved states and jurisdictions, 22 percent to be distributed based on population, and 34 percent to be distributed at the discretion of the Chairperson, either by state or regionally. *Id.* Plaintiffs argue that Defendants acted contrary to law in failing to follow this formula.

Defendants respond by incorporating their argument raised in response to Plaintiffs' Separation of Powers claim—that NEH has discretion and does not have to follow the formula set forth in § 956(f)(4) because of the residual clause contained in § 956(f)(6) and overall general discretion. For the reasons described above in rejecting this argument for Plaintiffs' Separation of Powers claim, the Court rejects this contention by Defendants. As discussed above, § 956(f)(6) does not provide the Chairperson with discretion to ignore the formula set forth in § 956(f)(4) for how to allocate funds appropriated to the Federal/State Partnership. Nor does the fact that funds remain available after the fiscal year mean that Defendants can ignore their statutory directives. Plaintiffs are likely to succeed on their claim that the NEH Defendants must allocate funds appropriated for approved plans under the formula set forth in § 956(f)(4).

### iii. Appeals Process

Third, Plaintiffs argue that NEH failed to provide a mechanism for appeal of the grant terminations. Plaintiffs cite 2 C.F.R. § 200.342, which requires that a federal agency "must maintain written procedures for processing objections, hearings, and appeals." Plaintiffs contend that these written procedures are the terms and conditions of the grants, which give the Councils the right to appeal a termination. *See* McDonald Decl., Ex. A. at 42. Defendants respond that there is no statutory or regulatory right to an administrative appeal because the regulations

provide for an appeal only in circumstances where NEH initiates "a remedy for noncompliance." *See* 2 C.F.R. § 200.342. It is undisputed that NEH did not find noncompliance by Plaintiffs.

This claim raises concerns with the Tucker Act. Although Plaintiffs style this argument as relying on a regulation, at this stage it appears that Plaintiffs are relying on the terms of the grant agreements. Therefore, the Court declines to consider this argument as a basis for the equitable relief that Plaintiffs seek.

### iv. ICA

Plaintiffs also allege that the NEH Defendants' conduct is contrary to the statutory mandates of the ICA. The ICA codifies Separation of Powers principles and limits the extent to which the President may defer spending funds that Congress appropriated for particular purposes. *See County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) ("Congress has intentionally limited the ability of the President to withhold or 'impound' appropriated funds and has provided that the President may only do so after following particular procedures and after receiving Congress's express permission." (citing the ICA)); *see also Aiken County*, 725 F.3d at 261 n.1 (explaining that "even the President does not have unilateral authority to refuse to spend the funds" appropriated to an agency and explaining the rescission request process in the ICA) ; S. Rep. No. 93-688, at 75 (1974) (explaining that the objective of the ICA was to assure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress").

The ICA vests the Executive Branch with strictly circumscribed authority to impound appropriated funds. *See* 2 U.S.C. §§ 683-84. If the Executive Branch seeks the permanent cancellation of funds, it may propose a "recission." To propose a rescission, the Executive Branch must comply with the following specific procedures.

> Whenever the President, the Director of the Office of Management and Budget, the head of any department or agency of the United States, or any officer or employee of the United States proposes to defer any budget authority provided for a specific purpose or project, the President shall transmit to the House of Representatives and the Senate a special message specifying--
>
> (1) the amount of the budget authority proposed to be deferred;
>
> (2) any account, department, or establishment of the Government to which such budget authority is available for obligation, and the specific projects or governmental functions involved;
>
> (3) the period of time during which the budget authority is proposed to be deferred;
>
> (4) the reasons for the proposed deferral, including any legal authority invoked to justify the proposed deferral;
>
> (5) to the maximum extent practicable, the estimated fiscal, economic, and budgetary effect of the proposed deferral; and
>
> (6) all facts, circumstances, and considerations relating to or bearing upon the proposed deferral and the decision to effect the proposed deferral, including an analysis of such facts, circumstances, and considerations in terms of their application to any legal authority, including specific elements of legal authority, invoked to justify such proposed deferral, and to the maximum extent practicable, the estimated effect of the proposed deferral upon the objects, purposes, and programs for which the budget authority is provided.

*Id.* § 684(a). If, on the other hand, the Executive Branch seeks temporarily to withhold funds, it may propose a "deferral." The process for proposing a deferral is the same as for proposing a rescission in all material respects. *See id.* § 683(a).

For purposes of this analysis, it does not matter whether NEH technically intended to propose a permanent rescission or a temporary deferral. That is because Plaintiffs argue, and Defendants do not dispute, that the Executive Branch and the NEH Defendants did *not* follow the specific procedural steps outlined in §§ 683 and 684. There is no evidence that a special message

detailing the indefinite and widespan withdrawals of obligated funding was ever communicated to Congress.

