Anna Sortun, OSB No. 045279
  Email: anna.sortun@tonkon.com
Steven M. Wilker, OSB No. 911882
  Email: steven.wilker@tonkon.com
Paul Balmer, OSB No. 203429
  Email: paul.balmer@tonkon.com
Gracey Nagle, OSB No. 215255
  Email: gracey.nagle@tonkon.com
Thomas M. Twitchell, *pro hac vice*
  Email: thomas.twitchell@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile: 503.274.8779
    *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON COUNCIL FOR THE HUMANITIES d/b/a OREGON HUMANITIES, a nonprofit corporation; FEDERATION OF STATE HUMANITIES COUNCILS, a nonprofit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DOGE SERVICE, a component of the Executive Office of the President; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; NATIONAL ENDOWMENT FOR THE HUMANITIES, an independent federal agency, and its advisory council NATIONAL COUNCIL ON THE HUMANITIES; MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities, <br><br> Defendants. | Civil No. 3:25-cv-00829-SI <br><br> **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> *ORAL ARGUMENT REQUESTED* |

PAGE 1 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

LR 7-1 CERTIFICATION........................................................................................................1

MOTION...............................................................................................................................1

MEMORANDUM OF LAW ................................................................................................1

I.      INTRODUCTION .................................................................................1

II.     RELATED LITIGATION BACKGROUND ........................................3

III.    FACTS .....................................................................................................5

IV.     LEGAL STANDARDS ........................................................................24

        A.     Constitutional Claims.................................................................24

        B.     APA Claims ................................................................................24

V.      ARGUMENT .........................................................................................25

        A.     This Court Has Jurisdiction .......................................................25

        B.     The Grant Terminations Violated Separation of Powers...........27

        C.     The Grant Terminations Violated the APA ...............................31

               i.     This Court Can and Should Consider Evidence Outside the
                      Designated Administrative Record...........................................32

               ii.    The Challenged Agency Action is "Final" and is Not
                      "Committed to Agency Discretion"..........................................33

               iii.   The Grant Termination Policy Resulted in Unlawful
                      Withholding and/or Unreasonable Delay of Agency Action..................33

               iv.    The NEH Defendants Acted Contrary to Law ........................34

               v.     The NEH, McDonald, and the National Council's Actions Were
                      Arbitrary and Capricious ........................................................38

        D.     This Court Should Impose Remedies Tailored to Redressing
               Defendants' Constitutional and Statutory Violations ...............41

CONCLUSION.....................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County,*
725 F.3d 255 (D.C. Cir. 2013) ...............................................................................28

*All. for the Wild Rockies v. Petrick,*
68 F.4th 475 (9th Cir. 2023) .................................................................................38

*Altera Corp. & Subsidiaries v. Comm'r,*
926 F.3d 1061 (9th Cir. 2019) ..............................................................................38

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.,*
2026 WL 80796 (D.D.C. Jan. 11, 2026) ...............................................................26

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...............................................................................................24

*Audubon Soc'y of Portland v. Zinke,*
2017 WL 6376464 (D. Or. Dec. 12, 2017) ...........................................................32

*Authors Guild v. Nat'l Endowment for the Humans.,*
2025 WL 3678097 (S.D.N.Y. Dec. 18, 2025) .........................................................4

*Authors Guild v. Nat'l Endowment for the Humans.,*
2026 WL 810422 (S.D.N.Y. Mar. 23, 2026) .......................................................4, 5

*Baird v. Bonta,*
81 F.4th 1036 (9th Cir. 2023) ...............................................................................43

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ...............................................................................................26

*Burlington Ins. Co. v. Oceanic Design & Const., Inc.,*
383 F.3d 940 (9th Cir. 2004) .................................................................................41

*California v. U.S. Dep't of Transp.,*
808 F. Supp. 3d 291 (D.R.I. 2025) ........................................................................25

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...............................................................................................24

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ...............................................................................................38

*City & Cnty. of S.F. v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ................................................................28, 31

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ...........................................................................24

*Clinton v. City of New York*,
    524 U.S. 417 (1998).............................................................................................28

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
    137 F.4th 932 (9th Cir. 2025) ............................................................................27

*Cnty. of Santa Clara v. Trump*,
    275 F. Supp. 3d 1196 (N.D. Cal. 2017), *aff'd in relevant part sub nom. City &*
    *Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ............................................43

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
    788 F. Supp. 3d 277 (D.R.I. 2025)......................................................................27

*Ctr. for Biological Diversity v. Haaland*,
    998 F.3d 1061 (9th Cir. 2021) ......................................................................38, 40

*Dep't of Educ. v. California*,
    604 U.S. 650 (2025)............................................................................................26

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)............................................................................................43

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)............................................................................................38

*FDA v. Wages & White Lion Invs., L.L.C.*,
    604 U.S. 542 (2025)............................................................................................39

*Forest Guardians v. Babbitt*,
    174 F.3d 1178 (10th Cir. 1999) .........................................................................34

*Free Enter. Fund v. Pub. Co.Acct. Oversight Bd.*,
    561 U.S. 477 (2010)............................................................................................28

*Harris v. United States*,
    19 F.3d 1090 (5th Cir. 1994) .............................................................................32

*Hells Canyon Pres. Council v. Jacoby*,
    9 F. Supp. 2d 1216 (D. Or. 1998) ......................................................................43

*Indep. Min. Co. v. Babbitt*,
    105 F.3d 502 (9th Cir. 1997) .............................................................................34

PAGE ii – TABLE OF AUTHORITIES

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) ..................................................................................32

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
  785 F. Supp. 3d 68 (D. Md. 2025) ............................................................................27

*McGraw-Edison Co. v. Preformed Line Prods. Co.*,
  362 F.2d 339 (9th Cir. 1966) ....................................................................................41

*Montana Wildlife Fed'n v. Haaland*,
  127 F.4th 1 (9th Cir. 2025) .......................................................................................42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc, v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................................................38, 40

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C.), *aff'd*, 591 U.S. 1 (2020)..........................................40

*Nelson v. NASA*,
  530 F.3d 865 (9th Cir. 2008), *rev'd and remanded on other grounds*, 562 U.S.
  134 (2011)..................................................................................................................43

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004).....................................................................................................33

*Occidental Eng'g Co. v. INS*,
  753 F.2d 766 (9th Cir. 1985) ....................................................................................24

*Oregon Wild v. U.S. Forest Serv.*,
  2026 WL 96908 (D. Or. Jan. 13, 2026) ...............................................................24, 25

*Rhode Island v. Trump*,
  810 F. Supp. 3d 283 (D.R.I. 2025)............................................................................25

*Simmons v. Jarvis*,
  2016 WL 4742256 (D. Neb. Sept. 12, 2016), *aff'd sub nom. Simmons v. Smith*,
  888 F.3d 994 (8th Cir. 2018) ....................................................................................32

*Slockish v. Fed. Highway Admin.*,
  2021 WL 683485 (D. Or. Feb. 21, 2021)...................................................................33

*Slockish v. United States Fed. Highway Admin.*,
  2020 WL 8617636 (D. Or. Apr. 1, 2020) ..............................................................32, 33

*Telecommunications Research & Action v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984)....................................................................................34

*Thakur v. Trump*,
  No. 3:25-cv-4737 (N.D. Cal.) ............................................................................ *passim*

PAGE iii –TABLE OF AUTHORITIES

*Thompson v. U.S. Dep't of Labor*,
885 F.2d 551 (9th Cir. 1989) ................................................................................32

*United Aeronautical Corp. v. U.S. Air Force*,
80 F.4th 1017 (9th Cir. 2023) ..............................................................................26

*United States v. McIntosh*,
833 F.3d 1163 (9th Cir. 2016) ..............................................................................31

*Washington v. U.S. Dep't of Transp.*,
2026 WL 183584 (W.D. Wash. Jan. 23, 2026)................................................25, 40

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)..............................................................................................28

**Statutes**

5 U.S.C. § 701(a)(2)....................................................................................................33

5 U.S.C. § 704.............................................................................................................33

5 U.S.C. § 706......................................................................................................31,38

20 U.S.C. § 951............................................................................................................5

20 U.S.C. § 953(c) ...................................................................................................6, 29

20 U.S.C. § 956(c) ............................................................................................. *passim*

20 U.S.C. § 957(b) ..............................................................................................6, 7, 9

20 U.S.C. § 960...............................................................................................10, 20, 21, 42

2024 Appropriations Act...........................................................................................9, 10

2025 CR, Public Law 119-4...........................................................................9, 10, 11, 14, 36

2026 Appropriations Act................................................................................................23

Impoundment Control Act .................................................................................27, 34, 37

Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024)..........................................................9

Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) ...............................9, 15

140 Stat. 154 (2026).....................................................................................................23

**Other Authorities**

2 C.F.R. § 200.340(a)(4)...........................................................................................17, 35

PAGE iv – TABLE OF AUTHORITIES

E.O. 14151 ...........................................................................................................................11, 15

E.O. 14217 ...........................................................................................................................16, 18

E.O. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) ....................................................................11

Executive Office of the President. E.O. 14158 § 3(a) (Jan. 20, 2025). ...................................11, 21

Fed. R. Civ. P. 56(a) ................................................................................................................24

Fed. R. Civ. P. 57 ....................................................................................................................41

Federal Register:  https://www.federalregister.gov/agencies/national-endowment-
     for-the-humanities (last visited April 14, 2026) ...........................................................37

**LR 7-1 CERTIFICATION**

The parties made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so.

**MOTION**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, Plaintiffs Oregon Council for the Humanities ("Oregon Humanities") and Federation of State Humanities Councils ("Federation") (together, "Plaintiffs") move for summary judgment on Plaintiffs' First, Second, Third, and Fourth Claims for relief ("Claims").

This Motion is based on Fed. R. Civ. P. 56, the Court's file and records in this action, the Administrative Record, the supporting Memorandum of Law, the Declaration of Phoebe Stein("Stein Dec."), the Declaration of Adam Davis ("Davis Dec."), and the Declaration of Anna Sortun ("Sortun Dec."), with attached exhibits, filed herewith.

**MEMORANDUM OF LAW**

## I.    INTRODUCTION

This month, the state and jurisdictional humanities councils ("Councils") marked the somber one-year anniversary of Defendants' decision to mass-terminate millions of dollars of federal humanities funding dedicated to the Federal State Partnership. As demonstrated by the paltry administrative record, such a monumental decision—which devastated local humanities programming across the Nation, undermined the Councils' missions, and harmed communities everywhere—involved either very little critical thought (at best) or thinly disguised animus. When DOGE employees arrived at the agency armed with ChatGPT and no experience in government, the Acting Chair went along with their plan and expressed "no questions or concerns" about DOGE's myopic goal of "clawing back" $322 million in humanities funding, including all the congressionally mandated funding for the Councils.