Moreover, to the extent that NEH intended to propose a temporary deferral, the ICA states that deferrals are permissible for *only* one of three reasons: "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). Indeed, "[n]o officer or employee of the United States may defer any budget authority for any other purpose." *Id.* Plaintiffs argue that setting aside the ICA's procedural requirements, Defendants failed to justify the grant terminations under any of these three bases.[29] Defendants concede this violation as well. *Cf. New York v. Trump*, 769 F. Supp. 3d at 138 (concluding that the plaintiffs "substantiated a likelihood of success in proving that the Executive's actions were contrary to law when bringing about a deferral of budget authority without sending a special message to Congress as the ICA requires").

In fact, Defendants' only argument with respect to the merits of the ICA analysis is that NEH appropriations need not be spent in a particular year, and thus, NEH did not exceed its discretion under 20 U.S.C. § 956(f)(6). But for the reasons provided in the Court's discussion of the Separation of Powers doctrine, Defendants have likely exceeded their discretion under §§ 956(f)(6) and 960(b)(1). Thus, Defendants' conduct also likely needed to comport with the

---

[29] To the extent that Defendants may have relied on policy to support impoundments, that would have been an insufficient justification. *See, e.g.*, Inst. of Museum & Libr. Servs., B-337375, 2025 WL 1714233, at *7 n.33 (Comp. Gen. June 16, 2025) ("The ICA does not allow deferrals for policy-based reasons, so to the extent a special message had proposed the deferral [of] . . . funds solely for compliance with the policies in EO 14238, that would likely have been impermissible."); Off. of Mgmt. & Budget, B-331564, 2020 WL 241373, at *5 (Comp. Gen. Jan. 16, 2020) ("The ICA does not permit deferrals for policy reasons. [The agency's] justification for the withholding falls squarely within the scope of an impermissible policy deferral." (citations omitted)).

procedural requirements for deferral or rescission under the ICA. Given the absence of

persuasive argument or evidence from Defendants to the contrary, the Court finds that Plaintiffs

are likely to succeed on the merits of their claim that the NEH Defendants acted contrary to law

(specifically, the ICA) by terminating Plaintiffs' grants without comporting with those

procedural requirements.

### c.  Arbitrary and Capricious

Agency action is

> arbitrary and capricious if the agency has relied on factors which
> Congress has not intended it to consider, entirely failed to consider
> an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is
> so implausible that it could not be ascribed to a difference in view
> or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019)

(quoting *Motor Vehicle Mfrs.*, 463 U.S. at 52). "[A]n agency's action can only survive arbitrary

or capricious review where it has articulated a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." *All. for the Wild Rockies v.

Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (cleaned up). Post-hoc rationalizations cannot justify

an agency's actions. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971).

A court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with

a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean

Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (first alteration in

original, remaining alterations added).

An agency also acts in an arbitrary and capricious manner when it changes policy without appropriate reasoning. As the Supreme Court has explained, "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy," even though it need not convince the court of the merits of its new policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted). Under the "change-in-position doctrine . . . . agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. ----, 145 S. Ct. 898, 917 (2025) (cleaned up).

Defendants again cite the OMB regulation to argue that a grant may be terminated without advance notice if NEH finds that the grant no longer effectuates program goals or agency priorities. *See* 2 C.F.R. § 200.340(a)(4). But "[*p*]*ost hoc* explanations of agency action by . . . counsel cannot substitute for the agency's own articulation of the basis for its decision." *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008). The mass termination letters stated that the terminated grant "no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2 C.F.R. § 200.340." The termination notices also referenced the President's Executive Order No. 14217 dated February 19, 2025 (which was apparently a mistake), and the President's agenda. The June emails partially rescinding the grant terminations merely stated that the Councils would be funded at 20 percent of the NEH's appropriation amount, "which is the minimum that NEH is congressionally mandated to award." Davis Decl. Ex C at 1. None of these letters set out any factual findings or reasoned bases for the NEH Defendants' termination

decisions, much less provided the Councils with any explanation. The emails contain only conclusory statements and provide no indication of reasoned decision-making. *Thakur*, 2025 WL 1734471, at \*14. As explained by the Court in *Thakur*, "2 C.F.R. § 200.340, to the extent it applies, does not alter the requirement under the APA that Defendants must provide a reasoned decision for their termination." *Id.* at \*14 n.25.

Adding to the arbitrary and capricious nature of the actions taken by the NEH Defendants is that the grant reductions "were likely performed *en masse*, without individualized analysis." *Id.* at \*14. Although McDonald summarily states in his declaration that he "undertook individualized assessments" of the grants, at this stage the record does not support that. *See supra* note 11. Moreover, the reduction "of previously awarded grants is a *per se* change in agency policy, requiring a reasoned explanation of the change." *Thakur*, 2025 WL 1734471, at \*15. As discussed, no such reasoned explanation was provided.