This is not how our democracy should function. One year later, the Councils are still without Congressionally appropriated funds from the National Endowment for Humanities ("NEH")—contrary to NEH's mission and self-stated goal to offer general operating support

PAGE 1 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

grants "to these councils to maintain local humanities infrastructure." As a result, the Councils, and most importantly the communities they serve, continue to suffer.  The agency's priorities have morphed from a rich history of supporting local and grassroots humanities efforts by a wide range of communities and Tribal nations, as Congress directs, to spending tens-of-millions of dollars on the President's pet-projects, including the Garden of American Heroes[1] and the "United States Triumphal Arch."[2]  And NEH now requires the Councils to promise that agency funds will not be used for "DEI" or any other topic targeted by Trump Administration Executive Orders, none of which mention NEH.  Eight months after notifying this Court that the Councils would receive Fiscal Year 2026 funding, the agency has failed to take the necessary steps for that to occur.

Defendants' actions must not stand.  The termination of funding to the Federal State Partnership bypassed express direction from Congress, ignored or flatly contradicted the stated purposes of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA"), and dispensed with the statutory procedures and due process afforded to the Councils.  This case therefore stands apart from other grant termination cases.  Congress created the Councils and mandated the manner of their funding through statutory formulas within NFAHA.  This litigation rests entirely upon NFAHA, the annual Congressional appropriations to NEH, and the Constitution—not the terms or characteristics of individual grant agreements or contracts.  All the challenged actions were taken in the name of the current Administration's political "cost-cutting" agenda and ideological campaign as reflected in its Executive Orders, which are squarely at odds with Congress's priorities as expressed in NFAHA and the annual appropriations to NEH.  As a result, the Court is not limited in granting the equitable remedies Plaintiffs seek.

---

[1] https://www.neh.gov/news/neh-announces-grant-opportunity-create-statues-iconic-americans-national-garden-american (Last visited April 14, 2026).

[2] https://www.cbsnews.com/news/arc-de-trump-taxpayer-funds/ (Last visited April 14, 2026).

PAGE 2 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

For the reasons detailed below, this Court should grant summary judgment in favor of Oregon Humanities and the Federation, declare that the pretextual agency and official actions violated the Constitution and other laws, vacate and set aside the illegal grant termination policy adopted by NEH and remand to NEH to comply with the Court's declaration, and enter a permanent injunction barring NEH from again violating the Constitution by ignoring Congressional intent and the NEH statutes concerning the Councils.

## II.    RELATED LITIGATION BACKGROUND

In the time since this Court issued its preliminary injunction, two other NEH-related cases have been proceeding in California and New York.

In *Thakur v. Trump*, University of California researchers filed a class action bringing constitutional separation of powers and APA claims challenging the Trump Administration's mass termination of federal research grants. 163 F.4th 1198, 1201–03 (9th Cir. 2025). The district court provisionally certified two plaintiff classes: the DEI Termination Class, whose grants were terminated pursuant to EOs directing agencies to eliminate equity-related projects, and the Form Termination Class, whose grants were terminated without any grant-specific explanation. *Id.* at 1202–03. On June 23, 2025, the court issued a preliminary injunction "ordering three government agencies to reinstate research grants the agencies had terminated." *Id.* Michael McDonald ("McDonald"), who acted as General Counsel and then Acting Chair at NEH during the relevant period in this case, submitted a declaration in the *Thakur* case that is cited below.[3]

On the other side of the country in *American Council of Learned Societies v. McDonald*, the plaintiff grant recipients challenged the cancellation of NEH grants via "mass termination emails," similar to those received by Plaintiffs here, also sent at DOGE's direction. 792 F. Supp.

---

[3] The Declaration of Michael McDonald submitted in *Thakur* is Exhibit C to the Declaration of Anna Sortun in Support of Plaintiffs' Reply in Support of Motion for Preliminary Injunction, Dkt. 35 (attached to the Declaration of Anna Sortun in Support of Plaintiffs' Motion for Summary Judgment ("Sortun Decl.") as Ex. C).

3d 448, 465–67 (S.D.N.Y. 2025).  The plaintiffs argued that the mass terminations violated, among other laws, the First Amendment, the APA, and the NEH authorizing statute.  *Id*. at 473–74.  The court granted the plaintiffs' motion for a preliminary injunction, finding they were likely to succeed on their First Amendment and APA claims.  *Id*. at 485.  The *ACLS* court also stayed the April 2025 mass terminations and froze the funds associated with those grants from being re-directed.  *Id*. at 500.

By September 2025—after *ACLS* had been consolidated with a similar matter filed in the same district—the court overseeing both matters authorized the plaintiffs to engage in discovery to develop the record beyond the existing AR.  *Authors Guild v. Nat'l Endowment for the Humans*., 2025 WL 3678097, at *3 (S.D.N.Y. Dec. 18, 2025).  The government resisted discovery, ultimately producing an AR containing only 23 documents.  *Id*. at *5–6.  The court found the Government's initial 23-document AR "demonstrably incomplete," particularly in light of McDonald's "declaration filed in *Thakur* . . . acknowledg[ing] that the grant-termination decisions were not made by NEH in isolation, but instead emerged from a coordinated, inter-agency process."  *Id*. at *6 (citing the record in *Thakur v. Trump*, No. 3:25-cv-4737 (N.D. Cal.)).  The court overruled the government's objections seeking to limit discovery to the AR and held that the plaintiffs were entitled to a complete AR, discovery from DOGE and four individuals (and several other federal agencies), and full responses to plaintiffs' written discovery requests and deposition notices.  *Id*. at *7, 14–15.  In January 2026, the plaintiffs ultimately deposed four senior federal officials: two GSA political appointees and DOGE team members (Nate Cavanaugh ("Cavanaugh") and Justin Fox ("Fox")), Adam Wolfson ("Wolfson") (the NEH Assistant Chair for Programs), and McDonald.  *Authors Guild v. Nat'l Endowment for the Humans*., 2026 WL 810422, at *2 (S.D.N.Y. Mar. 23, 2026).  Given the overlapping facts and administrative records, relevant portions of these depositions are cited below.

/ / /

/ / /

/ / /

PAGE 4 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## III.    FACTS

### National Endowment for the Humanities

Congress created NEH just over sixty years ago through the National Foundation on the Arts and Humanities Act of 1965.  Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60) (the "NFAHA").  NEH is an independent federal agency established to support the advancement of the humanities across the United States.

The NFAHA was the result of years of advocacy to ensure that the humanities were not left behind as the country focused on scientific progress.  The enabling statute provides that a "high civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of man's scholarly and cultural activity." P.L. 89-209, sec. 2(2).  Congress explained that it was necessary and appropriate for the federal government to sustain a "climate encouraging freedom of thought, imagination, and inquiry." *Id*. at (4).

In the sixty plus years since the passage of NFAHA, Congress repeatedly reaffirmed its commitment to these goals.  Last updated in 1990, the NFAHA makes clear that the "humanities belong to all people of the United States," and "it is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities." § 951(1).  Further, "it is the policy of the United States Government to support the exploration of human understanding through the humanities, including the fostering of mutual respect for the diverse beliefs and values of all persons and groups." 20 U.S.C. § 951(6).

Congress determined it is "necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations."  20 U.S.C. § 951(5). Congress created NEH and the National Endowment for the Arts so Americans could understand "the diversity of excellence that comprises our cultural heritage." *Id*. at 951(9).

 Congress's instruction to NEH specifically requires it to support diverse and underrepresented views by "giv[ing] particular regard to scholars, and educational and cultural

PAGE 5 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c). By statute, the Chairperson is authorized to "initiate and support programs" that "reach or reflect the diversity and richness of our American cultural heritage, including the culture of a minority, inner city, rural, or tribal community" 20 U.S.C. § 956(c)(4); "foster international programs and exchanges" *id.* § 956(c)(5); and "insure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons." *id.* § 956(c)(9). As such, the effort by DOGE and NEH to root out "DEI" violates the spirit of the law setting out NEH's basic framework.

As to protections for the freedom of thought embodied in the statutes, NFAHA specifies that "no department, agency, officer, or employee of the United States shall exercise any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any non-Federal agency, institution, organization, or association." 20 U.S.C. § 953(c).

## The National Council

Congress's commitment to funding the humanities that mirror the breadth and diversity of all Americans is clear in the structure of the grant-making process. Under the statute, the Chairperson of NEH determines funding "with the advice of the National Council on the Humanities." 20 U.S.C. § 956(c). The National Council is historically comprised of twenty-six members appointed by the President, "selected from among private citizens of the United States who are recognized for their broad knowledge of, expertise in, or commitment to the humanities," and who will "provide a comprehensive representation of the view of scholars and professional practitioners in the humanities and of the public throughout the United States." 20 U.S.C. § 957(b). In making appointments, the "President shall give due regard to equitable

PAGE 6 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

representation of women, minorities, and individuals with disabilities who are involved in the humanities." *Id*.[4]

The Chairperson of NEH "shall not approve or disapprove any such application [for funding] until the Chairperson has received the recommendation of the Council." *Id*. at § 957(f).

### State and Jurisdictional Humanities Councils

To ensure that distribution of humanities support in every state and jurisdiction of the United States, Congress established the Councils in 1976. 20 U.S.C. § 956(f). As noted by the Court in its Opinion and Order on Preliminary Injunction, the sponsor of the bill establishing the Councils explained that the new law "buil[t] solidly on the achievements on existing State arts and humanities programs and add[ed] new incentives for humanities programs by assuring them of yearly funding." 122 Cong. Rec. 11091 (Apr. 26, 1976). Each of the states and territories whose humanities Councils are involved in this litigation have formed Section 501(c)(3) nonprofit state humanities councils, which together constitute the membership the Federation.

As recipients of annual operating grants, Councils steward NEH funds intended by Congress for distribution throughout the country. The statutory infrastructure of the Federal State Partnership presupposes that the Councils depend heavily on NEH funding to deliver creative, intellectually stimulating, and emotionally vibrant humanities programming for all Americans. At any given time, including at the time of the subject mass grant terminations, Councils may have multiple open NEH grants that support their operations and fund humanities programming, including through grantmaking to local humanities organizations.[5]

---

[4] The current membership of the National Council consists of just four members. https://www.neh.gov/about/national-council-on-the-humanities (last visited Apr. 15, 2026). The White House fired all other members of the National Council in October 2025. *See* Jennifer Schuessler, *Trump Fires Members of Humanities Council* (Oct. 1, 2025) *available at* https://www.nytimes.com/2025/10/01/arts/trump-neh-firings.html (last visited Apr. 15, 2026).