Defendants also argue that Plaintiffs are not "regulated entities" as in *Wages & White Lion*, and thus the change-in-position framework—and specifically, the consideration of reliance interests—does not apply. But the Supreme Court and the Ninth Circuit have applied this framework and considered reliance interests even where the plaintiff is not a regulated entity. In 2020, for example, the Supreme Court stated: "When an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (quotation marks omitted)) (considering reliance interests of Deferred Action for Childhood Arrivals recipients); *see also Nat'l Urb. League v. Ross*, 977 F.3d 770, 778 (9th Cir. 2020) (considering the reliance interests of the public in a replan of the census); *City & Cnty. of S.F. v. U.S.*

*Citizenship & Immigr. Servs.*, 981 F.3d 742, 761 (9th Cir. 2020) (considering reliance interests of immigrants). Thus, Plaintiffs are likely to succeed on the merits of their claim that the NEH Defendants acted in an arbitrary and capricious manner in terminating the grants.

## B.  Irreparable Harm

To meet their burden for preliminary equitable relief, Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted); *see also Immigr. Defs. Law Ctr.*, 2025 WL 2080742, at *15 (stating that preliminary injunction factors apply to an APA stay). Such harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

A plaintiff's showing of serious "ongoing harms to their organizational missions" establishes a likelihood of irreparable harm. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (an increased difficulty for a plaintiff to accomplish its "primary mission" is adequate to show irreparable harm). And where projects rely heavily or entirely on federal funding, "[a] total loss of federal funding would be catastrophic, and the [Plaintiffs'] need for certainty renders damages inadequate." *City & Cnty. of S.F.*, 897 F.3d at 1244. "In cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.' Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss." *Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 3d 335, 349 (D.D.C. 2025)[30] (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994)).

---

[30] In the cited opinion in *Climate United Fund*, the district court was granting in part the plaintiff's motion for a temporary restraining order. Later, the district court issued a preliminary injunction, which was stayed in part on other grounds pending appeal. *See Climate United Fund*

As U.S. Chief District Judge John McConnell, Jr. of the U.S. District Court for the

District of Rhode Island explained,

> It is so obvious that it almost need not be stated that when money
> is obligated and therefore expected (particularly money that has
> been spent and reimbursement is sought) and is not paid as
> promised, harm follows—debt is incurred, debt is unpaid . . .
> services stop, and budgets are upended. And when there is no end
> in sight to the Defendants' funding freeze, that harm is amplified
> because those served by the expected but frozen funds have no
> idea when the promised monies will flow again.

*New York v. Trump*, 769 F. Supp. 3d at 142. Like the states in *New York*, Plaintiffs have "laid out

scores of examples of obligated funding and the harm that withholding such funding has

caused." *Id.*

The chaos caused by Defendants' conduct harms Plaintiffs' reputations.[31] Injury to

reputation "is not easily measured or fully compensable in damage" and thus is "often held to be

irreparable." *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996)

(collecting cases); *see also Thakur*, 2025 WL 1734471, at *24 (finding that evidence of "layoffs

---

*v. Citibank, N.A.*, 2025 WL 1118430 (D.D.C. Apr. 15, 2025), *stayed in part by* 2025
WL 1123856 (D.C. Cir. Apr. 16, 2025).

[31] *See* Asmo Decl. ¶ 12 ("The abrupt loss of NEH funding has forced OHC to break
commitments to organizations it has long-standing relationships with, causing irreparable harm
to their operations and to OHC's reputation as a trustworthy partner."); Best Decl. ¶¶ 8-9
(explaining that "[c]ommunity and partner organizations may begin to view HAR as a unreliable
or unstable collaborator," "[r]ebuilding trust could be difficult," and "longstanding institutional
partnerships . . . may be jeopardized"); Johnson Decl. ¶¶ 8, 10 (stating that "[a]fter promising
assistance, however, NMHC is now in a position of withdrawing support from local community
organizations, which . . . leads to significant distrust," and that the "termination of subawards
will likely have a chilling effect on applicants who under normal circumstances would consider
NMHC a stable funder"); Oey Decl. ¶ 8 (explaining that SDHC's decision to cancel the
Smithsonian exhibit may "impact [its] reputation and relationships with national partners");
Perez-Verdia Decl. ¶ 11 ("[T]he NEH termination has damaged AKHF's relationships with
partner organizations and communities. . . . These disruptions are not just logistical—they
represent a breakdown of trust."); Rockoff Decl. ¶ 6 (explaining that the "renewed relationship"
with a historically Black college or university "is now at risk").

of team members, interruption of graduate programs, and the potential complete loss of projects" would harm the plaintiffs' reputations, causing irreparable injury); *Maryland*, 2025 WL 1585051, at *34 ("The abrupt exiting of members and erosion of trust built between service programs and the community will have a detrimental impact on these programs absent immediate injunctive relief.").

The record also contains unrebutted evidence of the irreparable harm Plaintiffs are already experiencing, including cancelling programs and loss of staff. *See Elev8 Balt.*, 2025 WL 1865971, at *25 (finding that loss of staff, such that plaintiffs cannot carry out their mission, constitutes irreparable harm); *Maryland*, 2025 WL 1585051, at *34 (finding that "ceas[ing] or significantly curtail[ing] operations" constitutes irreparable harm). When these programs are cancelled, "there can be no do over and no redress." *Newby*, 838 F.3d at 9. No amount of money damages will allow Plaintiffs to recover these lost opportunities.