[5] The facts in this section are included in the Declaration of Phoebe Stein in Support of Plaintiffs' Motion for Preliminary Injunction.

PAGE 7 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Councils apply to NEH for general operating support grants (often referred to as "GOS grants") in response to an NEH Notice of Funding Opportunity ("NOFO").  The NOFO for each Fiscal Year appropriation outlines the steps that Councils must take to request a general operating support grant.

Once Councils submit application materials to the NEH, they await award decisions. Those decisions, called Notices of Action, set out the amount of funds awarded to the Council for the general operating support grant.  The amount of money in the pool to make award decisions is determined by how much Congress appropriates to NEH for this purpose.

Councils receive the NEH general operating support grant funding in one of two ways. They may ask for funds in advance for a particular expense.  The majority of funds, however, are reimbursements.  Councils pay expenses directly, then seek reimbursement from NEH under the relevant operating grant.  Until April 2, 2025, the NEH routinely and rapidly reimbursed Councils for these expenses (generally within five to seven business days).

In addition to general operating support grants, Councils may apply for and receive grant funding by applying for special initiative funding offered by NEH.  Special initiative grants are "non-competitive grants" set aside specifically for the Councils.  In other words, when the NEH Chairperson identifies an issue of importance for which the Councils are uniquely situated to assist NEH, the NEH Chairperson calls upon the Councils for their help.  Two recent examples of special initiative grants are the Chair's Grants to respond to climate disasters hitting communities throughout the United States and the United We Stand effort to mitigate the devastation of hate-fueled violence impacting our Nation.  Councils also may apply for (and do receive) grants through various NEH competitive grants open to the general public.

### 2024 and 2025 Congressional Appropriations to NEH

Since the founding of NEH, Congress has consistently funded the NEH generally and the Federal State Partnership specifically through annual appropriations.  In the 2024 Appropriations Act, Congress appropriated $207,000,000 to NEH, "of which $192,000,000 shall be available for support of activities in the humanities, pursuant to section [20 U.S.C. § 956(c)] of the Act and for

PAGE 8 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

administering the functions of the Act." Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024) (the "2024 Appropriations Act").  As such, $192,000,000 was designated for final awards to further the enumerated purposes under § 956(c), as well as administrative support.  2024 Appropriations Act at 281–82.  The President signed the appropriations bill.

On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all the funds appropriated to NEH in 2024, with the same breakdown in designated expenditures. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing Resolution").  NEH thus received an additional $207,000,000, including an additional $192 million for grants and other assistance programs under § 956(c).  The President signed the 2025 Continuing Resolution.

**NEH Funding of the Councils**

To receive federal funding, each Council must first "submit an application", "accompanied by a plan" that sets out certain requirements.  20 U.S.C. § 956 (f)(3).  All the Councils had 2025 plans approved by the NEH Chairperson as of the time of filing this litigation and all the Councils are awaiting approval and funding for 2026.

As with other NEH applications, the Chairperson of NEH needs the recommendation of the National Council to either approve or disapprove the Council plans. 20 U.S.C. § 957(f).

Congressionally appropriated funds are allocated among the Councils pursuant to a mandatory waterfall formula. 20 U.S.C. § 956(f). The first step of the formula is a minimum of $200,000 distributed to each approved plan. § 956(f)(4).  If there are excess funds following allocation of $200,000 to each approved plan, which there have been for the past two decades, then the excess is divided as follows:

- Thirty-four percent of such excess is available to the Chairperson for making grants "to States and regional groups and entities applying for such grants." § 956(f)(4)(A).

- Forty-four percent of the excess "**shall be** allotted in equal amounts among the States and grant recipients which have plans approved by the Chairperson [of NEH]." § 956(f)(4)(B) (emphasis added).

PAGE 9 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

- Twenty-two percent of the excess "**shall be** allotted [based upon population of] the States and grant recipients which have plans approved by the Chairperson [of NEH]." § 956(f)(4)(C).

Once done with the calculation, NEH usually provides the total allocations to the Federation in a spreadsheet. Historically, as noted by this Court, the $200,000 allotted per state in § 956(f)(4) amounted to a guaranteed 20% of all humanities endowment moneys. *See* Opinion and Order at 14, citing 122 Cong. Rec. 11091 (Apr. 26, 1976). Subsequently, the appropriations authorization statute was drafted to include a minimum carve-out for NEH that not less than 20 percent of all sums appropriated to NEH shall be for the Councils. *See* 20 U.S.C. § 960(a)(1)(B) (1976). In other words, the 20% sentence in § 960(a)(1)(B) addressed the minimum that *Congress* must allocate to the Federal State Partnership as a percentage of its total appropriation to NEH in any given appropriation bill. Congress set a floor for itself.

According to an internal NEH Memo authored by Fed/State Office Director Karen Kenton following the inception of this litigation, for more than 20 years, the "norm" at NEH was to follow Congressional direction to obligate more than the floor to the Councils. Congress indicated that 40% of its programmatic appropriation was for the Federal State Partnership.[6] Sortun Decl., Ex. G (NEH_000646). Consistent with past practice, NEH obligated more than 40% of its programmatic funding to the Councils following the passage of the 2024 Appropriations Act and again following the 2025 Continuing Resolution: "In fiscal year (FY) 25, Congress appropriated $65 million, or approximately 43 percent of NEH's appropriation of program funds ($150M) to the Office of Federal/ State Partnership (Fed/State) to support the state and jurisdictional humanities councils." *Id.*

Following the 2024 and 2025 appropriations, the Office of Planning and Budget (OPB) at NEH calculated and then obligated Councils' general operating support grants "based on the full-

---

[6] As discussed at length at the preliminary injunction stage, Congressional intent regarding the use of its appropriation is found throughout the Congressional record and has been extensively cited by NEH including in current statements on its website.

PAGE 10 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

year amount provided in [the appropriations bill] and the legislative formula for council allocations." *Id.*

As of May 2025, the amount budgeted by NEH for the Federal State Partnership but not distributed to Councils was $35 million in congressionally appropriated and obligated funds. Sortun Decl., Ex. G (NEH_000647).

### Trump Administration Executive Orders and Review of Agency Funding

On January 20, 2025, (Inauguration Day), the President established DOGE as a new component of the Executive Office of the President. E.O. 14158 § 3(a) (Jan. 20, 2025).  This Executive Order ("E.O.") required agencies to work with a "DOGE Team Lead" who would "advise" the agency "on implementing the President's DOGE Agenda." *Id*. § 3(c).

The same day, the President issued a series of EOs directing federal agencies to eliminate grant funding associated with diversity, equity, and inclusion ("DEI") programs, gender ideology, and what the Administration coined "wasteful spending." E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025); E.O. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025).

E.O. 14151 required every agency to provide the Office of Management and Budget ("OMB") a list of all "grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities." E.O. 14151 § 2(b)(ii).

Between January 20 and February 7, 2025, NEH Chairwoman Shelly Lowe directed NEH program staff to review open grants in light of the new EOs.  Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 7).

On January 27, 2025, Matthew Vaeth, Acting Director for the Office of Management and Budget ("OMB"), wrote a memo titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs." ("Temporary Pause Memo").[7]  The memo stated that federal

---

[7] https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf

PAGE 11 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

financial assistance "should be dedicated to … ending 'wokeness' and the weaponization of government," among other things. *Id*.

> "The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." *Id*.

Federal agencies were directed to review President Trump's Executive Orders and "complete a comprehensive analysis … to identify programs, projects, and activities that may be implicated in any of the President's executive orders. … [and] **must temporarily pause** all activities … that may be implicated in the executive orders, including but not limited to financial assistance for … DEI, woke gender ideology, and the green new deal." *Id*. Agencies were required to submit to OMB detailed reporting on programs, projects, and activities that were subject to the pause no later than February 10, 2025. *Id*.

### NEH Acts on Executive Orders

On January 28, 2025, the day after OMB's Temporary Pause Memo, then-NEH General Counsel Michael McDonald wrote an internal email titled "Follow-up on Temporary Pause Memo from OMB." Sortun Decl., Ex. G (NEH_000058-59). In the email, McDonald provided his "initial thoughts" about how NEH should "fully comply with the Memo." *Id*. As to the Councils, McDonald wrote: "another problem area would the use [sic] that the State Humanities Councils make of the federal financial assistance that NEH provides. Many councils have been on the forefront of promoting DEI and gender ideology, and environmental justice projects. At minimum, it would be advisable for Adam [Wolfson, of NEH] to have Karen [Kenton, head of Fed/State] send copies of the relevant EOs to them with a statement to the effect that no NEH monies they receive may be expended on any such projects or program." *Id*.

On February 7, 2025, NEH Chief Information Office Brett Bobley ("Bobley") directed Senior Management at NEH to review "all awards from 2021 to the present" that "advance Marxist equity, transgenderism, or green new deal social engineering policies." Sortun Decl., Ex. G (NEH_000060-61). The email asked that the recipients identify grants that focus on or

PAGE 12 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

promote a list of topics including DEI. *Id*. It attached a link to a spreadsheet to facilitate the review process. *Id.; see also* Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 8). Bobley created a system for staff to mark Biden-era projects on spreadsheets as either "High, Medium, Low, or No Connection" to terms of the EOs and communicated this to program directors at NEH. Sortun Decl. Ex. C (McDonald *Thakur* Decl. ¶ 9).

### DOGE Turns Attention to NEH and NEH Accommodates Demands

On March 10, 2025, the White House directed NEH Chair Shelly Low to resign from NEH and appointed Michael McDonald acting Chairperson. Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 11).

On or about March 12, representatives from DOGE, Justin Fox and Nate Cavanaugh, contacted McDonald to "discuss and advise [him] on implementing the President's priorities as stated in the [EOs], including terminating grants that a reasonable person could deem to violate the [EOs]." Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 12).

Cavanaugh and Fox began working with McDonald to implement DOGE's efforts to claw back grant funding. Sortun Decl., Ex. G (NEH_000063). Cavanaugh wrote to McDonald attaching "a list of grants that were awarded during President Biden's administration (Jan 20, 2021 through Jan 19, 2025) at NEH." *Id*. Cavanaugh concluded that there was $322 million in grants that "can presumably be clawed back." *Id*. The attached spreadsheet included all the Council general operating support grants.[8]

On March 13, Wolfson sent Cavanaugh and Fox a link to a spreadsheet showing that all grants since January 2021 had been reviewed and coded for level of involvement with DEI, gender ideology, and environmental justice. Sortun Decl., Ex. G (NEH_000064). Each grant

---

[8] The spreadsheet attached to this email can be found as an embedded attachment within the PDF marked as NEH_000063 submitted in the Administrative Record. Because of the size of that spreadsheet, we have not included it in our AR compilation attached to the Declaration of Anna Sortun.