Among other harms, Oregon Humanities has cancelled programs in rural communities and a free summer course for youth, and stopped all grant-making activities after receiving NEH's grant termination notice. Davis Decl. ¶¶ 16-17. In Ohio, the OHC has lost funding for organizations in rural Appalachia, including ones that serve women who are incarcerated and women who have escaped human trafficking. Asmo Decl. ¶ 8. The HAR and the SDHC cancelled contracts they had in place with the Smithsonian Museum to host a traveling exhibition—a one-time opportunity that will not reoccur. Best Decl. ¶ 6; Oey Decl. ¶ 8. The HAR also cancelled teacher institutes and workshops in Arkansas. Best Decl. ¶ 7. The NMHC withdrew promised support to local community organizations recovering from devastating 2022 wildfires and their destruction of historical sites. Johnson Decl. ¶ 8. And in Alaska, the AKHF has cut programs aimed at youth mental health and suicide prevention and programs supporting

veterans. Perez-Verdia Decl. ¶¶ 7, 9. The AKHF also lost funding for its language preservation

program, aimed at preserving 20 distinct Alaska Native languages, many of which are

endangered. *Id.* ¶ 8. The Eyak language lost its last fluent speaker in 2008, and some languages

have fewer than 40 remaining fluent speakers. *Id.* Without these programs, these languages may

be lost forever. As described in the declarations, all these Councils have had to cut staff and

curtail their services and ability to serve their missions. Thus, Plaintiffs have shown irreparable

injury absent a preliminary injunction.

## C.  Balance of the Equities and Public Interest

The Court turns to the final two *Winter* factors, the balance of the equities and the public

interest. These two factors "merge" into one when "the Government is the party opposing the

injunction." *Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022) (citing *Nken v. Holder*, 556

U.S. 418, 435 (2009) (applying merged factors in stay context)). These factors merge because

"the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831

F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original) (applying merged factors in preliminary

injunction context).

Defendants provide two principal arguments in support of their position that the equities

do not tip in Plaintiffs' favor. First, Defendants argue that the public has an interest in the

Judicial Branch respecting the judicial boundaries drawn by Congress. Defendants assert, citing

the vacated opinion granting a stay in *Widakuswara II*, that Congress has limited the resolution

of these types of cases to specialized tribunals, such as the Court of Federal Claims. But for the

reasons discussed above, this argument in unavailing because Defendants' minor premise is

false. This Court has jurisdiction over this lawsuit.

Defendants also argue that the relief sought by Plaintiffs would "disrupt NEH efforts to

implement the President's directives while complying with the agency's statutory obligations."

But for the reasons discussed above, Plaintiffs have shown a likelihood of success in their argument that the NEH Defendants are *not* complying with their statutory obligations. "There is generally no public interest in the perpetuation of unlawful agency action." *See Newby*, 838 F.3d at 12. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Am. Council*, 2025 WL 2097738, at *36 (same).[32] Moreover, as the Court noted in its discussion of Plaintiffs' irreparable harms, in addition to a substantial public interest in ensuring that the government obeys the law, there is a strong public interest in the pursuit and preservation of locally-sourced humanities projects, as emphasized by Congress. *Cf. Am. Council*, 2025 WL 2097738, at *36 (emphasizing that the balance of equities and public interest tilt in favor of a preliminary injunction "to preserve the possibility that we may yet get the opportunity to see what these scholars have to teach us"). Considering all relevant interests, the balance of the equities tips in Plaintiffs' favor.

## D.  Scope of Relief

Plaintiffs request that the Court enter both a stay under § 705 of the APA and a preliminary injunction against all Defendants. At oral argument, Plaintiffs abandoned their request for relief that could be construed as a mandatory injunction and clarified that they seek only a prohibitory injunction and parallel stay under the APA. They request that the Court enjoin and stay the April 2nd and June 2nd actions and any reallocation or disbursement of the awarded funds to any other party.

---

[32] Defendants also raise concerns with ordering the release of funds into existing grants because those funds may not be retrievable afterward. But because, as discussed below, Plaintiffs request only a prohibitory injunction preventing allocated funds from being disbursed to *other* sources and preventing Defendants from implementing the unlawful grant terminations, this argument is now moot.

Defendants respond that any injunctive relief the Court grants must be narrowly tailored. They argue that Plaintiffs inappropriately seek sweeping nationwide relief. Defendants also argue that the Federation lacks standing, that venue in the District of Oregon is inappropriate, and that the relief Plaintiffs seek is inconsistent with *Trump v. CASA, Inc.*, 606 U.S. ----, 145 S. Ct. 2540 (2025). The Court addresses in turn each of these three arguments advanced by Defendants.