PAGE 13 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

was rated high, medium, and low based upon level of involvement with these categories, including the Council operating grants.[9]

"[T]he policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion,' or 'diversity, equity, inclusion, and accessibility,' and 'gender ideology.'" Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 20).  "Subsequently, and in consultation with DOGE, [McDonald] more broadly chose grants for termination that did not contribute to the public's confidence in how NEH expended its taxpayer funds as required by NEH's authorizing statute." *Id*. ¶ 21.

DOGE employees assigned to NEH testified that as part of the grant review process, they used ChatGPT prompts to identify NEH grants with DEI components, focusing on grants awarded during the Biden administration.  For grants the NEH staff had already rated as "N/A" for DEI or gender ideology, DOGE used ChatGPT "[t]o highlight why [a] grant may relate to DEI" and "to pull out anything related to DEI." (Sortun Decl. Ex. A; Fox Dep. at 204:20-23; 209:25-210:2; *see also* 159:2-11; 193:20-23.)[10]  On March 17, Fox wrote to McDonald and Wolfson regarding review of NEH grants for DEI. (Sortun Decl. Ex. D).  "We reviewed all active grants for DEI involvement and marked them accordingly." He attached a spreadsheet that listed several Council general operating grants and other grants to Councils.  (Sortun Decl. Ex. E.)

On March 15, notwithstanding the EOs or DOGE's mandates, Congress enacted the 2025 Continuing Resolution, which appropriated funds for Fiscal Year 2025 at the same level and on

---

[9] The same day, McDonald wrote to Cavanagh and Fox providing them with direct access to the NEH systems. Sortun Decl., Ex. G (NEH_000065).

[10] These depositions have been the subject of intense media attention. We cite them here to illustrate that the process applied by DOGE impacted the Council grants in addition to more than a thousand grants to other recipients that are the subject of the *ACLS* litigation, which is discussed above at Section II.

PAGE 14 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

the same terms as Fiscal Year 2024. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (March 15, 2025). NEH thus received another roughly $200 million to spend on humanities programming.

McDonald previously attested that "[o]n March 17-18 [he] worked with NEH Assistant Chairman for Programs Adam Wolfson to conduct a further individualized review of the spreadsheets of open grants created by program staff." Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 13).

On March 19, Bobley sent NEH Assistant Chair for Planning and Operations Pranita Raghavan an email noting that McDonald and Wolfson had completed their work determining which grants "are potentially in conflict with the EO's" and that it was being forwarded "as it is ready to be transmitted to OMB." Sortun Decl., Ex. G (NEH_000073). The spreadsheet included on its list general operating support grants for the Councils as well as a grant to the Federation. For example, operating support grants for Connecticut, Minnesota, Hawaii, Arizona, and Kentucky were flagged as pertaining to DEI. McDonald described the spreadsheet as "a final spreadsheet containing only those projects that I and Mr. Wolfson deemed to conflict with President Trump's [EOs]." Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 14). Ms. Raghavan transmitted the spreadsheet to OMB "on behalf of the Acting Chair of NEH" on March 21, 2025.[11]

On March 20, NEH posted a webpage titled "NEH Implementation of Recent Executive Orders." The page stated that NEH was updating the funding restrictions section of its NOFOs in order "to comply with several recent Executive Orders, including 'Ending Radical and Wasteful Government DEI Programs and Preferencing,' 'Defending Women from Gender

---

[11] An earlier email from Ms. Raghavan mentioned that the response was a requirement of EO 14151 ("Ending Radical and Wasteful Government DEI Programs and Preferencing"). Sortun Decl., Ex. G (NEH_000074); *see also* Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 15). The spreadsheets included a list of active grants "flagged as not applicable for DEI," Sortun Decl., Ex. G (NEH_000076-78), as well as a "spreadsheet of active grants from 2020 to 2025," which included all the Council general operating support grants. Sortun Decl., Ex. G (NEH_000077-78).

PAGE 15 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Ideology Extremism and Restoring Biological Truth to the Federal Government,' and 'Ending Radical Indoctrination in K-12 Schooling.'"[12]  The page discussed only the implication of EOs on grant applications, not termination of existing grants.

Nonetheless, NEH and DOGE continued the process of mass-terminating grants based upon the EOs, including the grants to the Councils.

The morning of April 1, McDonald wrote to DOGE agent Fox with an explanation of NEH's review of grants for DEI. Sortun Decl., Ex. G (NEH_000302).  He advised DOGE that some projects had no applicability to "promoting DEI."  McDonald stated that such projects "are harmless when it comes to promoting DEI.  But in the interest of time, because we know you want to [move] quickly, we didn't give these applications the individualized consideration that we did to those in the first spreadsheet.  Accordingly, we only explicitly initialed a few important projects—such as the papers of George Washington—whose cancellation would not reflect well on any of us. And the same could be said for many other listed projects." *Id.*  McDonald continued, "[b]ut you have also told us that in addition to canceling projects because they may promote DEI ideology, the DOGE Team also wishes to cancel funding to assist in deficit reduction.  Either way, as you've made clear, it's your decision on whether to discontinue funding any of the projects on this list."  Sortun Decl., Ex. G (NEH_000303).

Later that day, DOGE responded to McDonald with a note that "[i]n accordance with the President's February 19, 2025, EO to eliminate all non-statutorily required activities and functions (See Commencing the Reduction of the Federal Bureaucracy, E.O. 14217), we will begin to execute the attached with your permission."  Fox attached a document called "FINAL NEH Grant Action Plan," which included all open Council general support operating grants and other Councils' grants, and as well as grants to the Federation.  Sortun Decl., Ex. G (NEH_000301).  A document attached to this email suggested that $24,954,979 in Federal/State Partnership grants would be cancelled. Sortun Decl., Ex. G (NEH_000304).

---

[12] https://www.neh.gov/executive-orders (last visited April 12, 2026).

PAGE 16 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

McDonald responded that he looked over the attachments and "I don't have any questions or concerns." Sortun Decl., Ex. G (NEH_000365).

In his deposition, McDonald stated that it was DOGE and not NEH who made the last call on grant terminations and admitted that he did not give the final list of terminations individualized review. (Sortun Decl. Ex. B (McDonald Dep. 142:1-17; 143:11-144:15; 204:6-208:21; 210:4-211:1; 211:22-212:9; 214:8-20)).

**NEH Terminates Council Grants Without Termination Procedures in Place**

On April 1, Richard Brundage, the Director of Grant Management at NEH, raised the issue of grant termination procedures and asked for a meeting to discuss "decision points" and "procedural considerations." Sortun Decl., Ex. G (NEH_000373). He attached "Termination Procedures" which were not included in the AR. The Acting General Counsel of NEH, Lisette Voyatzis, responded to him, explaining that "the legal basis for the terminations [of Council grants] is likely to be 2 CFR 200.340.340(a)(4), which allows an agency to terminate an award 'to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.' Accordingly, NEH won't follow the timeline you provided [and presumably included in the proposed Termination Procedures], or allow for appeals." Sortun Decl., Ex. G (NEH_000372).

In response, Mr. Brundage asked questions about how NEH should respond to the "inevitable influx of questions and complaints" that were sure to follow. McDonald responded that "I don't think we need to provide long (and obvious) explanations along the lines: there was a Presidential election, Presidential funding priorities have changed; NEH answers to the Chief Executive, therefore, etc." Sortun Decl., Ex. G (NEH_000371).

DOGE sent the mass termination notifications by email from outside the agency on April 2, 2025. Sortun Decl., Ex. G (NEH_000378).

The letters to the Councils were nearly uniform, except for the applicable grant identification number. They read:

PAGE 17 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

> This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant (Grant Application No. XXXX) effective April 2, 2025, in accordance with the termination clause in your Grant Agreement.
>
> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340*. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 2, 2025.

*See, e.g.,* Sortun Decl., Ex. G (NEH_000379) (Oregon Humanities email transmission); Sortun Decl., Ex. G (NEH_000382) (letter terminating Oregon Humanities' GOS grant).

Although the termination letters cited that EO 14217 "mandates that the NEH eliminate all non-statutorily required activities and functions," that EO in fact makes no mention of NEH, despite mentioning other agencies.  The letters made no effort to explain how or why the Council grants failed to "effectuate[] the agency's needs and priorities" or otherwise warrant termination. Nor did the letters address NEH's longstanding assessment through its comprehensive National Council review process—that the Councils' grants *do* effectuate agency priorities and are statutorily mandated and consistent with the goals of NEH as set out in the NFAHA.

The letters also did not explain what "exceptional circumstances" precluded the adherence to statutory notice procedures.  The letters did not include a reference to any method of appeal or seeking reconsideration.

All Council general operating support grants, and all open Council and Federation grants, were terminated on April 2.  On April 3, Fox sent an email to McDonald "[c]onfirming 1,208 of 1,220 grants to organizations were delivered tonight with effective terminations as of April 2, 2025."  Sortun Decl., Ex. G (NEH_000387).

PAGE 18 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**NEH Responds to Frantic Pleas for Information from the Councils**

A few weeks later, Karen Kenton, then head of the Fed/State Office at NEH, alerted McDonald that the Councils were sending "frantic pleas for funding and information" to NEH following the termination of their operating support grants. Sortun Decl., Ex. G (NEH_000644). A Teams chat from NEH staff stated that staff wanted to "understand what the plans are for funding the state councils. …. Will the [Fed/State] office and councils be abolished? The councils and the federation are desperate for any information we can provide …" Sortun Decl., Ex. G (NEH_000643).

On April 14, McDonald responded to Kenton that he "regret[ted] to hear that you've been receiving frantic pleas from the [Councils], but the agency can't offer any 'guidance' to them." Sortun Decl., Ex. G (NEH_000642). He continued:

> The Executive Branch is responsible for directing NEH to cutoff the SHC [Council] funding.
>
> The termination notices to the SHCs that came from NEH, as executed by the agency's DOGE team, informed SHCs that the termination of their grants represented 'an urgent priority for the Administration,' and that NEH would be repurposing its funding allocations in a new direction 'in furtherance of the President's agenda.'
>
> Because NEH is part of the Executive Branch, we must abide by the Administration's actions until such time as either Congress and the WH resolve it in some political deal, or the federal courts intervene and direct us to restore the SCH funding.
>  In the meantime, SCH funds remain terminated.

Sortun Decl., Ex. G (NEH_000642-643).

In response, Kenton asked questions including noting that she "hope[d] we'll be able to provide some relief to the councils by issuing the funds as per the statute." Sortun Decl., Ex. G (NEH_000642). She added that some Councils such as Arkansas "are preparing to shut down operations completely" and wondered what NEH should do to "document the closure and preserve the history of the council's partnership with NEH?" *Id.* In short, she asked McDonald what would happen to failed Councils.