### 1. Standing for Plaintiff Federation

Defendants' first argument is that Plaintiff Federation "is not in privity" with the government because it is neither a party to grant agreements nor an intended third-party beneficiary. According to Defendants, Plaintiffs instead seek relief that would benefit a host of Councils that are not parties here. Thus, Defendants argue, allowing Plaintiffs' requested injunctive relief would violate the principles recently articulated in *CASA*, that universal injunctions "likely exceed the equitable authority that Congress has granted federal courts," and injunctive relief is likely appropriate only when it is "complete," not "universal." 145 S. Ct. at 2548, 2556-57.

The Court finds Defendants' argument unpersuasive. First, the Federation properly is a plaintiff in this case. To have standing, a plaintiff must have a "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) ("For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute."). The required personal interest must satisfy three elements throughout the litigation: (1) an injury in fact, *i.e.*, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal connection

between the injury-in-fact and the defendant's challenged behavior; and (3) likelihood that the injury-in-fact will be redressed by a favorable ruling. *Friends of the Earth*, 528 U.S. at 180-81; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (reiterating that the "irreducible constitutional minimum" of standing consists of "an injury in fact . . . fairly traceable to the challenged conduct of the defendant, and . . . likely to be redressed by a favorable judicial decision").

Here, Defendants challenge only the first element, that the Federation has not itself suffered an injury that is at stake. The Court disagrees. The Federation alleges that it has suffered injuries-in-fact from, among other conduct, the termination of tens of thousands of dollars in grant money that NEH designated directly to the Federation itself. *See* Stein Decl. ¶ 15. This previously approved funding would have supported the Federation's ability to address the Councils' data evaluation needs, including funding in-person consultation with data and evaluation experts. *Id.*; *cf. Thakur*, 2025 WL 1734471, at *18, 21-22 (concluding that the plaintiffs sufficiently showed they had a "personal stake" in their claims because rescinded grant money was significant to their livelihoods and reputation). For the reasons provided in the Court's discussion of the Tucker Act, these allegations are not—as Defendants imply—in service of breach of contract claims. The Federation properly is a plaintiff in this lawsuit in its own right. The Court may grant it equitable relief.

Second, in addition to having a personal stake here, the Federation asserts standing with respect to claims arising from the termination of NEH grants awarded to its members. When an association brings a lawsuit on behalf of its members, that is called "associational" or "organizational" standing. The Court agrees that the Federation has associational standing to bring claims on behalf of its member Councils. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975)

("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The Federation satisfies each of the three elements required for associational standing. Defendants challenge only the third element of this test.[33] They assert that "Plaintiffs provide no explanation" for why this lawsuit does not require the individual participation of the members of the Federation. The third element of the associational standing test "is best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). "Individualized proof from the members is not needed where, as here, declaratory and injunctive relief is sought rather than monetary damages." *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F. 3d 1178, 1181 (9th Cir. 1998); *see also Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986) (explaining that "[a]ctions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group

---

[33] Regarding the first two elements of the test, the Federation includes among its members the other Plaintiff in this case, Oregon Humanities, which has standing to bring this lawsuit. The Federation also is "the national membership organization for the state and jurisdictional humanities councils" and "advocates for increased investment in and engagement with the national network of humanities councils." Stein Decl. ¶¶ 4, 6. The interests it asserts in this case are thus germane to its purposes.

representation" and that when courts "are concerned only with the question of preliminary injunctive relief, the participation of plaintiff's individual members is not necessary to litigate [the] action" where the "nub" of the claim depends on the plaintiff's evidence, "not on evidence that differs from member to member"); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (noting that the associational standing doctrine generally would bar an action for damages, unlike an action for declaratory and injunctive relief).

Applying these principles, the Court finds that the individual participation of each Council is not required. First, Plaintiffs have provided declarations and other submissions discussing harms experienced by a representative sample of member Councils. *See generally* ECF 9, 10, 14, 15, 16, 17, 18, 36-1.[34] Additionally, although the specific number of terminated grants may vary from Council to Council, the Federation's claims in this case depend not on evidence that differs from Council to Council, but whether Defendants' decision to mass terminate grant funding to the Federal/State Partnership violates federal law and constitutional principles. Accordingly, the Court joins other district courts around the country that have concluded in similar contexts that associations have standing to bring cases on behalf of their members. *See, e.g.*, *Ass'n of Am. Univs. v. Dep't of Energy*, --- F. Supp. 3d ----, 2025 WL 1414135, at *8 (D. Mass. May 15, 2025); *Am. Council*, 2025 WL 2097738, at *20.

In other words, what Plaintiffs request is not a universal injunction. They do not request an injunction applying to "any person" or against Defendants writ large. Plaintiffs' request for relief properly is limited to themselves, and for the Federation, within the relief afforded by direct and associational standing. Within the principles of direct and associational standing, the

---

[34] The exhibit in ECF 36-1 is a letter provided by Plaintiffs that discusses the termination of a grant provided directly to an organization in Mississippi but is "nearly identical" to the termination notice that the MHC received concerning its general operating support grant.