PAGE 19 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

McDonald responded that NEH could provide no assurances and suggested that Councils who were failing "have devoted insufficient time and energy to attracting local, non-federal, sources of funding.  In such instances, a competitive search for a new partner might be warranted."  Sortun Decl., Ex. G (NEH_000641).

### NEH Moves the Goalposts Following Council Grant Terminations

In response to Kenton's question on statutorily mandated funding for the Councils, McDonald cited 20 U.S.C. § 956(f)(4)(c), the NEH statutory waterfall statutes:

> The language in our statute, 956(f)(4), provides that the allotment to each [Council] will be 22% of the remaining amount. That percentage increased by agreement to 40%. But the administration is reading the statutory language narrowly and specifically. My understanding, therefore, is that if a [Council] has received 22% of that third allotment [under the waterfall] in FY25, it has already received 'its statutorily mandated fiscal year 2025 funds' and may not receive any more funding.

Sortun Decl., Ex. G (NEH_000641). McDonald did not mention 20 U.S.C. § 960 or suggest that the appropriated amount could be adjusted to a twenty-percent "floor." *Id*.

On April 24, three weeks after NEH terminated the Council grants, NEH published "An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders." Sortun Decl., Ex. G (NEH_000407-414).  It read, in relevant part:

> In recent weeks the [NEH] has taken several internal operational steps to improve efficiency, eliminate offices that are not essential to fulfilling its statutory requirements, and to return to being a responsible steward of taxpayer funds. NEH has also taken programmatic steps to ensure that all future awards will, among other things, be merit-based, awarded to projects that do not promote extreme ideologies based upon race or gender, and that help to instill an understanding of the founding principles and ideals that make America an exceptional country.

*Id*.

### NEH Responds to this Lawsuit and Concocts New Explanation for Terminations

This lawsuit was filed on May 15, 2025.

On May 27, 2025, Karen Kenton circulated a memorandum at NEH regarding "Final allocations of federal fiscal year 2025 humanities council funding."  The memo called out "the

PAGE 20 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

$35 million that was budgeted for the state programs but not allocated now that the percentage changed from 40 to 20 percent." Sortun Decl., Ex. G (NEH_000645). "In fiscal year (FY) 2025; Congress appropriated $65 million, or approximately 43 percent of NEH's appropriation of program funds ($150M) to the Office of Federal/State Partnership (Fed/State) to support the state and jurisdictional humanities councils." Sortun Decl., Ex. G (NEH_000646). But in contrast to **those obligated funds**, "[d]uring the two FY 2025 continuing resolutions [], NEH awarded [only] $29,079,662 to the councils which amounts to 19.4 percent of the agency's fiscal year appropriation of program funds under the full-year CR." *Id*.

Kenton's memo stated that the state grants were terminated per the President's E.O., Commencing the Reduction of the Federal Bureaucracy, and that "the base percentage for the councils was reduced from 40 percent, the norm for more than 20 years, to 20 percent, the base amount as mandated in NEH's authorizing language," citing 20 U.S.C. § 960. *Id*.

On June 2, 2025, some of the Councils and the Federation received letters "rescinding" the official termination letters received in April. Sortun Decl., Ex. G (NEH_000420). These letters stated, for the first time, that "[f]or fiscal year 2025, the agency is funding at a 20 percent allocation, which is the minimum that NEH is congressionally mandated to award to its state and jurisdictional humanities council partners [20 U.S. Code § 960 - Authorization of appropriations, 1 B]. NEH will issue a partial award to bring your council's fiscal year 2025 GOS grant allocation to the full 20 percent minimum." Sortun Decl., Ex. G (NEH_000420).

These letters were accompanied by an email from Kenton, which stated that "I realize the reduction in funds from 40 percent to 20 percent still represents an incredible hardship." Sortun Decl., Ex. F (June 2, 2025 email from Kenton).

This was the first time in the history of NEH and the Councils that any Council was informed by NEH that the agency believed it could alter its awards based upon 20 U.S.C. § 960.

PAGE 21 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

It was also the first time in the history of NEH that it terminated Council grants after obligating funds.[13]

### NEH Provides Councils No Due Process or Opportunity to be Heard

Federal statutes provide that NEH grants to the Federation's members, including their grants for general operating support, may be terminated only if the Chairperson of the NEH finds that certain conditions occur.  See 20 U.S.C. § 956(f)(7).  As a prerequisite to termination, the statutes require a finding by the NEH Chairperson "after reasonable notice and opportunity to be heard." 20 U.S.C. § 956(f)(7).  Such a prerequisite finding may be that a council (1) "is not complying substantially with the provisions" of the state council subsection of the statutes, (2) "is not complying substantially with terms and conditions of its State plan or grant recipient application approved under" the same section, or (3) "any funds granted to [a council] have been diverted from the purposes for which they are allotted." *Id*.

If one of the above conditions occur, the statutes provide an opportunity to cure: "The Chairperson shall immediately notify the Secretary of the Treasury and the [council] with respect to which such finding was made that no further grants will be made under this subsection to such [council] until there is no longer a default or failure to comply or the diversion has been corrected, or, if the compliance or correction is impossible, until such [council] repays or arranges the repayment of the Federal funds which have been improperly diverted or expended."

These statutory procedures for grant terminations were not followed by NEH in April 2025 or anytime thereafter.

McDonald testified to his belief that "NEH's authorizing statute does not set forth any prohibition or limitation on the sole discretion of the NEH Chairperson to terminate or rescind

---

[13] Indeed, it was extraordinarily rare for NEH to terminate *any* open grants prior to April 2025: According to McDonald's deposition testimony, NEH had terminated "probably under half a dozen" grants in the 22 years McDonald worked at the agency and had never terminated "a whole host of grants" following a presidential election. (Sortun Decl. Ex. B; McDonald Dep. 66:4-67:12; 68:7-11.)

PAGE 22 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

grant awards" and that "NEH's authorizing statute does not set forth any requirement that NEH …make grants to particular participants." Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶¶ 22-23).

**NEH Has Not Taken Steps to Distribute Fiscal Year 2026 Funding**

The 2026 Appropriations Act included $207,000,000 in appropriations to NEH.  Public Law 119-74; 140 Stat. 154 (2026).

On August 1, 2025, Defendants filed with this Court "Defendants' Notice" of "several developments relevant to this matter." ("Notice") ECF 37.  Defendants stated in that Notice that "[o]n July 25, 2025, [NEH] approved a motion to fund applications for general operating support grants for all 56 state and jurisdictional humanities councils. NEH will determine the exact funding amounts in accord with its FY 2026 appropriations, the legislated funding formula for the councils, and its Acting Chairman's discretionary authority." *Id*.  The Notice attached an action from the July 2025 meeting of the National Council on the Humanities and was signed by McDonald. *Id*. Ex. A.  The list of approved funding for Councils indicated the term of the funding would be November 2025 through October 2026 (12 months).  *Id.*

As of the date of this Motion, no Council has received a Notice of Action on 2026 funding – meaning, despite the Notice made on the eve of the hearing on preliminary injunction, NEH has not taken any steps for money for 2026 to flow to the Councils.

**NEH Requires Councils to Restrict Use of Funds Based Upon EOs**

NEH continues to instruct grantees that they must abide by the Trump Administration Executive Orders when applying for federal funding in response to a NOFO.[14]  In the Frequently Asked Questions portion of its website, NEH answers the question, "[w]hy has NEH added guidance to its NOFOs on the 'promotion of gender ideology,' 'environmental justice initiatives or activities,' 'discriminatory equity ideology,' and 'DEI/DEIA'?":

---

[14] https://www.neh.gov/executive-orders (Last visited April 17, 2026.)

PAGE 23 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

As a federal agency, NEH is required to comply with all relevant Executive Orders issued by the Administration. NEH updated the Funding Restrictions section of its NOFOs to comply with several recent Executive Orders, including "Ending Radical and Wasteful Government DEI Programs and Preferencing," "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," and "Ending Radical Indoctrination in K-12 Schooling." You can learn more about these Executive Orders by visiting the White House's Presidential Actions webpage.

## IV.    LEGAL STANDARDS

### A.    Constitutional Claims

On Plaintiffs' separation of powers claim (Count 4 of the Amended Complaint), the Court should grant summary judgment if Plaintiffs "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment. *Anderson*, 477 U.S. at 252. For the Constitutional Claims, the Court's review is not limited to the Administrative Record.

### B.    APA Claims

Courts routinely resolve APA challenges through summary judgment. *Oregon Wild v. U.S. Forest Serv.*, 2026 WL 96908, at *1 (D. Or. Jan. 13, 2026). In APA cases, however, the district court "is not required to resolve any facts in a review of an administrative proceeding," because there is no genuine issue of material fact in the conventional Rule 56 sense. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985). Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id*. at 769. "Accordingly, summary judgment functions as a mechanism for determining as a matter of law whether the administrative record

PAGE 24 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

supports the agency's decision and whether the agency complied with the APA." *Washington v. U.S. Dep't of Transp.*, 2026 WL 183584, at *9 (W.D. Wash. Jan. 23, 2026) (citation omitted). Courts in this district apply this framework when resolving APA claims on summary judgment. *See Oregon Wild*, 2026 WL 96908 at *3–4.

## V.    ARGUMENT

### A.    This Court Has Jurisdiction

As an initial matter, and as the Court has already determined, the Court may exercise jurisdiction over Plaintiffs' constitutional and APA claims and enter the relief sought here. P.I. Op. at 41–48.  Plaintiffs' claims arise from alleged violations of federal statute (the NEH's authorizing statute) and the U.S. Constitution (the separation of powers doctrine), and Plaintiffs seek declaratory and prospective equitable relief targeting the unlawful policies that resulted in the gutting of the Councils and their grantmaking abilities—not money damages or contract-based enforcement of past-due obligations.  To the extent Defendants recycle their Tucker Act arguments, the Court should reaffirm its prior decision and reach the merits of Plaintiffs' claims.