Court properly may order injunctive relief for the Federation's members. *Cf. Ass'n of Am. Univs. v. Dep't of Def.*, --- F. Supp. 3d ----, 2025 WL 2022628, at *28 (D. Mass. July 18, 2025) (explaining that after an association has established standing to sue on behalf of its members, "no additional showing is necessary to afford relief to all . . . members" of that association).

## 2. Venue

Defendants argue that "venue in Oregon appears inappropriate" because "Plaintiffs' memo indicates that the non-Oregon members of the Federation are impacted locally or within their individual states; there is no tie to the District of Oregon." The Court disagrees that venue is inappropriate. Pursuant to 28 U.S.C. § 1391(e)(1)(C), civil actions in which the defendant is "an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States," may be brought in, among other venues, the judicial district where "the plaintiff resides if no real property is involved in the action." No real property is involved in this action.[35]

Thus, the Court considers whether at least one of the two Plaintiffs resides within the District of Oregon. *See Ry. Lab. Execs.' Ass'n v. ICC*, 958 F.2d 252, 256 (9th Cir. 1991)

---

[35] "The Ninth Circuit has not addressed the meaning of 'real property' in § 1391(e)[]." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2009 WL 1025606, at *2 (N.D. Cal. Apr. 14, 2009). Indeed, the only opinion issued by the Ninth Circuit defining "real property" of which the Court is aware is unpublished. *See Gabriel v. Gen. Servs. Admin.*, 547 F. App'x 829, 832 (9th Cir. 2013) ("Real property includes 'land and anything grown on, attached to, or erected on it, excluding anything that may be severed without injury to the land.'" (citing *Black's Law Dictionary* 1255 (8th ed. 2004)). Accordingly, the Court uses the definition of "real property" provided by the District of Nevada: "an action involves real property if it is a suit involving the protection or recovery of real property or an estate therein." *Ferguson v. Lieurance*, 565 F. Supp. 1013, 1015 (D. Nev. 1983); *see also Santa Fe Int'l Corp. v. Watt*, 580 F. Supp. 27, 30 (D. Del. 1984) (indicating that real property issues arise when a court confronts problems "which are recurrent but peculiar to certain areas . . . such as mineral rights" (quotation marks omitted)). Neither party suggests—and the Court does not find—that the protection or recovery of real property or an estate is at issue here, or for that matter, that this case falls into any of the other definitions discussed in this footnote.

(explaining that venue need be proper only for one plaintiff under § 1391(e)(1)(C));[36] *Exxon Corp. v. FTC*, 588 F.2d 895, 898-99 (3d Cir. 1978) ("There is no requirement that all plaintiffs reside in the forum district."), *overruled on other grounds as recognized in Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 138-39 (3d Cir. 2014); *Sidney Coal Co., Inc. v. Soc. Sec. Admin.*, 427 F.3d 336, 344-46 (6th Cir. 2005) (collecting cases and reviewing legislative history of § 1391(e) to conclude that the provision's residency requirement is satisfied if at least one plaintiff resides in the district in which the action has been brought), *cert. denied*, 547 U.S. 1020 (2006). Defendants do not contest that Oregon Humanities resides in the District of Oregon, or that the District of Oregon is an improper venue for that Plaintiff. Thus, venue is proper with respect to one Plaintiff, and accordingly, the District of Oregon is an appropriate venue for this case. *Cf. Las Ams. Immigr. Advoc. Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1202 (D. Or. 2020) ("Where there are multiple plaintiffs, only one plaintiff must be a resident of the district to satisfy the residency requirement of venue under § 1391(e)(1)(C)." (citing *Ry. Lab. Execs. Ass'n*, 958 F.2d at 256)), *on recon. sub nom. Las Ams. Immigr. Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173 (D. Or. 2021); *Am. Council*, 2025 WL 2097738, at *18 (finding that venue was proper because some of the plaintiffs resided in the court's district and because no real property was involved in the action).

### 3. Stay Under § 705 of the APA

Defendants' third argument is that the scope of relief available against NEH under the APA must be consistent with the principles of *CASA*. Defendants assert that although the APA permits courts to "hold unlawful and set aside agency action," *see* 5 U.S.C. § 706(2), "that

---

[36] *Railway Labor Executives Ass'n* precisely states that "venue need be proper for only one plaintiff under 28 U.S.C. § 1391(e)(4)." *See* 958 F.2d at 256. For clarification purposes, the Court notes that this provision of the statute has since been renumbered as § 1391(e)(1)(C).

language may not be equated with the wholesale vacatur of agency action." The Court does not

find Defendants' argument persuasive.

First, what Plaintiffs request at this stage of the litigation is *not* "vacatur of agency

action" under § 706(2) of the APA. Plaintiffs request a stay under § 705. Under § 705, when

"justice so requires" and "to the extent necessary to prevent irreparable injury," a reviewing

court may "issue all necessary and appropriate process to postpone the effective date of an

agency action or to preserve status or rights pending conclusion of the review proceedings." In

other words, a stay under § 705 functions like a prohibitory injunction; the stay preserves the

status quo and does not impose additional obligations on an agency or vacate agency action

altogether. Because Plaintiffs do not request vacatur under § 706(2) at this time, the Court

declines further to address Defendants' arguments about the extent to which the text of § 706(2)

comports with *CASA*.