At the outset, putting the APA claims to one side, the Tucker Act does not bar the Court from reviewing Plaintiffs' statutory and constitutional claims.  "The APA's waiver of sovereign immunity—and, by extension, the Tucker Act's possible usurpation of the Court's jurisdiction— is not required" for Plaintiffs' constitutional claims.  *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 303 (D.R.I. 2025) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)).  As the Court already determined, the NEH likely violated the Separation of Powers doctrine by refusing to spend funds Congress lawfully allocated under the Appropriations Clause.  P.I. Op. at 39.  Whether Defendants violated the Separation of Powers doctrine in their grant terminations is a "classic constitutional question that district courts are tasked with analyzing." *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 296 (D.R.I. 2025).  Even if the Court departs from its prior decision that it has jurisdiction over Plaintiffs' APA claims—and it should not—Plaintiffs' constitutional claims provide an alternative basis for exercising

PAGE 25 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

jurisdiction over Defendants. *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 2026 WL 80796, at *11 (D.D.C. Jan. 11, 2026) (plaintiff's First Amendment claims "constitute[d] 'truly independent legal grounds'" for finding the Tucker Act did not apply (quoting *Crowley*, 38 F.4th at 1106)). The Supreme Court's more recent decision in *National Institutes of Health ("NIH") v. American Public Health Association* is not implicated in Plaintiffs' constitutional claims because the result there turned on the APA's "limited waiver" of sovereign immunity. 145 S. Ct. 2658, 2659 (2025). To the extent Defendants rely on the Tucker Act to try to avoid the APA claims, that argument fails because Plaintiffs seek only "noncontractual" injunctive and declaratory relief. *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). The Amended Complaint's prayer asks the Court to "[v]acate or set aside the blanket" grant terminations and rescissions as well as "[e]njoin Defendants from enforcing or giving effect to their decisions . . . to delay or refuse to spend the funds appropriated to NEH by Congress." Am. Compl. at 40; *see also* P.I. Op. at 47 (finding that "Plaintiffs seek injunctive and declaratory relief"). Defendants implemented a policy of grant terminations—complying with Executive Orders 14151 and 14222 to sidestep the statutory process for grant terminations, failing to apply the NFAHA formulas, and ignoring congressionally appropriated amounts. Vacatur of the unlawful agency actions implementing this policy would not result in contract damages but merely "give the plaintiff[s] the very thing to which [they were] entitled." *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988)(citation omitted). That is the hallmark of equitable— not contractual—relief. And as in *Bowen*, whether to allow the NEH to effectuate its grant termination policy in violation of the APA "represents an ongoing policy that has significant prospective effect." *Id.* at 889. And as the Supreme Court reiterated recently, the fact that "setting aside" the NEH's unlawful action would result in the "disbursement of funds" from NEH to the Councils does not automatically transform Plaintiffs' APA challenge to the NEH's unlawful conduct into a claim for money damages. *See Dep't of Educ. v. California*, 604 U.S. 650, 651, (2025).

PAGE 26 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The source of Plaintiffs' remedies—i.e., the NEH authorizing statutes and the Constitution, not the terms of any contract—likewise forecloses the Tucker Act's application. As alleged in the Amended Complaint and found by the Court, Am. Compl. ¶ 130, P.I. Op. at 34, the termination and rescission decisions violate 20 U.S.C. § 956(f)(4)'s requirement for apportioning funds appropriated by Congress.  While the Tucker Act "impliedly forbids an APA action seeking injunctive and declaratory relief . . . if that action is a disguised breach-of-contract claim," Plaintiffs' claims do not rest on whether the terms of "any government contract" was breached.  *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 937–38 (9th Cir. 2025) (cleaned up).  At the preliminary injunction stage, Defendants raised no argument that Plaintiffs failed to comply with the terms of the grants, and Plaintiffs did not argue that any grant gave rise to their right for repayment.  *See generally* ECF Nos. 8, 31, 34.  As the Court explained, this case turns on the legality of Defendants' actions under "the U.S. Constitution (Separation of Powers, the Appropriations Clause, the Spending Clause, and the Take Care Clause) and statutes (the Act, APA, and ICA)," and not "on the terms of any agreements between [Plaintiffs] and the Government."  P.I. Op. at 46; *see also Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d 277, 296 (D.R.I. 2025) ("[T]he States' claims do not arise in any contract, but the APA—particularly its provisions forbidding arbitrary and capricious action . . . and the Constitution's . . . underlying separation of powers principles."); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 104–05 (D. Md. 2025) (challenge to mass termination of AmeriCorps programs arose under the APA, not the Tucker Act, because "[t]he grant terms are simply not relevant to this case at all").

**B.      The Grant Terminations Violated Separation of Powers**

Defendants violated the constitutional separation of powers by ignoring congressional directives to fund the Federal State Partnership.  They also blindly followed the Administration's policy instruction to apply an ideological lens at odds with the NFAHA, and in the process repurposed funds on which the Councils relied.  These actions fractured the Councils, ending sixty years of unbroken history during which both Republicans and Democrats, whether in the

PAGE 27 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Congress or the White House, funded and deployed the Councils to spread federal funds to enrich communities across America.

This Court has jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co.Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). The U.S. Constitution assigns the power of the purse solely to Congress, not the President. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018)). Congress also holds legislative power, not the President. U.S. Const. art. I, § 1. Nor can the President enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)). Instead, the President must ensure laws are faithfully executed. U.S. Const. art. II, § 3. In short, the President's authority must originate from Congress or the Constitution. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).

"[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of S.F.* at 1233–34 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Outside of the veto power, the President does not have authority to thwart congressional will by canceling appropriations passed by Congress. *Id*. at 1232. As then-Circuit Judge Kavanaugh explained, "a President sometimes has policy reasons. . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken County,* 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Thus, "[a]bsent congressional authorization, [an] Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F.*, 897 F.3d at 1235. As this Court has already observed, an Executive Order that so requires "violates the constitutional principle of the Separation of Powers." *Id*.

That is exactly what happened here: when the Trump Administration entered office, it published Executive Orders aimed at reducing spending at federal agencies and attempted to

PAGE 28 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

align agency priorities with those of the President on issues such as DEI, gender, and climate change.  None of the Executive Orders mention NEH.  Nevertheless, officials with DOGE and NEH sprang into action to implement the new Presidential priorities, with McDonald repeatedly stating that NEH's obligation was to follow the will of the Executive.

The justifications given to Councils along with the termination of their grants cited changing "agency priorities," as if the agency could unilaterally determine that the Federal State Partnership was not (or was no longer) a priority specifically directed by Congress.

Indeed, the explanations McDonald provided internally at NEH echoed this sentiment: "The termination notices to the [Councils] that came from NEH, as executed by the agency's DOGE team, informed [Councils] that the termination of their grants represented 'an urgent priority for the Administration,' and that NEH would be repurposing its funding allocations in a new direction 'in furtherance of the President's agenda.'" Sortun Decl., Ex. G (NEH_000642-643).  And when an NEH employee pushed back on the lack of termination procedures and asked how questions should be handled, McDonald responded, "I don't think we need to provide long (and obvious) explanations along the lines: there was a Presidential election, Presidential funding priorities have changed; NEH answers to the Chief Executive, therefore, etc."  Sortun Decl., Ex. G (NEH_000371).

These and other statements by McDonald and NEH illustrate that the President essentially cancelled congressional appropriations through use of DOGE, and that McDonald and NEH went along with that executive overreach.  McDonald previously testified that **nothing** in the statutes curtails his discretion to terminate grants, and he acted as such following the election of President Trump.  (Sortun Decl., Ex. C (McDonald *Thakur* Decl. ¶ 22)).

The Federal State Partnership exists because Congress wanted policy determinations about the humanities to be made at the *local* and *regional* level, with Congress expressly **prohibiting** federal officials from having a say in policy:  20 U.S.C. § 953(c), "Prohibition against Federal supervision over policy determination" reads, "In the administration of this subchapter no department, agency, officer, or employee of the United States shall exercise any

PAGE 29 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

direction, supervision, or control over the policy determination … of any … non-Federal agency, institution, organization, or association."  The Chairperson of NEH is also specifically directed by Congress to coordinate and develop programs *in cooperation* with the State humanities agencies. 20 U.S.C. § 956(d).  Hence, NEH's designation of the Federal State *Partnership*.

This Court has already concluded that the Chairperson's discretion *is* constrained when it comes to the Federal State Partnership:  "Congress deliberately solved the issue of how to divide appropriated funds by carefully considering at the time competing requests from the States and the administration," and Congress required that NEH fund the Federal State Partnership to "furnish *adequate* programs in the humanities in each of the several states."  PI Op. at 36.  Under the NFAHA, NEH *must* fund Councils. Its officials may not ignore Congressional appropriations to the Councils.

In addition, NEH also must permit Councils to use federal funds to advance the purposes of the agency—as outlined by Congress, not constrained by Executive Orders. Some of those purposes are delineated in § 956(c), which include a congressional mandate to, for example, "reach or reflect the diversity and richness of our American cultural heritage, including the culture of a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4).

In the termination process that played on in April 2025, the Councils were swept into the agency's attempt to apply the EOs, and later in DOGE's ChatGPT-enabled filtering of grants. The factual record demonstrates that agency and DOGE officials overrode Congressional directives on use of NEH moneys.  For example, several Councils were flagged as having "DEI" components in their **general operating support** grants, and others had Chairperson grants terminated for "DEI."  (*See discussion, supra* pp. 14-17.)

Finally, NEH was required by Congress to provide Councils with notice and opportunity to be heard prior to terminating grants.  Failing to do so by citing "exceptional circumstances" in termination letters when none existed is a further constitutional violation.  Indeed, and as discussed further below in the context of the APA, the termination letters also referenced an OMB regulation in stating that the Council grants "no longer effectuate[] the agency's needs and

PAGE 30 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

priorities and conditions of the Grant Agreement." ECF 11-1 at 2. Permitting an OMB regulation from the OMB Guidance for Federal Financial Assistance to veto Congressionally appropriated spending is a further violation of separation of powers.

McDonald, NEH, and DOGE did none of the things Congress required in April through June of 2025 in conjunction with the mass cancellation of Council grants. Instead, following Inauguration Day, McDonald followed all instruction received from the Administration, including cooperating with DOGE to cut off mandatory statutory funding to the Councils under the guise of "DEI" or "new agency priorities."

NEH claims it followed EOs in terminating grants, but the President cannot unilaterally refuse to spend funds. *City & Cnty. of S.F.*, 897 F.3d at 1232. NEH's refusal to follow congressional directives and its blind loyalty to the Executive Branch violates the Separation of Powers doctrine. The Executive Branch cannot rewrite the NEH statutes concerning the Councils or refuse to spend funds appropriated to them. *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

## C.     The Grant Terminations Violated the APA

Judicial review of agency action is governed by the APA. 5 U.S.C. § 706. A reviewing court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the Court should grant summary judgment on Plaintiffs' APA claims against NEH, McDonald, and the National Council ("NEH Defendants") because NEH Defendants undertook agency action contrary to law and because their actions were arbitrary and capricious.[15]

---

[15] Plaintiffs incorporate the APA arguments in support of their Motion for Preliminary Injunction. *See* Dkt. 8 at 26–32.