Second, the Court does not agree with Defendants that relief granted under the APA must

comport with the principles of *CASA*, because *CASA* is not a case about § 705 stays. The only

mention of the APA in *CASA* is in the context of § 706 vacaturs, and only to emphasize that

"[n]othing" in the *CASA* decision "resolves the distinct question whether the Administrative

Procedure Act authorizes federal courts to vacate federal agency action." 145 S. Ct. at 2554 n.10;

*see also id.* at 2567 (Kavanaugh, J., concurring) ("To be sure, in the wake of the Court's

decision, . . . in cases under the Administrative Procedure Act, plaintiffs may ask a court to

preliminarily 'set aside' a new agency rule."); *Ass'n of Am. Univs. v. Dep't of Def.*, 2025

WL 2022628, at *27 (noting that "the Court does not necessarily agree that a stay under the APA

is subject to the same limitations espoused in *CASA*"); *but see Immigr. Defs. Law Ctr.*, 2025

WL 2080742, at *15 (stating that although *CASA* "explicitly declined to extend its holding to the

APA context, its complete-relief principle for crafting injunctive relief provides some useful guidance for crafting interim equitable relief" (citation omitted)). To the extent that the principles supporting the Supreme Court's decision in *CASA* apply to a § 705 stay, Plaintiffs' requested stay to protect the named Plaintiffs, including by association the Federation's member Councils, comports with the theory that relief must be complete, not universal.

Having addressed Defendants' arguments, the Court turns to the appropriateness and scope of a § 705 stay. For the reasons discussed above, Plaintiffs have met their burden to show that a stay is appropriate.

### 4. Conclusion

The Court finds that Plaintiffs' requested relief, as clarified at oral argument, is prohibitory and narrowly tailored. Enjoining Defendants and staying the NEH Defendants from implementing the April 2nd grant terminations and directing Defendants not to re-obligate *pendente lite* to another party the unlawfully withdrawn grant funding is narrowly tailored to the claimed harm in this case.

## E. Administrative Stay and Bond

### 1. Defendants' Request for an Administrative Stay

Defendants request that if the Court issues injunctive relief, that relief be stayed pending the disposition of any appeal authorized by the Solicitor General of the United States or, at a minimum, administratively stayed for a period of seven days to allow the government to seek an emergency stay from the court of appeals. The Court denies this relief.

When determining whether to enter this type of a stay, a court considers the following four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay

> will substantially injure the other parties interested in the
> proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 426 (quotation marks omitted).

Here, a stay is not appropriate because Defendants satisfy none of these factors. First, for the reasons discussed, *Plaintiffs*—not Defendants—have shown a likelihood of success on the merits. *Cf. Thakur*, 2025 WL 1734471, at *31 ("Defendants' request for a stay pending appeal, or for seven days pending a motion to the court of appeals for a stay, is also denied . . . because Plaintiffs are likely to succeed on the merits of their APA and First Amendment claims."); *see also Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023) (denying a plaintiff's motion to stay because he failed to show a likelihood of success on the merits). Second, Defendants have also made "no showing that dispersing congressionally appropriated funds for statutorily mandated purposes would cause irreparable harm in this case." *Cmty. Legal Servs.*, 137 F.4th at 942. As discussed, Defendants are likely violating statutory obligations and principles of Separation of Powers that have existed for decades. Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Id.* at 943 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).[37] Third, the issuance of a stay would substantially injure Plaintiffs, who will continue to suffer the loss and potential closure of state humanities programs. *Cf. New York*

---

[37] Defendants cite the Supreme Court's opinion in *California* to support their concern that a preliminary injunction could require the government to spend money not recoupable after being distributed. First, as noted above, Plaintiffs no longer seek relief requiring the government to spend any money. Rather, Plaintiffs request the Court to enjoin Defendants from *spending those allocated funds elsewhere*. Thus, Defendants' argument is moot. Second, as Judge Koh explained in *Community Legal Services*, the Supreme Court in *California* "relied upon a declaration from a government official asserting the difficulties inherent in recovering disbursed funds under the specific grant agreements in that case." 137 F.4th at 943 (citing *California*, 145 S. Ct. at 969). Here, as in *Community Legal Services*, no such evidence was presented. "To the contrary, [Defendants'] motion fails to cite any evidence [on Defendants' ability to recoup] at all." *Id.*

*v. Kennedy*, --- F. Supp. 3d ----, 2025 WL 1803260, at *21 (D.R.I. July 1, 2025) (denying agency's request for stay in light of the plaintiffs' assertion that a stay would result in "specific, concrete, documented harms" (quotation marks omitted)). Finally, Defendants have offered no argument or evidence that the public interest supports a stay. To the contrary, for the reasons above, the public interest benefits from immediate preliminary injunctive relief. Therefore, because Defendants have failed to satisfy the *Nken* factors, the Court denies their request for a stay. *Cf. PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 454 (D. Md. 2025) (denying Defendants' request for stay because they satisfied none of the four *Nken* factors).