PAGE 31 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

###### i.      This Court Can and Should Consider Evidence Outside the Designated Administrative Record

Judicial review under the APA is generally limited to the administrative record that was before the agency at the time of its decision. *Lands Council v. Powell*, 395 F.3d 1019, 1029–1030 (9th Cir. 2005). However, courts consider extra-record evidence in limited circumstances: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Id.* at 1030 (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Svc.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

The presumption that the administrative record is complete for purposes of evaluating an APA claim may be overcome if a plaintiff can "(1) identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record, and (2) identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents that are likely to exist." *Audubon Soc'y of Portland v. Zinke*, 2017 WL 6376464, at *4 (D. Or. Dec. 12, 2017) (cleaned up) (citation omitted). The record should include "all documents and materials directly or *indirectly* considered by agency decision-makers." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citations omitted) (emphasis original).

Further, the *Lands Council* exceptions for consideration of extra-record evidence "operate to identify and plug holes in the administrative record," *Lands Council*, 395 F.3d at 1030, thus allowing this Court to consider documents the agency directly or indirectly relied on, as well as post-decision deposition testimony explaining agency decision-making. *See, e.g.*, *Harris v. United States*, 19 F.3d 1090, 1096 n.7 (5th Cir. 1994) ("administrative officials who participated in the action may explain their actions," even if explanation is outside the administrative record); *Simmons v. Jarvis*, 2016 WL 4742256, at *8–9 (D. Neb. Sept. 12, 2016), *aff'd sub nom. Simmons v. Smith*, 888 F.3d 994 (8th Cir. 2018) (agreeing to consider exhibits and transcripts from depositions taken years after the challenged action); *cf. Slockish v. United States*

PAGE 32 – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Fed. Highway Admin.*, 2020 WL 8617636, at \*25 (D. Or. Apr. 1, 2020), report and recommendation adopted in part, rejected in part sub nom. *Slockish v. Fed. Highway Admin.*, 2021 WL 683485 (D. Or. Feb. 21, 2021) (court did not consider extra-record deposition testimony on summary judgment "because the record sufficiently explains defendants' decisions" and the extra-record evidence would be duplicative).

Here, the facts and circumstances detailed above demonstrate that this Court can consider cited evidence outside of the AR when reviewing the grant terminations under the APA.

### ii.    The Challenged Agency Action is "Final" and is Not "Committed to Agency Discretion"

For an agency action to be reviewable under the APA, it must be "final." 5 U.S.C. § 704. As this Court has already found, at the time this suit was filed, the April 2025 terminations constituted final agency actions.  (PI at 49.)  Further, this Court also concluded that NEH's voluntary change in conduct following the filing of this lawsuit did not moot Plaintiffs' claims because the reduction in funding "marks the consummation of NEH's decision-making process and has legal consequences for Plaintiffs."  *Id*. at 50.

Further, administration action that is "committed to agency discretion by law" is exempt from judicial review. 5 U.S.C. § 701(a)(2). That is not the case here. This Court also previously concluded that NFAHA provides a mandate to NEH to fund the Federal/State Partnership, including providing a statutory formula for approved plans and requiring that funds shall be available to all approved plans as of the first of the fiscal year.  Thus, the Court already concluded that the grant termination decisions are reviewable.  PI Opinion at 51. Nothing has changed in this regard since the Court issued its preliminary injunction.

### iii.    The Grant Termination Policy Resulted in Unlawful Withholding and/or Unreasonable Delay of Agency Action

Under section 706(1) of the APA, a court must "compel agency action unlawfully withheld or unreasonably delayed" where an agency was "*required to take*" a "discrete agency action" but has not. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis

PAGE 33 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

original). An agency may have "unreasonably delayed" action even if it did not miss a "concrete deadline." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). To evaluate whether agency action is unreasonably delayed, courts in this circuit look to the guidelines in *Telecommunications Research & Action v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*").[16] *See Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997).

Here, there is no reasonable ground to dispute that NEH is required to award the FY 2025 and FY 2026 funds that Congress appropriated, and that the NEH Defendants themselves concede must be awarded. The *TRAC* considerations uniformly point to unreasonable delay here, and the Court should therefore grant summary judgment on Plaintiffs' Count I for relief under § 706(1).

### iv.    The NEH Defendants Acted Contrary to Law

The Administrative Record confirms what this Court has already found.  NEH Defendants acted contrary to law because (i) they entirely ignored the statutory process for grant suspensions or terminations; (ii) they failed to apply the statutory formulas and ignored Congressionally appropriated amounts; and (iii) by acting contrary to the requirements of the Impoundment Control Act.

/ / /

/ / /

---

[16] The-so called *TRAC* factors are: "(1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC,* 750 F.2d at 80 (cleaned up).

**Statutory Process for Grant Suspensions or Terminations**

The Administrative Record confirms that NEH did not believe it needed to comply with the NFAHA termination provisions because of the Executive Orders and the Administration's stated priority of defunding agencies.

As previously found by this Court, the purpose of § 967(f)(7) is to "provide a mechanism to terminate or suspend grants when a grant recipient is not in compliance with the Act, and to prevent that grant recipient from receiving any further funds (and potentially to have to repay funds), until the recipient as cured the noncompliance." PI Op. at 54. The Court also found that this section "applies when NEH rescinds funding allotted to the Federal/State Partnership." *Id*. at 55.

There is no dispute that NEH did not follow the statutory procedures when it terminated all the Councils' general operating support grants and other open grants. The explanation NEH gave in termination letters was that the Council grants "no longer effectuate[] the agency's needs and priorities and conditions of the Grant Agreement." ECF 11-1 at 2. This Court already concluded that section 956(f)(7), which specifically excludes other remedies for noncompliance, controls over the more general referenced regulation in the OMB Guidance for Federal Financial Assistance.

Finally, the OMB regulations allow agencies to terminate grant agreements "to the extent authorized by law." 2 C.F.R. § 200.340(a)(4). Here, NFAHA established the Councils as a primary funding priority which required stable funding to furnish "adequate" programs. PI Op. at 56. "[T]he Act does not authorize termination of grants without a finding that the grant recipient is not complying substantially with the requirements of the statute or the grant agreement or has diverted funds from the purposes for which they are allotted." *Id*. In short, the terminations were expressly *not* authorized by law.

For the same reasons Plaintiffs argued at the preliminary injunction stage and that the Court previously found in Plaintiffs' favor, the Court should grant Plaintiffs' Motion for Summary Judgment on this ground.

PAGE 35 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**Application of Statutory Formulas**

Likewise, for the same reasons the Court found Plaintiffs likely to succeed on their claim that NEH, McDonald, and the National Council were required to apply the formulas in § 956(f)(4), the Court should grant summary judgment. Nothing in the administrative record provides a reasoned explanation, let alone any explanation grounded in the statutes, for NEH's grant terminations in April 2025. NEH disregarded the statutory provisions governing distributions to councils and terminated the Council grants en masse under the pretext that the grants either involved subjects addressed in the EOs or because of the Administration's changing priorities.

Regarding the June 2025 so-called "Rescissions," NEH again failed to apply 956(f)(4). It appears that after this lawsuit began, the agency (without authority) in effect *de-obligated* $35 million in Congressionally appropriated funds for approved Council plans. Karen Kenton's May 2025 internal NEH memo describes the process:

> On March 15, 2025, President Trump signed the [2025 CR, Public Law 119-4] that provided $207 million to NEH. In [FY 2025] Congress appropriated $65 million, or approximately 43 percent of NEH's appropriation of program funds ($150M) to the [Office of Federal/State Partnership] to support the [Councils]….
>
> On April 2, 2025, all awards issued to the councils, including the two partial FY 2025 GOS awards, were terminated per the President's February 19, 2025, order, *Commencing the Reduction of the Federal Bureaucracy ...* **and the base percentage for the councils was reduced** from 40 percent, the norm for more than 20 years, to 20 percent.

Sortun Decl., Ex. G (NEH_000646) (emphasis added). This post hoc reduction (a) did not follow the grant termination requirements in the statutes as outlined above; (b) was not authorized by the National Council; and, (c) offered no justification for the agency's decision to ignore Congress's intent concerning the Federal State Partnership.

Essentially, in actively reducing the appropriation by half (from 40% to 20%), NEH terminated 50% of the funds obligated to the Councils by NEH's Office of Planning and Budget following Congressional appropriations. As above, the statutes provide mechanisms for NEH to terminate grant funding, none of which were followed here.

PAGE 36 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In addition, the National Council did not meet during the relevant timeframe (April through June 2025), meaning Defendants' significant reduction in funding to the Federal State Partnership could not have been reviewed by the National Council and McDonald could not have received advice from the Council on this issue.[17]  Under the statutes, the Chairperson of NEH "shall not approve or disapprove any such application [for funding by the Councils] until the Chairperson has received the recommendation of the Council."  *Id*. at § 957(f).  Further, "The Council shall … advise the Chairperson with respect to policies, programs, and procedures for carrying out the Chairperson's functions."  *Id*.

Finally, although this Court concluded that the $65 million appropriation in the Congressional record does not have the force of law, that does not mean NEH can entirely ignore Congressional intent. Indeed, the administrative record shows that NEH Defendants initially followed Congress's direction:  Karen Kenton noted that "$35 million [which was later terminated] …was budgeted for the state programs but not allocated now that the percentage changed from 40 to 20 percent." Sortun Decl., Ex. G (NEH_000645).  NEH does not have the authority under the statutes to relocate or divert funds meant for the Federal State Partnership to other uses like the Garden of American Heros and the "United States Triumphal Arch." That appears to be the direction NEH is taking.

For the same reasons Plaintiffs argued and the Court found Plaintiffs likely to succeed at the preliminary injunction stage, the Court should grant Plaintiffs' Motion for Summary Judgment on this ground.

## Violation of the Impoundment Control Act

For the same reasons included in the Court's Opinion and Order at the preliminary injunction phase, the Court should conclude on summary judgment that the conduct of NEH Defendants was contrary to the statutory mandates of the Impoundment Control Act.  Nothing in

---

[17] Meetings of the National Council are published on the Federal Register: https://www.federalregister.gov/agencies/national-endowment-for-the-humanities (last visited April 14, 2026).

the Administrative Record or the facts that have unfolded in the last eight months have changed

this analysis, and Plaintiffs adopt their prior arguments and incorporate them here.

### v.    The NEH, McDonald, and the National Council's Actions Were Arbitrary and Capricious

Federal agencies must engage in "reasoned decision making," *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019), and the APA directs courts to "set aside" agency actions that are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious when an agency:

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc, v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To survive arbitrary and capricious review, an agency must have articulated a satisfactory explanation for its action. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citing State Farm, 463 U.S. at 52, 43). Post hoc rationalizations cannot justify an agency's actions. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971).

A complete explanation behind the challenged determination in the administrative record is especially important where the agency decision was a change in course: "When an agency changes its position, it must (1) display awareness that it is changing position, (2) show the new policy is permissible under the statute, (3) believe the new policy is better, and (4) provide good reasons for the new policy." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (cleaned up). Indeed, if a "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must provide "a reasoned explanation. . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Further, under the "change-in-position doctrine . . . agencies are free to change their existing policies as long as they provide a

PAGE 38 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up).

The Administrative Record confirms the Court's prior conclusion that the NEH Defendants acted in an arbitrary and capricious manner in terminating the grants. The justification for slashing funds moved from one thing to another – at first, it was DEI or failure to comply with Presidential policy objectives, then it was anything deemed "wasteful," based entirely on the subjective impression of DOGE employees without government experience. In the end, however, McDonald entirely deferred to the DOGE team's blanket decision that all Biden-era grants should be cut, including all Council grants. The same DOGE team fed all NEH grants, including grants to the Council, into ChatGPT to identify grants that were "DEI" or "Crazy Grants" for cutting. (*See* Sortun Decl. Ex. A (Fox Dep. at 228:5-9; 229:2-10; 230:18-233:14)).

On April 1, 2025, McDonald wrote to DOGE that "in the interest of time, because we know you want to [move] quickly, we didn't give these applications [flagged for termination] the individualized consideration that we did to those in the first spreadsheet." Sortun Decl., Ex. G (NEH_000367). McDonald signed off on DOGE's final list by saying, "I don't have any questions or concerns." Sortun Decl., Ex. G (NEH_000365). Nowhere in the Administrative Record does McDonald, the former General Counsel of NEH, inform DOGE that Council funding is mandatory, acknowledge the requirement that any terminations must comply with the NEH enabling statute, or raise any concern that DOGE's across-the-board cuts flew in the face of congressional intent.

Nor is there a "reasoned explanation" for the May/June 2025 post hoc change that resulted in a significant reduction in previously awarded grants. The explanation given to the Councils in connection with revising the congressional appropriation from 40% to 20% was that the grants were out of line with new, "urgent" "agency priorities." At the time of the terminations, it was not clear what those urgent priorities were. By now the NEH Defendants

PAGE 39 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

have shown their hand, as they announced their intent to reallocate Federal State Partnership funds to the President's pet projects like the Garden of American Heroes and the America 250 events.  But they cannot repurpose money obligated to the Councils in this way for the reasons set out in the Separation of Powers section above.

Further, the brevity of the administrative record itself demonstrates that the NEH Defendants' actions were arbitrary and capricious. Because the administrative record must show that the agency connected the dots and include "a satisfactory explanation for [agency] action," *see State Farm*, 463 U.S. at 43, courts routinely vacate agency decisions where the administrative record was sparse or silent on the determination in question.  *See, e.g.*, *Washington v. U.S. Dep't of Transp.*, 2026 WL 183584, at *12 (W.D. Wash. Jan. 23, 2026) (freezing of electric vehicle formula funds was arbitrary and capricious where the administrative record included "no evidence of informed decision making" and relied upon a two-page letter that did not explain why "the retroactive revocation of all State Plan approvals and the categorical withholding of funds from obligation" was necessary); *Haaland*, 998 F.3d at 1068– 69 (Fish and Wildlife Service failed to adequately articulate its "about-face" from a prior determination on an endangered species listing where the "essential flaw" of the reversal determination was "its failure to offer more than a cursory explanation of why the findings underlying its 2011 Decision no longer apply"); *NAACP v. Trump*, 298 F. Supp. 3d 209, 239–40 (D.D.C.), *aff'd*, 591 U.S. 1 (2020) (rescission of DACA program was arbitrary and capricious where "scant legal reasoning" and "barebones" analysis in the AR failed to adequately explain the agency's determination).  Here, the sparse administrative record and apparent lack of reasoned decision-making—especially in light of a major change in agency policy—is itself evidence that the NEH Defendants' actions were arbitrary and capricious.

Finally, there is still no indication that the NEH Defendants considered the "serious reliance interests" that the Councils, the Federation, and the public all placed on steady NEH funding in general and in the 2025 NEH funding in particular.  This Court previously found that the NEH Defendants were required to specifically weigh reliance interests in deciding to change

PAGE 40 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

position from prior funding practice. Dkt. 39 at 63–64 (collecting cases). However, the Administrative Record demonstrates that the NEH Defendants did not consider the reliance interests of the Councils, the Federation, or other grant recipients, and the grant terminations were therefore arbitrary and capricious.

For those reasons, and those already identified by the Court in connection with the Preliminary Injunction Motion, the Court should grant summary judgment on Plaintiffs' APA claims.

> ### D.      This Court Should Impose Remedies Tailored to Redressing Defendants' Constitutional and Statutory Violations

The Court should enter three forms of relief to remedy the harms to Plaintiffs and the Federation's members caused by the unlawful grant terminations: a declaration that the terminations were unlawful, vacatur of the grant terminations resulting in reactivation of the cancelled grants, and a permanent injunction prohibiting Defendants from terminating the grants on the same unlawful bases and by the same unlawful means in the future.

First, the Court should enter a declaratory judgment that Defendants' termination of the Council grants violated the Constitution and the NFAHA. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. A declaratory judgment is appropriate when the declaration would "serve a useful purpose in clarifying and settling the legal relations in issue, and [] when it w[ould] terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *McGraw-Edison Co. v. Preformed Line Prods. Co.*, 362 F.2d 339, 342 (9th Cir. 1966) (citation omitted). "A 'declaratory judgment' is a 'binding adjudication that establishes the rights and other legal relations of the parties' where those rights are in doubt." *Burlington Ins. Co. v. Oceanic Design & Const., Inc.*, 383 F.3d 940, 952 (9th Cir. 2004) (quoting Black's Law Dictionary 7th ed. (1999)).

A declaration would serve a useful purpose here: it would clarify whether Defendants' past conduct in terminating the grants violated the Constitution and thereby give relief from uncertainty about whether Defendants may take similar actions in the future.

Second, the Court should vacate Defendants' grant termination policy which resulted in total or partial termination of the grants. "Where a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA." *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). Here, vacatur is necessary to restore Plaintiffs to the status quo before the terminations. *See City of Saint Paul v. Wright,* 2026 WL 88193, at *8 (D.D.C. Jan. 12, 2026) (vacating grant termination notices that violated the Fifth Amendment equal protection doctrine). Indeed, in *Saint Paul*, the government acknowledged that because the Court had "determined that DOE's grant termination decisions . . . were unlawful," the "appropriate remedy" was to "vacate th[o]se decisions." Defendants' Brief at 3, *City of Saint Paul v. Wright*, No. 25-cv-03899 (D.D.C. Feb. 13, 2026), ECF No. 31. As in *City of Saint Paul* and *President and Fellows of Harvard College v. U.S. Department of Health and Human Services*, the Court should vacate the terminations at issue. 798 F. Supp. 3d 77, 138 (D. Mass. 2025).

Third, the Court should enter a permanent injunction precluding Defendants from terminating the grants in the future on the same unlawful bases and in the same unlawful manner as they did in this case. Specifically, the Court should enjoin the NEH from using § 960 to alter the amount Congress appropriates to the Federal State Partnership. Vacatur alone is not enough. Although vacatur necessarily entails the reinstatement of grants that were wrongfully terminated either in whole or in part, it does not preclude Defendants from terminating the grants again, even immediately after reinstatement. Without a permanent injunction precluding that future unlawful conduct, Plaintiffs face a substantial risk that Defendants will re-terminate their awards. A permanent injunction is therefore necessary to afford complete relief from the constitutional violations established here.

Plaintiffs satisfy each of the factors supporting entry of a permanent injunction, as the Court's ruling on their Preliminary Injunction Motion affirms. *See* PI Op. at 64–68. "The

PAGE 42 –  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

standards for a permanent injunction are the same as a preliminary injunction, except the moving party must show actual success on the merits, instead of probable success on the merits." *Hells Canyon Pres. Council v. Jacoby*, 9 F. Supp. 2d 1216, 1245 (D. Or. 1998) (citing *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987)).  To establish the right to a permanent injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Without question, Plaintiffs are suffering irreparable injury both constitutional and financial. "[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011); *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) ("If a plaintiff . . . shows he is likely to prevail on the merits [of a claimed constitutional violation], that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation.").  The grant terminations here—carried out by the Executive to effectuate the President's priorities in the face of congressional purpose and funding to the contrary—violate the separation of powers doctrine and constitute a clear separation injury to the recipients of the cancelled grants.  *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017) (recognizing the infliction of "constitutional injuries by violating the separation of powers doctrine"), *aff'd in relevant part sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

Even if Plaintiffs were required to show more than constitutional harm, they have done so.  As the Court previously found, the record contains ample evidence of irreparable harm: reputational harm as Councils have reneged on their commitments to partner organizations; financial and operational harm through cancelled programs and lost staff; and practical harm to the ultimate recipients of the Councils' grants, who are unable to continue their work without the

PAGE 43 –   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

anticipated funds appropriated by Congress. PI. Op. at 64–67. Those harms are ongoing, as Oregon Humanities, the Federation, and the Federation's members have had to cancel or delay projects that were funded by the grants and lay off staff working on the projects. *See e.g.* Stein Dec.; Davis Dec. Nor are legal remedies, such as damages, adequate to remedy Plaintiffs' harms.

The balance of the equities and public interest likewise favor a permanent injunction for those reasons supporting imposition of a preliminary injunction in this case.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' Motion for Summary Judgment, declare that the terminations were unlawful, vacate the grant terminations leading to their reactivation, and enter a permanent injunction prohibiting Defendants from terminating the grants on the same unlawful bases and by the same unlawful means in the future.

DATED: April 17, 2026.

TONKON TORP LLP

By:    *s/ Anna Sortun*
          Anna Sortun, OSB No. 045279
            Direct: 503.802.2107
            Email: anna.sortun@tonkon.com
          Steven M. Wilker, OSB No. 911882
            Direct: 503.802.2040
            Email: steven.wilker@tonkon.com
          Paul Balmer, OSB No. 203429
            Direct: 503.802.5745
            Email: paul.balmer@tonkon.com
          Gracey Nagle, OSB No. 215255
            Direct: 503.802.5753
            Email: gracey.nagle@tonkon.com
          Thomas M. Twitchell, *pro hac vice*
            Direct: 503.802.5706
            Email: thomas.twitchell@tonkon.com
          *Attorneys for Plaintiffs*

099997\33304\19479617v7