### 2.  Defendants' Request for a Bond

Rule 65(c) of the Federal Rules of Civil Procedure states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Federal courts, however, have discretion as to the amount of the security and whether to even require a security in the first place. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("Rule 65(c) invests the district court with discretion as to the amount of the security required, *if any*." (emphasis in original) (cleaned up)); *see also People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir.) ("The court has discretion to dispense with the security requirement . . . where requiring security would effectively deny access to judicial review."), *amended*, 775 F.2d 998 (9th Cir. 1985).

Defendants request that any injunctive relief be conditioned on a bond. Defendants argue that a bond is appropriate here because any preliminary injunction would "potentially mandate that the government spend money not recoupable once distributed." As discussed, Plaintiffs have

withdrawn that requested remedy. Thus, Defendants do not show any reasonable damages they might potentially sustain.

Even if Defendants could show a possibility of damages, the Court has considered the relative hardships and the likelihood of success on the merits and concludes that to require any security in this case would be unjust. As a result of Defendants' conduct, Plaintiffs face irreparable harm to their ability to fund local humanities projects. Requiring a bond would constrain Plaintiffs' ability to enforce their rights. *See Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, --- F. Supp. 3d ----, 2025 WL 1233674, at *13 (N.D. Cal. Apr. 29, 2025) ("Because this litigation is brought by nonprofit organizations to protect the public interest and ensure compliance with federal law, the Court declines the Government's request [for a bond]."); *PFLAG*, 769 F. Supp. 3d at 454 ("Because the Court has found that Plaintiffs are likely to succeed on their claim that the withholding of the funds at issue in this case is unconstitutional, the Court again declines to require a bond."); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md.) (setting "nominal bond of zero dollars" because the plaintiffs brought the case to protect their constitutional rights and a bond would "essentially forestall [the plaintiffs'] access to judicial review"), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025).[38] Because this litigation is brought to protect the

---

[38] The Court acknowledges that other courts, including courts in this circuit, have chosen to impose *nominal* bonds instead of no bond at all. *See, e.g.*, *S.F. A.I.D.S. Found. v. Trump*, --- F. Supp. 3d ----, 2025 WL 1621636, at *29 (N.D. Cal. June 9, 2025) (imposing bond of $1,000); *S. Educ. Found.*, 2025 WL 1453047, at *18 (imposing bond of $100); *Thakur*, 2025 WL 1734471, at *31 (imposing bond of $100); *New York v. Kennedy*, 2025 WL 1803260, at *21 (imposing bond of $100). Here, Defendants did not request, nor does the Court see the value in imposing, a nominal or symbolic bond. Indeed, Defendants did not propose any amount for the requested bond.

public interest and ensure compliance with federal law, the Court concludes that requiring

Plaintiffs to post a bond is not needed.

## PRELIMINARY INJUNCTION

**IT IS HEREBY ORDERED** that the Court **GRANTS IN PART** Plaintiffs' Motion for

Preliminary Injunction and until this Court orders otherwise and except as otherwise expressly

permitted by this Preliminary Injunction, or until such time as the parties agree in writing to

amend, supersede, or terminate this Preliminary Injunction:

1.      Defendants' April 2, 2025 terminations of Plaintiffs' previously approved grants

was unlawful and Defendants are enjoined from implementing those terminations as to grants

awarded to either Plaintiffs Oregon Council for the Humanities d/b/a Oregon Humanities or the

Federation of State Humanities Councils, including all member Councils of the Federation;

2.      Defendants shall not further terminate, suspend, or cancel Plaintiffs' grants

approved as of April 2, 2025, absent cause specified in 20 U.S.C. § 956(f)(7) or further Order of

the Court; and

3.      Defendants shall not obligate, loan, encumber, disburse, or otherwise dispose of

the funds committed to Plaintiffs, including the member Councils of the Federation, through

grants approved as of April 2, 2025, except as to Plaintiffs.

## APA STAY

The Court **ORDERS**, under 5 U.S.C § 705, that Defendants National Endowment for the

Humanities, National Council on the Humanities, and Michael McDonald are hereby **STAYED**

from implementing the April 2, 2025 terminations of Plaintiffs' grants and from disbursing,

encumbering, loaning, granting, or otherwise disposing of the funds committed to Plaintiffs,

including the member Councils of the Federation, through grants approved as of April 2, 2025,

except as to Plaintiffs.

## CONCLUSION

The Court GRANTS IN PART Plaintiffs' Motion for a 5 U.S.C. § 705 Stay and

Preliminary Injunction (ECF 7), as stated in this Opinion and Order.

DATED this 6th day of August, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge